# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In re PAYCOM SOFTWARE, INC. SECURITIES LITIGATION<br><br><br>This Document Relates to: All Actions | Master Case No. 5:23-cv-01019-F<br><br>CLASS ACTION<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ......................................................................... 1

II.    JURISDICTION AND VENUE .................................................................... 6

III.   PARTIES ...................................................................................................... 6

    A.    Lead Plaintiff .......................................................................................... 6

    B.    Defendants ............................................................................................... 7

    C.    Relevant Non-Parties .............................................................................. 8

IV.    FACTUAL BACKGROUND ...................................................................... 9

    A.    Paycom Offers Payroll, Tax Management, and Other Software Services
        Primarily to Small and Mid-Size Employers to Manage their Workforces .......... 9

    B.    Paycom's Revenue Growth Depends Upon Winning New Clients, Cross-Selling
        to Existing Clients, and Retaining Clients ........................................................ 12

    C.    Despite Identifying Numerous Risks from Introducing Beti that Would
        Negatively Impact Sales, Paycom Launches Beti to Improve Revenue
        Retention ......................................................................................................... 17

    D.    Defendant Richison Mandates that Paycom's Client Relations Representatives
        Focus on Selling Beti to Every Existing Client, Which Prevented CRRs From
        Cross-Selling Additional, Non-Payroll Applications and Caused an Increase in
        Client Attrition ................................................................................................. 22

        1.    To Overcome the Strong Opposition from Approximately One-Half of
            Paycom's Existing Clients Who Did Not Want to Adopt Beti, Defendants
            Require Paycom's CRRs to Force Beti Adoption by Including Beti in Every
            Cross-Selling Proposal, Making Many Clients Angry ................................. 23

        2.    As Beti Adoption Continues to Stagnate, Defendants Require CRRs to Help
            Clients Implement Beti and Threaten Termination If They Do Not Sell Beti to
            More Clients .............................................................................................. 26

        3.    Defendants Triple the CRRs' Commissions for Selling Beti, Further
            Diverting CRRs' Time Away From Cross-Selling Other Paycom Products .. 28

    E.    A Large Number of Existing Customers Who Are Unhappy with the Efforts to
        Force Beti on Them Terminate Paycom Payroll Services, Driving Up Customer
        Attrition ........................................................................................................... 30

    F.    Paycom's "Turn Team" Observes Paycom Is "Losing Tons of Clients" With the
        Number "Growing Every Day" But Delays Terminating These Accounts to

Avoid a "Big Hit to Paycom's Overall Customer Count" and to Conceal Declines in Revenue Retention .................................................................. 34

V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS THROUGHOUT THE CLASS PERIOD ..................................... 36

A.  February 8, 2022 FY 2021 Earnings Call.............................................. 36

B.  May 3, 2022 Q1 Earnings Call ............................................................. 56

C.  August 2, 2022 Q2 Earnings Call.......................................................... 68

D.  November 1, 2022 Q3 Earnings Call .................................................... 69

E.  November 30, 2022 Credit Suisse Conference ..................................... 73

F.  December 7, 2022 Barclays Conference ............................................... 77

G.  February 7, 2023 FY 2022 Earnings Call.............................................. 80

H.  May 2, 2023 Q1 Earnings Call ............................................................. 91

VI.  DEFENDANTS REVEAL THE TRUTH OVER MULTIPLE PARTIAL CORRECTIVE DISCLOSURES ................................................................... 95

A.  The 2023 Q2 Earnings Call on August 1, 2023.................................... 95

B.  The 2023 Q3 Earnings Call on October 31, 2023 ................................ 99

VII. POST-CLASS PERIOD EVENTS .................................................................. 105

A.  In December 2023, Defendants Further Admit that Client Relations Representatives Were Forcing Clients to Utilize Beti, Not Cross-Selling ........ 105

B.  In February 2024, Defendants Restate Paycom's Revenue Retention Metrics for 2022, Admitting that Paycom's Revenue Attrition Was Underreported and Revenue Retention Was Overstated Throughout the Class Period .................. 106

C.  During the June 4, 2024 Baird Conference, Defendant Richison Admits Existing Clients Resist Purchasing and Using Beti ....................................... 109

VIII. SCIENTER ....................................................................................................111

A.  Defendants Were Warned Prior to Beti's Launch that Beti Would Cannibalize Paycom's Unscheduled Revenues, Negatively Impact Paycom Employees' Ability to Cross-sell Additional, Non-Payroll Products, and Increase Client Attrition ........................................................................... 112

B.  Defendants Received Enormous Backlash from CRRs and Managers Who Complained that the Mandate for All Clients to Adopt Beti Was Destroying

Relationships with Client Accounts and Preventing CRRs from
Cross-Selling ................................................................................ 114

C. Defendant Richison Admits, and Confidential Witnesses Confirm, that
Defendant Richison Was Deeply Involved in the Details of Beti and the
Decisions to Push Beti on All Clients ............................................... 115

D. Defendants Admit Reviewing Weekly "Retention Reports" and Other Reports
throughout the Class Period that Showed Client Resistance and Revenue
Attrition from the Many Clients Who Opposed Being Forced to Adopt Beti .. 117

E. Defendants Admit Tracking KPIs and Reviewing "Months of Data" of Beti
Usage During the Class Period that Showed Beti Cannibalizing Paycom's
Revenues ....................................................................................... 119

F. Defendant Richison Instructed Paycom's Turn Team to Delay Removing Lost
Clients from Reported Revenue Retention and Customer Counts, Resulting in a
Restatement of Revenue Retention in 2024 ....................................... 123

G. Defendants Were Motivated by Equity-Based Awards to Inflate Paycom's Stock
Price and Maintain the Appearance of a High Revenue Retention Rate ........... 124

IX. LOSS CAUSATION AND ECONOMIC LOSS .......................................... 125

A. August 1, 2023 Disclosure ................................................................. 126

B. October 31, 2023 Disclosure .............................................................. 130

X. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON
THE MARKET ...................................................................................... 134

XI. NO SAFE HARBOR ............................................................................... 136

XII. CLASS ACTION ALLEGATIONS ......................................................... 137

XIII. COUNTS .............................................................................................. 139

Count I ..................................................................................................... 139

Count II .................................................................................................... 140

XIV. PRAYER FOR RELIEF ......................................................................... 142

XV. JURY DEMAND .................................................................................... 142

1.      Lead Plaintiff, Dr. Calvin Mein ("Lead Plaintiff" or "Plaintiff") brings this class action pursuant Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), individually and on behalf of himself and all persons and entities similarly situated, other than Defendants (defined at Section III.B., *infra*), who purchased or otherwise acquired Paycom Software, Inc. ("Paycom") securities between February 8, 2022 and October 31, 2023, inclusive (the "Class Period").

2.      Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of his undersigned attorneys ("Lead Counsel"), which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding Paycom; (ii) Defendants' other public statements, including transcripts of interviews and calls Defendants participated in; (iii) interviews with individuals who are former employees of Paycom ("Confidential Witnesses" or "CWs"); (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Paycom and the industry in which the Company operates; and (v) pertinent court filings.

## I.    NATURE OF THE ACTION

3.      Paycom is a software-as-a-service ("SAAS") company that offers payroll and human capital management services to small and mid-size employers. As is common

among SAAS businesses, Paycom's revenue growth is critically dependent on the Company's ability to retain clients.

4.    To improve Paycom's ability to retain clients and increase revenues, Paycom developed a new way of processing payroll in which a client's employee reviewed the payroll before it was processed, allowing the employee to catch any errors before Paycom ran the payroll. Richison called this new software service "Beti"—an acronym for the "Better Employee Transaction Interface." Defendant Richison theorized that employee review of a client's payroll, before it was processed by Paycom, would provide great value to the client by reducing payroll errors, saving the client time and money. In short, Beti was designed to create the "perfect payroll" for clients by increasing client satisfaction, thereby improving Paycom's revenue retention rate and increasing Paycom's market share as the Company retained more and more clients.

5.    In conjunction with launching Beti in July 2021, Defendant Richison mandated to Paycom's field sales teams that all new customers were required to purchase Beti and no sale of Paycom's products could be made to a new customer unless it included Beti. Defendant Richison gave a similar mandate to Paycom's Client Relations Representatives ("CRRs") whose job was to "cross-sell" or "upsell" Paycom's additional, non-payroll products to existing clients. Defendant Richison mandated that all existing customers needed to be sold Beti by the end of 2021 and required that no cross-selling could occur unless the deal with the existing client included Beti.

6.    According to confidential witnesses, by September 2021, shortly after Paycom launched Beti, Paycom's CRRs began complaining to management that forcing

2

existing customers to purchase Beti was destroying CRRs' relationships with clients, thereby preventing CRRs from generating revenue from cross-selling non-payroll products, and ultimately driving clients away from Paycom. But Defendant Richison insisted that Beti was the future of Paycom and remained steadfast in the attitude that "if a customer doesn't want to automate their payroll [by adopting Beti] then we don't want them—we know what's best for them," which was not disclosed to investors.

7.    Despite "enormous backlash" from existing customers as reported by the CRRs, Defendants continued for months to insist that CRRs needed to sell more Beti to more of Paycom's existing client base. Beginning around August 2022, after Beti sales to existing customers had stagnated for months, Defendants began threatening CRRs with termination if they did not sell more Beti. Indeed, even if a CRR was meeting 100% of other cross-selling quotas, if the CRR failed to sell the required amount of Beti, the CRR was at risk of being fired.

8.    Making matters worse, and further reducing CRRs cross-selling opportunities, the Defendants required the CRRs to not only sell Beti to every client, but to help the clients implement and use Beti, which required days of training and significant changes to clients' internal processes. Paycom tracked the clients' usage of Beti and held the CRRs responsible for the usage metrics. In essence, the Defendants expected the CRRs—whose traditional role was exclusively to cross-sell non-payroll products—to force clients to purchase, implement, and use a new product that the clients did not even want.

9.    Nonetheless, client adoption of Beti continued to stall. By August 2022, more than a year after the product's launch, only approximately 40% of Paycom's existing clients

had implemented or were in the process of implementing Beti. Several months later, in November 2022, that number had only risen to about 50%. Thus, attempting to further incent CRRs to push Beti upon existing clients, around December 2022, Defendant Richison tripled the commissions for CRRs who sold Beti to make up for commissions they were losing from being unable to cross-sell because Beti implementation was taking up half their work time. But even the greater commissions could not overcome existing clients' opposition to being forced to purchase and use Beti, and six months later, in June 2023, Paycom's client adoption rate of Beti still remained around 50% of existing clients.

10.    Defendants knew that Beti was having a severe, negative impact on Paycom's revenue growth by destroying cross-selling opportunities, cannibalizing a portion of the Company's unscheduled revenues from billable corrections, and driving clients away from Paycom, because: (1) Defendants were warned of these risks before launching Beti; (2) there was an "enormous backlash" amongst the client-facing CRRs who informed the Defendants of the negative impacts of pushing Beti onto every existing client; (3) the Defendants regularly received and reviewed Retention Reports, Usage Reports, SaveOps Reports, and Lost Clients Reports that showed customer attrition was rising prior to and throughout the Class Period as a result of having Beti forced on them; and (4) the Defendants reviewed months of data of Beti usage that demonstrated Beti was cannibalizing a portion of Paycom's revenues. Defendants were motivated to push Beti because Beti garnered a higher client retention among those clients that adopted it and Defendants' equity-based compensation increased by maintaining a favorable revenue retention rate.

11.    Despite the Defendants' knowledge throughout the Class Period about the negative effects Beti was having on Paycom's business and operations, Defendants told investors, *inter alia*, that: Paycom's cross-selling remained "very consistent" and that the Company "always had a healthy upsell to current clients"; that Beti represented an "incremental increase in revenue opportunity" that was exclusively "accretive" to Paycom's revenues; and that the Company was "seeing a lot of satisfaction across the client base" throughout the Beti push, such that retention was "equal to or improved" over the prior year and Defendants expected "retention to continue to rise as a larger percent of [their] current client base deploys Beti."

12.    The truth was revealed over two partially corrective disclosures—one on August 1, 2023 and one on October 31, 2023—revealing that: (i) Beti was cannibalizing a portion of Paycom's revenues by eliminating revenue from extra payrolls that were run to correct client errors; (ii) cross-selling revenues had significantly declined as CRRs were focusing on selling and implementing Beti instead of upselling Paycom's non-payroll products; and (iii) client attrition was increasing as angry clients who did not want Beti left Paycom. As a result of these disclosures, Paycom's stock price plummeted from $370.78 per share on August 1, 2023 to close at $150.69 per share on November 1, 2023, representing a total drop of nearly 60% and a $12.2 billion loss in market capitalization across the two disclosures on unusually high trading volumes, causing investors' losses.

13.    On February 7, 2024, shortly after the Class Period, Paycom disclosed that it would be restating its annual revenue retention rate for 2022 because Defendants had been improperly including clients who had left Paycom in the annual retention calculation.

14.    Plaintiff now seeks relief, for himself and for a Class of similarly situated investors, from the fraud that was perpetrated by Defendants.

## II.    JURISDICTION AND VENUE

15.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Paycom is headquartered in Oklahoma City, OK in this District.

## III.    PARTIES

### A.    Lead Plaintiff

19.    Lead Plaintiff Dr. Calvin Mein resides in San Antonio, Texas. He is a Doctor of Medicine and is currently employed as an Ophthalmologist and Retinal Specialist at Retina Consultants of Texas. Lead Plaintiff purchased or otherwise acquired PAYC securities during the Class Period and has been damaged thereby.

**B.    Defendants**

20.    Defendant Paycom Software, Inc. provides cloud-based human resources and payroll functions it refers to as "human capital management" solutions. Defendant Paycom is incorporated in Delaware. The Company's headquarters is located at 7501 W. Memorial Road, Oklahoma City, OK 73142. Paycom common stock was listed and traded on the New York Stock Exchange ("NYSE"), an efficient market, throughout the Class Period under the ticker symbol "PAYC." As of February 8, 2022, and October 24, 2023, there were more than 60 million shares of Paycom common stock issued and outstanding.

21.    Defendant Chad Richison ("Richison") is, and was at all relevant times, Paycom's founder, President, Chief Executive Officer ("CEO"), and Chairman of its Board of Directors.

22.    Defendant Craig E. Boelte ("Boelte") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Paycom.

23.    Defendants Richison and Boelte are collectively referred to hereinafter as the "Individual Defendants" and, together with Paycom, comprise the "Defendants." The Individual Defendants, because of their positions with Paycom, possessed the power and authority to control the contents of the Company's filings with the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and investors. Each of the Individual Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information

available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### C.    Relevant Non-Parties

24.    CW1 worked at Paycom as a Team Lead of Billing from September 2020 to July 2023, then as a Team Lead of Revenue Accounting until March 2024.  As a Team Lead of Billing, CW1 ensured the accuracy of billing items in order to reduce risk in potential audits. CW1's job responsibilities remained relatively the same as a Team Lead of Revenue Accounting.  CW1 resolved billing errors and worked to improve billing accuracy for reporting and audit purposes. CW1 reported to Billing Supervisor Michelle Crowell, who reported to Billing Manager Kyle Winston. Winston reported to Controller Cory Dowers, who reported to Defendant Craig Boelte.

25.    CW2 joined Paycom several years before the Class Period began and was a Sales Manager at all relevant times until leaving the Company in the last half of 2023. CW2 first became familiar with Beti before the product's launch in July 2021, and in October 2021, CW2 worked under Chief Sales Officer ("CSO") Holly Faurot to help push Beti to clients nationwide.

26.    CW3 was employed at Paycom from March 2020 through March 2022 as a Client Support Specialist, and from March 2022 through September 2022 as a Sales Operations Strategist. As a Client Support Specialist, CW3 provided new clients with assistance as they implemented Paycom's products. As a Sales Operations Strategist, CW3

prepared a package of Companywide reports to be used in high-level meetings held every Thursday involving the CEO and CSO. Those reports included a Lost Clients Report and a Save Opportunities Report. In the Sales Operations Strategist Role, CW3 reported to Casamere McGhee, who reported to Mike Crowder, who reported to Chief Sales Officer Holly Faurot.

27.    CW4 worked as a Client Relations Representative, a Transition Specialist Representative, and a Senior Transition Specialist for several years prior to the beginning of the Class Period. CW4 left Paycom in early 2022. In the Transition Specialist roles, CW4 worked on implementing Paycom's software with the Company's new clients, including Beti once it launched in mid-2021.

## IV.    FACTUAL BACKGROUND

### A.    Paycom Offers Payroll, Tax Management, and Other Software Services Primarily to Small and Mid-Size Employers to Manage their Workforces

28.    Defendant Paycom is a SaaS company that was founded in 1998 and debuted on the NYSE in 2014. Paycom offers comprehensive, cloud-based, human capital management ("HCM") services and software designed to enable companies to manage the complete employment lifecycle, from recruitment to retirement.

29.    Paycom offers a suite of software modules—a total of 29 during the Class Period—and tools designed to streamline common HCM processes and reduce client payroll costs. These applications fall into five general categories: talent acquisition, time and labor management, payroll, talent management, and HR management, and include tools such as "Enhanced Background Checks" to help clients easily screen prospective new

hires, and "Labor Allocation," which simplifies the process of setting up and tracking employee hours.

30.     Each of Paycom's 29 modules is a separate tool designed to address a specific area of HCM. While these applications are sold in customizable packages, all packages sold to customers *must* include Paycom's primary module, which is payroll. As Paycom explained in its annual SEC filing for 2021: "Our payroll application is the foundation of our solution and all of our clients are required to utilize this application in order to access our other applications."

31.     Paycom sells its software services through three types of sales personnel. First, Paycom has an inside sales force that responds to inbound sales calls from small businesses with less than 50 employees. Paycom represents in its public filings that only about 5% of Paycom's revenues are generated from clients with less than 50 employees. Second, Paycom has field sales personnel who target new clients with 50 to 10,000 employees. However, in August 2023, Paycom announced that it would begin targeting new clients with more than 10,000 employees.

32.     Third, Paycom also has a team of Client Relations Representatives (CRRs) that work with client accounts after the client begins using the Company's payroll software to "cross-sell" or "upsell" additional modules to those existing clients, thus increasing the amount of revenue Paycom earned from existing clients. Historically, after a new client was brought on to Paycom's services, CRRs would then inherit the account for the purpose of cross-selling the client Paycom's additional, non-payroll software modules. Throughout the Class Period, Paycom employed approximately 275 CRRs.

33.     In Paycom's annual filing on Form 10-K for the year ended December 31, 2021, filed with the SEC on February 17, 2022 (the "2021 Form 10-K"), Paycom explained that it charges its clients "on a per-employee basis for certain services we provide." Thus, Paycom's revenues are impacted both by the active headcount of its client base and the number of transactions Paycom processes on behalf of a client. In other words, Paycom charges for its products based on the number of a client's active employees. For example, if a Paycom client was a small business with 100 active employees, and if that client's "software cost" was $3.00 per paycheck per employee, it would cost that client $300 to run each payroll using Paycom's software, in addition to the base fee Paycom charged the client for each module.

34.     Notably, given Paycom earns revenue based on the number of transactions it processes for a client, Paycom earns additional revenue when client errors require additional transactions to correct the errors. These revenues are referred to herein as "unscheduled revenues" and include running off-cycle payrolls that deviate from the typical payroll cycle, including processing bonuses and commissions, and correcting payroll errors such as when a client's employee is underpaid or overpaid and needs their paycheck corrected.

35.     CW1, an employee in Paycom's billing department for three and a half years ended March 2024, recalled that a "fairly big" portion of Paycom's revenues came from unscheduled items. Defendant Boelte stated in the 2023 Q4 Earnings Call on February 7, 2024 that Paycom's revenues arising from unscheduled or off-cycle payroll runs required

to correct client errors ("unscheduled revenues from billable corrections") comprise about 5% of Paycom's revenues.

36.     In its public filings, Paycom has only one reporting segment. In other words, Paycom does not separately report sales generated by field sales, inside sales, and CRR sales, or what percentage of total revenues are attributable to the CRRs' cross-selling of non-payroll applications to existing clients, as opposed to revenues attributable to inside sales and field sales of Paycom's primary payroll applications. CW2, a Sales Manager from prior to the Class Period through the latter half of 2023, estimated—based on figures CW2 learned from weekly, Companywide national sales calls—that CRRs generated an average of 20–25% of revenues at Paycom each week from cross-selling, and recalled that on at least one weekly call, CW2 heard that CRRs had generated as much revenue as the field sales team that week.

## B.     Paycom's Revenue Growth Depends Upon Winning New Clients, Cross-Selling to Existing Clients, and Retaining Clients

37.     For a decade immediately preceding the Class Period, Paycom reported year-over-year ("YOY") revenue growth each quarter of, on average, more than 30%. Throughout the Class Period, the Defendants continued to report similar results and expectations for future results.

38.     Importantly, Paycom's ability to maintain such a high rate of revenue growth depended on Paycom's ability to win new clients, cross-sell to existing clients, and retain existing clients.

39.     Retaining existing clients was essential to Paycom's growth, as Paycom could not grow its quarterly revenues if the Company's sales to new clients and existing clients were outweighed by a failure to retain existing clients. Retaining clients also allowed Paycom to cross-sell additional services after clients were onboarded and using Paycom's systems. Indeed, Paycom's Sales Operations team would routinely provide the retention rates of the CRRs—who were responsible for cross-selling—to the CRRs' managers, so that the managers could work with the CRRs to better retain clients.

40.     Paycom reported its annual revenue retention and customer retention rates to investors only once per year, in February when the Company announced its full-year financial results for the most recent year. Prior to, and throughout the Class Period, Paycom reported revenue retention figures of 93%, 94%, and 93% for fiscal years 2020, 2021, and 2022, respectively. *See* Figure 1.

**Figure 1**

| Fiscal Year | No. of Customers (as of Dec. 31) | Rev. Retention Rate (v. prior year) |
|---|---|---|
| 2018 | 23,500 | 92% |
| 2019 | 26,500 | 93% |
| 2020 | 31,000 | 93% |
| 2021 | 33,900 | 94% |
| 2022 | 36,600 | 93% |

41.     Annual revenue retention was important to Paycom's management, including the Individual Defendants. During a May 4, 2021 earnings call, Defendant Richison admitted receiving and reviewing Retention Reports and thereby knowing the trends in Paycom's revenue retention, stating: "In fact, someone gave me a retention report the other

day, and I thought it was a usage report because the trends are almost the exact same. You watch usage go up, you watch retention go up. And so that's really what we've been seeing as a reflection of strong retention, it's about usage." Later, during a June 1, 2021 conference held by securities research firm Cowen and Company ("Cowen"), Defendant Richison admitted that Paycom had been tracking retention "the same way since 2007," and expressed his understanding of how retention was calculated.

42.    To better understand Paycom's retention performance, Defendant Richison requested the Lost Clients Report every week, which reported the number of clients Paycom lost that week and the reasons why those clients had stopped using Paycom's services. This data was fed by CRRs to their sales managers, who sent it up the reporting chain to be aggregated into a single Lost Clients Report that was then sent on to Chief Sales Officer Holly Faurot and Defendant Richison. Similarly, Paycom CRRs helped generate a weekly "Save Opportunities Report" or "SaveOps Report," which showed whether clients were still using Paycom services, and included the clients' last scheduled payroll run dates. CRRs worked to "save" such clients before they ended up on the Lost Clients Report.

43.    CW3 confirmed that throughout CW3's tenure, CW3 sent Paycom's executives and sales Vice Presidents ("VPs") a package of reports each Thursday, in advance of high-level meetings, which included the Lost Clients Report and the Save Opportunities Report. CW3 personally created this package by retrieving data stored in Paycom's CRM and Power BI and inputting the data into an Excel spreadsheet, which contained macros that made the data viewable and readable by the executives who received

the reports. CW3 stated that the purpose of the weekly reporting package was to keep the executives informed on how the Company was performing.

44.    CW3 recalled that in addition to providing the executives and sales VPs with the reports in electronic format, some of the reports were also printed and hand delivered to Chief Sales Officer Faurot. CW3 described the Thursday reports as one of the most important aspects of CW3's job, and stated that it was imperative that the reporting package get delivered to the executives and VPs for their weekly meetings every Thursday. CW3 confirmed that the reporting package for Thursday meetings had been prepared and sent by a senior colleague prior to CW3 stepping into the Sales Operations Strategist Role in March 2022.

45.    CW2, a Sales Manager, corroborated that Defendant Richison regularly reviewed the Lost Clients and SaveOps Reports in meetings. CW4 echoed CW3's statements that the Lost Clients Report was a very important report within Paycom, that both the Lost Clients and SaveOps Reports were circulated within Paycom at least monthly, and that such information was also readily-available through Paycom's software systems. Thus, Defendants had access to the Lost Clients and SaveOps Reports and underlying data at all times throughout the Class Period. Indeed, Richison and Holly Faurot reviewed every client that left Paycom during the Class Period by way of the Lost Clients Report. CW4 knew that Defendant Richison reviewed the Lost Clients Report because CW4 recalled Richison making reference to one of CW4's clients, who had appeared on the Report in 2021.

46.    CW2 added that, when a Paycom client stops processing payroll with the Company—as signaled by missing their first payroll with Paycom—sales personnel would then act quickly to try and win the client back. CW2 described that when a client missed a payroll that had been expected to be processed, everybody on the sales accounts and service teams were notified, and it became a drop everything situation to try to re-sell the client on Paycom before losing them to a competitor. CW4 also recalled receiving emails whenever a client was added to the SaveOps Report, and that Paycom management was copied on these emails depending on the size of the client.

47.    Paycom's annual revenue retention was also important to investors and securities analysts who followed the Company and often reported on this metric. For example, in a February 9, 2022 report, Morningstar Research Services, LLC ("Morningstar") wrote that Paycom was positioned for future growth, specifically noting that "Paycom has enjoyed steady improvement in revenue retention." Morningstar attributed Paycom's record revenue retention rate of 94% to "the continued roll out of self-service payroll software Beti and associated modules that are now included for all new clients[.]" Similarly, a February 9, 2022 report from Barclays Bank PLC ("Barclays") outlining Paycom's "strong Q4" results noted the Company's "[a]nnual revenue retention increased to a record 94%" as a factor underlying Barclays' decision to maintain Paycom's positive rating.

48.    Historically, Paycom's calculation for determining its reported annual revenue retention rate ("ARRR") was:

**((*Total Revenue – Revenue Attrition*) / *Total Revenue*)**

49.    Paycom defined "Attrition" as the fees paid by a former client during the 12 months preceding date of the client's last payroll processing with Paycom.

50.    Unbeknownst to investors throughout the Class Period, clients who stopped using Paycom to process their payrolls were not necessarily or automatically included as part of the Attrition that was used to calculate Paycom's revenue retention rate. Rather, those former clients were only included in the calculations after Paycom's internal teams deemed them to be "lost" clients. Thus, even if a client had ceased using Paycom's services many months earlier, that former client would not impact the revenue retention rate until Paycom manually deemed that client a "lost" client.

**C.    Despite Identifying Numerous Risks from Introducing Beti that Would Negatively Impact Sales, Paycom Launches Beti to Improve Revenue Retention**

51.    On February 10, 2021, Defendant Richison announced that Paycom would be launching a new module called "Beti"—an acronym for "better employee transaction interface"—that would purportedly "provide our clients with a better employee transaction interface for payroll." Beti was Richison's baby and his vision was for Paycom's entire client base to be on Beti.

52.    According to Richison, Beti created the perfect payroll by giving employees full insight into their paychecks, including advanced knowledge of take-home pay and how its calculated, allowing employees to resolve payroll errors well before payroll is run on payday. Prior to and throughout the Class Period, Defendant Richison remained steadfast in his directive that "everything is about Beti. … I tell our salespeople all the time. [']Look,

if you can't get someone to understand the benefits and value of Beti to their organization … I don't have anything else for you to sell.[']" Defendant Richison explained that this new payroll application would be rolled out to the market in July 2021.

53.    In April 2021, prior to the launch of Beti in July 2021, Paycom's leadership established a team (the "Beti go-to-market team") of approximately twenty to twenty-five individuals to ensure the go-to-market launch of Beti was successful and optimized by identifying risks and other key considerations related to the launch of Beti.

54.    One of the risks the team discussed was the potential financial impact Beti would have in eliminating revenues from "billable corrections," as Beti was expected to create "perfect payrolls" and thereby eliminate the need to re-run payroll or correct client mistakes after payroll had been processed. Billable corrections represented a form of off-cycle payroll, and the Beti team recognized that Paycom makes money on off-cycle payrolls. CW4 was not a member of the Beti go-to-market team, yet likewise confirmed that, as a former Paycom employee, "we know how expensive it is for clients [to run] off-cycle payroll," adding that Beti came with a "promise" to clients that it would reduce the number of off-cycle payroll runs. CW4 explained that revenues from off-cycle payroll runs were a significant portion of Paycom's revenues.

55.    Another risk that the Beti go-to-market team identified was that Beti represented so much change for existing clients that some might not want to adopt it at all. In contrast to Richison's public statements that Paycom would begin including Beti for all *new* clients starting in July 2021, the Beti go-to-market team understood that some *existing*

Paycom customers would be resistant to changing to Beti, especially when it affected clients' payroll processes and clients' employees.

56.    Despite the Beti go-to-market team identifying the revenue impact that the risk of client attrition represented, Richison maintained the attitude that Paycom didn't want customers who were unwilling to adopt Beti, even stating internally that "if a customer doesn't want to automate their payroll by adopting Beti then we don't want them—we know what's best for them." In other words, Defendant Richison was willing to lose clients (and their revenues) that were not willing to implement and use Beti. Indeed, CW4 stated that it was commonly known *within* Paycom that if a client did not want to use Paycom's products as Paycom had designed them and intended them to be used, that it was acceptable to Paycom management to let these clients go.

57.    Moreover, the Beti go-to-market team also discussed at length prior to Beti's launch that the CRR and Paycom Service Department ("PSD")[1] groups were so slammed and busy that it would be difficult for these teams to find time to sell Beti and/or do implementations for the product once it did launch. Getting existing customers to switch to Beti would require the CRR and PSD groups to change their internal processes. CRR's argued that it was their job to cross-sell and they should not be responsible for Beti implementations.

58.    Members of the Beti go-to-market team briefed Shelly Ballew and Dickens Aubourg, Director of Product Management, on the financial impact Beti would have on

---

[1] The PSD's primary role is to provide customer service and support to existing Paycom clients.

Paycom prior to when Paycom launched Beti. Shelly Ballew had been asked by Chad Richison to take on Beti, so after Ballew and Aubourg were briefed by the go-to-market team, the pair would meet with Defendant Richison to discuss the risks that had been identified by the Beti go-to-market team.

59.     In addition to Paycom's creation of the Beti go-to-market team, CW3 recalled that Paycom conducted beta-testing of Beti prior to its July 2021 release.

60.     Despite the internal recognition of risks associated with Beti, Paycom pushed forward with the launch of Beti and on May 4, 2021, during Paycom's 2021 Q1 Earnings Call, Defendant Richison informed investors that Beti had been rolled out "to a select few clients during the quarter" and expressed that "over the next 12 to 18 months Beti will become the standard for how payroll should be done."

61.     On June 1, 2021, at the Cowen 49th Annual Technology […] Conference, during a Paycom presentation, Defendant Richison announced that Paycom expected at least 100 Paycom clients to adopt Beti during the second quarter of 2021 (*i.e.,* April 1 to June 30) and that he expected "to open [Beti] up to all clients by July."

62.     In a July 6, 2021 press release entitled "Paycom Launches Beti, an Industry-First Employee-Driven Payroll Solution" (the "July 6, 2021 Press Release"), Paycom announced the official release of Beti, which it described as "an enhancement" to the Company's existing payroll applications that allows employees to manage their own payroll, including their timecards, expenses, PTO requests and benefits, in a process called "self-service payroll." The Company further claimed that Beti streamlines the payroll

process, increases efficiencies, reduces errors, and eliminates "imperfect and time-consuming process[es] for HR and payroll staff members."

63.    On August 3, 2021, during Paycom's 2021 Q2 Earnings Call, Defendant Richison informed investors that Paycom had exceeded its previously-stated goal of selling Beti to 100 clients in Q2 of 2021:

> I'm very pleased with the launch so far. We are receiving tremendous feedback… As we said during our Q1 earnings call, we are planning to have 100 pilot clients on Beti in the second quarter, and we easily achieved that goal. On July 6, we opened up Beti to all clients. And through the end of July, we've already sold Beti to over 1,000 new and existing clients. I continue to expect that all Paycom clients will eventually deploy Beti. It's the only way payroll should be done.

64.    Importantly, during the question-and-answer portion of the 2021 Q2 Earnings Call, Defendant Richison explained that Paycom would now require *all* new customers to purchase Beti for an additional fee by including Beti in every quote to new customers:

> [A]s we're selling new -- onboarding new clients now, Beti is a part of that. And so our sales reps, **Beti comes with the payroll package now. It is an additional fee for that, but it is included on *every* quote moving forward for new businesses** as we believe this is the way businesses win and achieve their return on investment with our product as it relates to the payroll side of what we do.[2]

65.    Then, during the December 7, 2021 Barclays Global Technology, Media and Telecommunications Conference, Richison again specified that Beti had been included in all quotes to new customers since July 2021:

> For new clients since July of this year, our system has quoted Beti as part of our solution for anyone that has received a quote from Paycom since July. So

---

[2] Emphasis added unless otherwise noted.

for those clients, it's not as much about talking them into changing their processes so that Beti works for them, because that was a part of the sales process all along.

**D. Defendant Richison Mandates that Paycom's Client Relations Representatives Focus on Selling Beti to Every Existing Client, Which Prevented CRRs From Cross-Selling Additional, Non-Payroll Applications and Caused an Increase in Client Attrition**

66.    Beginning in June 2021, all of Paycom's CRR sales teams were told by Defendant Richison and Chief Sales Officer Holly Faurot that every existing client needed to be signed with Beti by the end of 2021. Defendant Richison told investors, in response to a securities analyst's question during the September 15, 2021 Jefferies Virtual Software Conference, that rather than waiting to sell Beti to existing clients "at renewal" after their current contract expires in "another 12 to 24 months," Paycom was instead seeking to convert all existing clients to Beti immediately, stating: "Today. We're going out [to sell Beti] to all clients today."

67.    However, the Defendants did not inform investors that Paycom's CRR sales teams—whose traditional role was only cross-selling non-payroll products—would not be focused on cross-selling other Paycom products anymore because they were now under a mandate to get every existing client to adopt Beti. This mandate that CRRs sell Beti to every existing client persisted throughout the Class Period.

68.    CW2 corroborated that CRRs became required to sell Beti with all cross-sales. CW4, a Transition Specialist Representative who worked with new customers to implement Paycom software, similarly affirmed that once it launched, Beti was being pushed to all existing clients. Furthermore, CW4 recalled Paycom's goal was to get

22

customers to 100% utilization of Beti (*i.e.*, to get all of the customer's employees to use Beti), so as to reduce customers' payroll-related errors.

69.    Unbeknownst to investors, however, approximately one half of Paycom's existing clients were opposed to buying and using Beti, a risk that Defendant Richison had been warned of prior to Beti's July 2021 launch and a fact which Richson was made aware of whilst CRRs tried, often unsuccessfully, to cross-sell Beti.

    1.    <u>To Overcome the Strong Opposition from Approximately One-Half of Paycom's Existing Clients Who Did Not Want to Adopt Beti, Defendants Require Paycom's CRRs to Force Beti Adoption by Including Beti in Every Cross-Selling Proposal, Making Many Clients Angry</u>

70.    Initially, in 2021, Defendants' mandate that CRRs sell Beti to every existing client was not enforced with any penalty or incentive for the CRRs, and client adoption of Beti was very slow. Existing customers were highly resistant to adopting Beti due to the additional cost and effort to convert their systems. Indeed, nearly a full year after Beti was first introduced in July 2021, by Defendant Richison's own admission, only approximately 25% of Paycom's customers had adopted Beti—meaning it was still necessary to upsell nearly 75% of Paycom's client portfolio on Beti. Vice President of Client Relations, Kyle Supak, was shocked at the slow pace of conversions.

71.    As early as September 2021, CRRs were providing Defendants with feedback from existing clients, who told the CRRs that they did not need Beti or want to pay for more services in part because Beti would require clients to change their established payroll processes. CRRs' complaints about clients' opposition to Beti were fed up the reporting chain by Client Relations managers to sales Directors and the VP of Client

Relations, Kyle Supak. Such feedback included that forcing customers to utilize Beti was destroying CRRs' relationships with their clients and preventing CRRs from cross-selling anything to those clients.

72.    CW4, who at the time worked with new clients to help implement Beti, stated that customer "feedback was really mixed" on the new product. CW4 elaborated that CW4 learned first-hand from working on the new customer implementations that Beti was "not a great fit" for some customers, especially for companies with a large number of employees who were being handed, by way of Beti, more control over their paychecks. CW3 recalled that Beti "was another step in an already complicated process," which was not easy for clients to adopt. CW4 similarly recalled that approximately 30% of new clients were opposed to, or resisted, adopting Beti, and that Paycom leadership therefore provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

73.    Even though Beti was not a great fit for many clients, Defendants required that every cross-selling proposal for non-payroll products include an additional cost for Beti that was baked into the overall price, such that clients were required to purchase Beti if they purchased any additional Paycom product. In other words, Paycom did not itemize the separate products in a suite sold to customers, so that the Company's clients would not know that a portion of the price charged to them was attributable to Beti. However, adding Beti could increase the fees paid to Paycom by anywhere from $2,000 to $25,000 per client per year.

74.    CW1, who worked in Paycom's billing department from September 2020 until July 2023, confirmed that the price Paycom charged each client was a "blended number" wherein clients could not discern the cost breakdown for the various Paycom services modules. Moreover, CW1 recalled, once a client signed a sales proposal, "they were locked in" to the services committed to in the proposal. CW1 further provided that even if a client wanted any Paycom software modules removed from their account, Paycom would still bill the clients the same, and truly removing a module required approval from Defendant Richison himself.

75.    CW1 further corroborated that, from CW1's perspective in the billing department, it was evident that Paycom's clients were not happy that they were being billed for services that they did not want to receive, or no longer wanted to receive. CW1 also recalled hearing from the PSD that customers were unhappy with being "nickled-and-dimed" for Paycom services like Beti.

76.    Despite this feedback, CRRs were told by sales leadership that there was no choice but to continue pushing Beti, and the message for the ensuing several months into 2022 was to sell more Beti. Indeed, Paycom did not come close to meeting Defendants' internal deadline to convert all existing clients onto the Beti platform by the end of 2021, and thus the mandate persisted and became more aggressive, throughout the Class Period.

77.    For example, the Defendants attempted to further enforce the mandate to sell Beti to every existing client by eliminating CRRs' ability to create sales proposals that did not include Beti. CW4 confirmed that Paycom's internal tool for creating sales proposals was altered to require that Beti be included in all proposals moving forward. CW2 was also

aware that CRRs became required to sell Beti alongside any other product they sold to clients, and corroborated that Paycom's software tool for creating sales proposals was changed such that CRRs could not even create a new proposal in the system that did not include Beti. CW2 recalled discussing with Joshua Antonius, head of CRRs in CW2's region, all the time that CRRs were being forced to sell Beti to clients who did not want it.

78.     Despite Defendants' requirement that every sales proposal include Beti, Paycom continued to struggle to upsell clients on Beti.

2.     <u>As Beti Adoption Continues to Stagnate, Defendants Require CRRs to Help Clients Implement Beti and Threaten Termination If They Do Not Sell Beti to More Clients</u>

79.     As Beti sales to existing clients stagnated, Defendants changed the CRRs' job description in July 2022 and began threatening CRRs with termination if they did not sell more Beti. CRRs—who had originally been hired strictly to cross-sell Paycom modules—were now required to learn the Beti payroll software and help clients implement that payroll application. This was a significant undertaking, considering that the CRRs had little knowledge of or experience with payroll implementation.

80.     Indeed, prior to the Beti rollout in July 2021, Paycom CRRs did not sell payroll products or assist clients in implementing them because these were primary products that every new customer had already purchased. Prior to Beti, Paycom's inside or field sales teams would make an initial sale to a customer which always included the payroll applications, and then a specialized onboarding team would help the new client implement the payroll applications, after which the client would be assigned to a CRR whose job was to cross-sell Paycom's additional, non-payroll applications to the client.

Moreover, Beti was the only cross-sellable product that Paycom had ever enforced as mandatory, requiring CRRs to push for 100% of clients to purchase and use Beti.

81.     As part of their newly-defined role, CRRs were required to provide daily reports to Chief Sales Officer Faurot regarding meetings with their assigned existing-client accounts, including reporting how many clients each CRR met with to discuss Beti, and how many sales of Beti were made in a given day. Concurrent with the reporting mandate, Faurot began threatening to fire CRRs if they were not selling Beti at a satisfactory pace. The ultimatum to sell Beti was so intense that CRRs that were otherwise at 100% for their standard cross-selling goals would still be put on performance improvement plans if they did not sell Beti to enough clients.

82.     The quotas imposed on CRRs were not limited to Beti sales, but also included metrics relating to clients' usage of the product. Despite the fact that CRRs were primarily in a sales role, the implementation-related metrics that CRRs were held accountable for included how many Beti implementation meetings each CRR had with their clients, and how often clients used Beti's "Approve my Check" feature. For example, some CRRs were required to have eight to ten meetings with clients about Beti per week, with three meetings per week dedicated to increasing the number of times the "Approve my Check" feature was used. Moreover, CRR managers were required to track in a Microsoft Excel spreadsheet how many Beti units had been sold and implemented each week by the CRRs, which managers then reported upwards to sales directors on a weekly basis.

83.     The CRRs' new duties were so time-consuming that they ate up half of the CRRs' workday and left little time for CRRs to perform their primary job of cross-selling,

thereby making it impossible to hit quotas for cross-selling software other than Beti, a product which in itself generated little additional revenue for Paycom. *See* Section D.3, *infra.* Notably, however, there was no sales compensation benefit or incentive for retaining clients, despite the fact that retaining clients became harder due to having to focus on Beti.

84.    CW4 similarly recalled that Paycom at the time "pushed difficult metrics" for Beti on Transition Specialist Representatives, who were responsible for helping clients implement the software. CW4 explained that these metrics included how well, and how often, clients and their employees used Beti, with Paycom's goal being to get 100% utilization by clients' employees.

### 3.    Defendants Triple the CRRs' Commissions for Selling Beti, Further Diverting CRRs' Time Away From Cross-Selling Other Paycom Products

85.    Despite Defendants' mandates and threats discussed above, Paycom's sales of Beti to existing clients was still stagnating at around 40% throughout most of 2022. Thus, in January 2023, to incent the CRRs to continue pushing Beti on existing clients who were opposed to it, the Defendants tripled the CRRs' commissions for selling Beti.

86.    Paycom's relentless push for CRRs to sell Beti to 100% of customers impeded the Client Relations Representatives from effectively cross-selling other, revenue-generating Paycom products to existing customers. While ordinarily one of the first steps in CRRs' cross-selling is to meet with an existing client's executives about the new products, executives began refusing to meet with the CRRs because they were angry at Paycom for trying to force them to buy Beti.

87.    Throughout the Class Period, selling and implementing Beti took up an increasing amount of CRRs' time, such that they were prevented from hitting quotas for cross-sales revenue. Implementation of Beti alone could take up to five meetings with a client, and CRRs could spend an entire day with a client focusing on a particular process related to Beti implementation. Thus, focusing on Beti sales and implementation took away upwards of 50% to 60% of CRRs' time that would otherwise be spent making cross-sales.

88.    CW4, who worked on Beti implementations prior to when the task was assigned to CRRs, corroborated that even basic Paycom implementations of Beti by smaller clients could take thirty to sixty days to complete, and that deployments of Beti by larger clients could take more than three months to complete. CW4 explained that implementation of the expanded suite of Paycom software—including products like Talent Management and Talent Acquisition—by a larger client could take as much as a year-and-a-half.

89.    However, throughout the Class Period, investors were unaware that the Defendants were requiring Paycom's CRRs to essentially stop cross-selling non-payroll products, and instead dedicate their time to learning payroll functions and trying to convince existing clients to convert their payroll processes to, and then implement, Beti. Notably, the Defendants never warned investors that Paycom's use of its CRR group to push Beti on all existing clients created material risks to Paycom's cross-selling revenues, Paycom's unscheduled revenues, and Paycom's annual revenue retention rate—risks that were identified and reported internally by the Beti go-to-market team prior to the launch of Beti.

90.     Indeed, Defendants would admit at the end of the Class Period that requiring CRRs to abandon their traditional duties of cross-selling additional, non-payroll applications to existing customers caused Paycom to lose at least $20 million of cross-selling revenues in 2023, and forecasted that amount to increase significantly in 2024 as Defendants lowered annual revenue growth forecasts by nearly two thirds, from 30% for FY 2022 to just 10-12% for FY 2024.

**E.   A Large Number of Existing Customers Who Are Unhappy with the Efforts to Force Beti on Them Terminate Paycom Payroll Services, Driving Up Customer Attrition**

91.     In addition to losing a substantial amount of cross-selling revenue and revenue from unscheduled, billable corrections, Paycom also lost sales from attrition of unhappy clients who opposed being forced to purchase and use Beti.

92.     The push for all existing clients to purchase Beti caused a significant loss of clients, who resented Paycom for forcing them to take Beti when they did not want or need it. CW1 also recalled that poor customer service from Paycom's Service Department was contributing to customer attrition. By March or April of 2022, a lot more clients were leaving Paycom as a result of the Beti mandate compounded by poor service levels.

93.     Similarly, CW2 recalled that all of the Paycom sales department acknowledged that forcing Beti on clients was driving them away, because Paycom management introduced sales training designed to counteract such customer pushback. CW2 recounted that Paycom's the Chief Sales Officer held a national sales training meeting in Aspen, Colorado in October 2021 to teach Paycom salespeople how to lower clients'

resistance to Beti and to get clients to try Beti without causing them to push Paycom away. CW2 attended this training, along with Richison and CSO Holly Faurot wherein it was discussed that existing clients' pushback to Beti was high, with Richison acknowledging existing clients' strong resistance to Beti.

94.    The Lost Clients and SaveOps Reports showed that prior to and throughout the Class Period, Paycom's existing clients, angry that Paycom was forcing Beti on them, were leaving Paycom because they did not want or need Beti.

95.    Despite client pushback to Beti as discussed in the October 2021 national sales training, Defendant Richison remained unwavering in his insistence that Beti be pushed on all clients, willing or not, telling investors in the November 1, 2022 Q3 earnings call that "today, everything is about Beti. … I tell our salespeople all the time. [']Look, if you can't get someone to understand the benefits and value of Beti to their organization … I don't have anything else for you to sell.['] … And so it's … a strategy that we've been continuing to drive."

96.    Indeed, Paycom's own internal metrics corroborate that Paycom was losing clients who did not want to be forced to use Beti. Paycom's annual revenue retention rate—which is inversely correlated to Paycom's client attrition rate—declined from 94% in 2021 to just 91% in 2022 and 90% in 2023. Notably, this decline in Paycom's revenue retention rate was not known to investors until February 7, 2024 when the Company restated its revenue retention number for 2022. Prior to restatement, Paycom had represented to investors a stable revenue retention rate of 93%, 94%, and 93% for the years 2020, 2021, and 2022, respectively.

97.    Paycom's publicly-reported metrics as to Beti's adoption rates also demonstrate slow uptake of the product due to the undisclosed customer resistance to the product. Throughout the Class Period, Defendant Richison provided investors and analysts with occasional updates, including:

    i.    In the May 3, 2022 Q1 Earnings Call, Richison reported that "over 1/4 of our clients have implemented and/or are in the process of implementing Beti," which represented "over 10,000 of our clients."

    ii.    In the August 2, 2022 Q2 Earnings Call, Richison reported that "Beti is the future of payroll and already over 13,000 clients or nearly 40% of our client base have embraced Beti."

    iii.    In a September 7, 2022 conference hosted by Citigroup Inc. ("Citigroup"), Richison reported that "[w]e started converting" existing customers "in September. Today, as companies come on already, half of their employees are doing their own payroll within their first payroll." Richison also reported that "[w]e've got 40% of our client base on it."

    iv.    In the November 1, 2022 Q3 Earnings Call, Richison reported that "about 50% of all current clients are on Beti."

    v.    In the February 7, 2023 FY 2022 Earnings Call, Richison reported that "[w]e're around 50%. It's about where we were when we reported in November."

vi.      In a June 6, 2023 conference hosted by Baird, Richison reported that "[w]ith Beti, we're over 50% now of the employees do their own payroll."

vii.     In the August 1, 2023 Q2 Earnings Call, Richison reported that "we've still got about 40% of our client base not on Beti."

viii.    Finally, in the October 31, 2023 Q3 Earnings Call, Richison reported that "nearly 2/3 of our clients have made the shift to Beti."

98.    As demonstrated by the foregoing statements, the portion of Paycom's existing client portfolio that adopted and/or implemented Beti stalled at around 50% for over eight months (starting September 30, 2022 as reported in the November 1, 2022 Q3 Earnings Call, through the June 6, 2023 Baird conference), yet Defendants did not disclose what was impeding Beti adoption until *after* the Class Period: that forcing Beti on unwilling customers was driving them away from Paycom entirely. Indeed, the revenue Paycom lost in 2022 from client attrition was approximately equal to all the cross-selling revenues generated by the entire CRR team that year, meaning that what the CRRs did was a wash and thus the only growth in revenue that year came by way of field sales to new clients. Paycom's client attrition issues carried well into 2023, as the Company continued to push Beti on unwilling existing customers.

**F.    Paycom's "Turn Team" Observes Paycom Is "Losing Tons of Clients" With the Number "Growing Every Day" But Delays Terminating These Accounts to Avoid a "Big Hit to Paycom's Overall Customer Count" and to Conceal Declines in Revenue Retention**

99.    Throughout the Class Period, Paycom closely monitored four "key metrics" to evaluate its business and measure its performance: clients, clients based on parent company grouping, sales teams, and annual revenue retention rate. Defendants admittedly received client retention reports. Accordingly, Paycom was aware throughout the Class Period that it was suffering from client and revenue attrition. Confidential Witnesses confirm this.

100.    CW1 explained that Paycom had a "Turn Team" that was responsible for terminating the accounts of clients who had canceled their contracts with Paycom so that they would not be counted as active clients. CW1 explained that the Turn Team was part of the PSD, and that CW1 gained insight into client attrition through interactions with the Turn Team and through CW1's role in Paycom's billing department.

101.    CW1 recalled hearing from the Turn Team that Paycom was "losing tons of clients" in late 2022 and the number was "growing every day" into 2023. However, CW1 recalled that despite the increasing rate of client attrition, the Turn Team was not timely removing the accounts of clients who had terminated their contracts with Paycom.

102.    CW1 stated that CW1 had access to Paycom's "Admin B2 System," a dashboard developed internally at the Company that contained the information relating to client accounts that needed to be terminated because they had stopped processing payroll with Paycom. CW1 recalled discovering in December 2022 that there was a large number

of accounts in the Admin B2 system that were being counted as "active," but that needed to be terminated in the system. According to CW1, some of the dormant accounts in Paycom's system had not processed payroll with the Company for years, yet were still counted as active. CW1 reported this to Michelle Crowell, who reported it to Kyle Winston, who CW1 believed reported it to Paycom Controller Cory Dowers, who reported directly to Defendant Boelte. In response, CW1 was told that steps were being taken to close out the dormant accounts, but that the PSD had been directed to do so slowly to spread the terminations out over a longer period of time and avoid causing a sudden, big hit to Paycom's overall client count. CW1 believed that this delayed removal of former clients from Paycom's list of active clients was done at the direction of Richison, because in CW1's experience of nearly four years at Paycom, "most ideas" such as this came from Richison.

103.    CW1 stated that it took about a year to terminate the large number of accounts that should not have been counted among Paycom's active clients. CW1 also stated that the Turn Team was not incentivized to terminate client accounts quickly because members of that team were "rated on attrition." As a result, CW1 observed that the number of accounts that needed to be terminated and thus excluded from the "active" client count continued to grow into 2023. CW1 recalled going back into the Admin B2 system a few times thereafter to see if dormant accounts had been resolved, and discovered that some still had yet to be marked as inactive.

104.    As a result of Paycom's undisclosed, intentional delay in properly recognizing client account terminations, Paycom reported misstated and inflated revenue

retention rates in 2022. Indeed, Paycom would later restate its revenue retention rate for 2022 in a press release on February 7, 2024 and in the Company's Form 10-K filed with the SEC on February 15, 2024.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS THROUGHOUT THE CLASS PERIOD[3]

105.   Throughout the Class Period, Defendants made materially false and/or misleading statements, or omitted material information necessary to make statements not misleading, relating to the adoption of Paycom's Beti software product, client retention and revenue retention, CRR cross-selling revenue, and cannibalization of Paycom's unscheduled revenues from billable corrections.

### A.   February 8, 2022 FY 2021 Earnings Call

106.   The Class Period begins on February 8, 2022, when Paycom held an earnings call at 6:00 p.m. Eastern Time, after the stock market closed for trading that day, to report the Company's financial and operational results for its fourth quarter and fiscal year ended December 31, 2021 (the "FY 2021 Earnings Call").

107.   During prepared remarks, Defendant Richison told investors that Paycom was seeing "**very strong adoption**" of, and "**demand**" for, the Company's Beti product, which "**continues to bolster**" sales momentum and rapid growth in 2022:

> 2021 was a very strong year for Paycom. **We extended our platform to the employee even further through innovations like Beti**, which enables employees to do their own payroll, **and we are seeing very strong adoption and record employee usage as measured by the DDX. Strong demand**

---

[3] Statements alleged to be false and misleading are bolded and underlined within this section, Section V. The remaining statements are provided for context.

**continues to bolster our sales momentum, and record new client sales in 2021 have positioned us to deliver another year of rapid growth in 2022**.

108.   The foregoing statement was misleading because it omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the false impression that Beti demand, adoption, and usage were strong and would drive revenue growth consistent with the 30%+ growth Paycom enjoyed in prior years, but omitted that: (1) Defendants' mandate, which required CRRs to help existing clients implement Beti and to enforce client adoption and usage of Beti, was consuming half of the CRRs' work time and preventing the CRRs from cross-selling Paycom's other, revenue-generating products; (2) increases in Beti usage were cannibalizing Paycom's unscheduled revenues from billable corrections; and (3) more than half of existing clients were strongly resisting Paycom's efforts to force them to purchase and use Beti, and Paycom's insistence despite that pushback was destroying the CRRs' relationships with clients, causing client attrition which hurt the Company's recurring revenues.

109.   All of the above were having a material, negative impact on Paycom's sales growth in 2022 at the time of Defendant Richison's misstatement, as evidenced by the particularized facts set forth in this complaint, including:

      i.      Upon introducing Beti in July 2021, Defendants required CRRs to focus their time on selling Beti to *all* existing customers, without exception and, as described by CW2 and corroborated by CW4, made

it impossible to create sales proposals that did not include Beti, thereby reducing CRRs' time and ability to cross-sell non-payroll products.

ii.    In 2022, upwards of 50% to 60% of CRRs' time that was once exclusively dedicated to cross-selling became diverted to Beti implementation, in order to meet goals for Beti-related metrics imposed on CRRs, making it impossible for CRRs to meet their traditional, non-payroll cross-selling quotas.

iii.    Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

iv.    Defendant Boelte admitted on October 31, 2023 that Paycom's decision to forgo CRR cross-selling revenues to focus on Beti sales and implementation had been an intentional "strategic revenue decision[]" that would continue indefinitely. Considering that Defendant Richison had maintained from the outset that "everybody" would be on Beti, Defendant Boelte's October 2023 admission also

indicated that this had been Defendants' strategy since they handed down the Beti mandate in July 2021.

v.      The Beti go-to-market team identified and considered, prior to the launch of Beti, that one of the obvious risks was the possibility that Beti would have a negative financial impact on Paycom by reducing client errors that needed to be corrected with unscheduled or off-cycle payroll runs.

vi.     CW1 and CW4 corroborated that Paycom's unscheduled revenues, which included billable corrections which would be lost with Beti adoption, were a substantial amount of Paycom's revenues.

vii.    Defendant Richison admitted at the end of the Class Period, on October 31, 2023, that Beti was resulting in "lower related revenue recognized by Paycom" and Defendant Boelte admitted that same day that "increases in Beti usage" had "eliminated certain billable items, which is cannibalizing a portion of [Paycom's] unscheduled revenues."

viii.   The Beti go-to-market team created in April 2021 identified and discussed at length the risk that Beti represented so much change in payroll processes for clients that some existing clients would be resistant to, and not want to adopt, Beti. Indeed, CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled

that at least 30% of new clients were resistant or objected to adopting Beti.

ix.     Upon introducing Beti in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients away from Paycom, resulting in worsening retention rates. Paycom's loss of revenue from client attrition in 2022 was equal to all the cross-selling revenues generated by the CRRs that year.

x.     CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

xi.     According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023,

Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

xii.     In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rate for 2022, thus reducing the reported retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away throughout the Class Period.

xiii.    In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking existing clients' adoption rates because "they're not all keen on [adopting Beti],"— raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

110.    During the question-and-answer portion of the FY 2021 Earnings Call, Barclays analyst Raimo Lenschow asked the Individual Defendants for their thoughts on Paycom's annual revenue retention rate, reported to be at 94% "going forward." In

response, Defendant Richison falsely stated that Paycom management was seeing "**a lot of satisfaction across the client base**" from which the Company would drive even higher revenue retention rates:

> **Raimo Lenschow**
> *Barclays Bank PLC, Research Division – MD & Analyst*
>
> Congrats to a great finish to the year. Chad and Craig, I had like 2 questions. One was on the retention rates. So 94% is kind of again up from last year, very, very strong especially considering where you're playing in the market. Can you talk a little bit about the drivers there? And is that kind of -- how are you thinking about this number going forward?
>
> \* \* \*
>
> **Chad R. Richison**
> *Paycom Software, Inc. – Founder, President, CEO & Chairman of the Board of Directors*
>
> \* \* \*
>
> And answer to that question, it's all really driven by usage. The more success a client has using our products, the greater the return on the investment they're achieving, and that makes them want to stay with us longer. And so how high can it go? Obviously, at some point, you do have to look at you're always going to have a certain number of clients that could be bought, sold and merged. But I -- we're very ambitious with that number. **We're seeing a lot of satisfaction across the client base. So I don't -- I wouldn't necessarily say we're done with our retention aspirations, but we feel really good by being able to raise it again**.

111.    The foregoing statement was false and misleading when made because it omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the false impression that existing clients largely accepted Beti, and that the push for existing clients to adopt Beti was having a positive impact on retention, but omitted that more than half of Paycom's existing clients

did not want to adopt Beti and were strongly resisting Paycom's attempts to force them to purchase it, and Paycom's attempts to force existing clients to purchase and use Beti were destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

    i.    Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for existing clients that some might not want to adopt it and would be angry if forced to adopt it.

    ii.    Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

    iii.    CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. At the time Paycom introduced Beti in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the

43

CRRs' relationships with existing client accounts and caused many clients to leave Paycom starting in the second half of 2021 and continuing throughout the Class Period, resulting in worsening retention rates.

iv.  CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

v.   According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future.

44

Collectively, these facts raise a strong inference that the Defendants were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

vi.    In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rate for 2022, thus reducing the reported retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away.

vii.    In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking existing clients' adoption rates because "they're not all keen on [adopting Beti]," raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

112.    Analyst Samad Samana of Jefferies LLC ("Jefferies") asked on the FY 2021 Earnings Call how well Paycom was doing in getting existing clients to adopt Beti, and whether that would continue in 2022. In response, Defendant Richison falsely stated that Paycom was experiencing ongoing "success" in converting existing clients to Beti:

**Samad Saleem Samana**
*Jefferies LLC, Research Division – Equity Analyst*

Great. And then maybe just a follow-up. Beti is impacting retention in a positive way. I'm curious if you can maybe update us on what the traction is in terms of getting the installed base to using Beti and how we should think about that progression in 2022.

**Chad R. Richison**
*Paycom Software, Inc. – Founder, President, CEO & Chairman of the Board of Directors*

Yes. **And so we're having a lot of success with the installed base using Beti**. I mean, internally, there is a little bit of a process change for our clients. You're moving things that you were doing after the payroll ends, the pay period ends. You're moving that to the beginning. But **we continue to have success selling Beti both into our current installed base**. And as a reminder, all new business that we've brought on since July of last year all have Beti included in its pricing and usage expectation.

113.    The foregoing statements were false and misleading when made because they omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statements gave the impression that the Company was having success in driving Beti adoption by existing clients, but omitted that more than half of Paycom's existing clients were unwilling to adopt Beti and were strongly resisting Paycom's attempts to force them to purchase and use Beti, and that Paycom's attempts to force existing clients to purchase and use Beti were destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

       i.    Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for existing clients that some might not want to adopt it and would be angry if forced to adopt it.

46

ii.      Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

iii.     CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. Upon introducing Beti in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients away from Paycom, resulting in worsening retention rates.

iv.      CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were

designed to help Paycom employees overcome clients' objections to Beti.

v.  According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

vi.  In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rate for 2022, thus reducing the reported retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away.

vii.  In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking

existing clients' adoption rates because "they're not all keen on [adopting Beti]," raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

114.    Analyst Bhavin Shah of Deutsche Bank AG ("Deutsche Bank") queried on the FY 2021 Earnings Call whether any of Paycom's software modules were helping client retention. In reply, Defendant Richison falsely stated that Paycom was "**not having a lot of losses on customers**" such that its "**retention rate [was] going up**:"

**Bhavin S. Shah**
*Deutsche Bank AG, Research Division – Research Analyst*

Chad, just any commentary you can provide in terms of which modules are seeing increased adoption as HR becomes more strategic with the great resignation? And then are you seeing any customers -- like are you seeing more customers come back to the table or even the size of land get bigger?

**Chad R. Richison**
*Paycom Software, Inc. – Founder, President, CEO & Chairman of the Board of Directors*

* * *

And then as far as seeing customers come back to the table, **we're not having a lot of losses on customers, as we just talked about our retention rate going up**. When we do lose a client, though, it is -- we get a meeting with them normally pretty quick just because of the usage around their employee base. If we're looking at a DDX of 95% where employees are making 95% of all the changes into the system, that's a client that finds it difficult to leave without destroying their return on investment and all the automation that they had achieved through our products. So we have a lot of win-backs there, but I would just start off by saying we're not really losing as many as we once did.

115.    The foregoing statement was materially false when made because the facts existing at the time directly contradicted Defendant Richison's statement that "we're not having a lot of losses on customers." Paycom was, in fact, suffering a great loss of existing

customers who did not want to be forced to adopt Beti, as evidenced by, *inter alia*, Defendants' later restatement of its annual revenue retention rate for the year 2022 from 93% to 91%, which represented tens of millions of dollars in annual revenues.

116.    Moreover, Defendant Richison's foregoing statement was misleading because it omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the impression that Paycom was not losing many clients and that Beti was helping keep retention high, but omitted that more than half of Paycom's existing clients were unwilling to adopt Beti and were strongly resisting Paycom's attempts to force them to purchase and use Beti, and that Paycom's attempts to force existing clients to purchase and use Beti were destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

     i.     Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for existing clients that some might not want to adopt it and would be angry if forced to adopt it.

     ii.     Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom.

Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

iii.  CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. Upon introducing Beti in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients away from Paycom, resulting in worsening retention rates.

iv.  CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

v.  According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and

to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

vi.    In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rate for 2022, thus reducing the reported retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away.

vii.    In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking existing clients' adoption rates because "they're not all keen on [adopting Beti]," raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

117.    When asked by analyst Daniel Jester of BMO Capital Markets Equity Research on the FY 2021 Earnings Call about "updated thoughts" regarding the length of

time for full Beti penetration into the base and "how that progression is going to evolve," Defendant Richison, despite his knowledge of clients' refusals to adopt Beti and the resulting increases in client attrition, falsely stated that "**we continue to have a lot of success deploying Beti, and I still expect that *all* of our clients will be using Beti at some point**."

118.    The foregoing statement was false and misleading when made because it omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave investors the impression that all existing clients would eventually adopt Beti, but omitted that more than half of Paycom's existing clients were unwilling to adopt Beti and were strongly resisting Paycom's attempts to force them to purchase and use Beti, and that Paycom's attempts to force existing clients to purchase and use Beti were destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

     i.     Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for existing clients that some might not want to adopt it and would be angry if forced to adopt it.

    ii.     Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who

were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

iii.    CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. Upon introducing Beti in July 20201, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients away from Paycom, resulting in worsening retention rates.

iv.    CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

v.    According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a

54

client wasn't interested in using the Company's software the way and to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

vi.     In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rate for 2022, thus reducing the reported retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away.

vii.    In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking existing clients' adoption rates because "they're not all keen on [adopting Beti]," raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

### B.    May 3, 2022 Q1 Earnings Call

119.    On May 3, 2022, Paycom held an after-market-hours call to apprise investors and analysts of the Company's financial and operating results for its first fiscal quarter ended March 31, 2022 (the "2022 Q1 Earnings Call").

120.    During prepared remarks, Defendant Richison enthusiastically claimed that Paycom's clients were "embrac[ing]" the Company's self-service Beti product and that Paycom's sales force was "energized and aligned" on the go-to-market strategy for the product:

> Employee usage continues to trend higher as **more companies embrace our self-service solutions and push ownership of the data out to the employee**. Increasing employee usage is a key component of the ROI that our clients realize and we believe our employee usage strategy is a competitive advantage and a driver of our very strong growth. **Already well over 1/4 of our clients have implemented and/or [are] in the process of implementing Beti, our most advanced employee usage payroll experience to date. In less than a year, over 10,000 of our clients have embraced Beti as the right way to do payroll.** Beti is fundamentally a better way to run all payroll processes to the benefit of the employer and employees. We will continue to innovate Beti to deliver even more value to our clients, making it even more compelling. Beti is the future of payroll.

121.    The foregoing statements were false and misleading when made because they omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statements gave the impression that Beti adoption among existing clients was speeding along without issue, and that adoption would increase because Beti was the "right way to do payroll," but omitted that more than half of Paycom's existing clients were unwilling to adopt Beti and were strongly resisting Paycom's attempts

to force them to purchase and use Beti, and that Paycom's attempts to force existing clients to purchase and use Beti were destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

    i.    Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for existing clients that some might not want to adopt it and would be angry if forced to adopt it.

    ii.    Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

    iii.    CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. Upon introducing Beti in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients

away from Paycom, resulting in worsening retention rates. During 2022, Paycom's loss of revenue from client attrition was equal to all the cross-selling revenues generated by the CRRs that year.

iv. CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

v. According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants

were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

vi.    In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rate for 2022, thus reducing the reported retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away.

vii.    In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking existing clients' adoption rates because "they're not all keen on [adopting Beti]," raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

122.    During the question-and-answer portion of the 2022 Q1 Earnings Call, Defendant Richison was questioned by Robert W. Baird & Co. ("Baird") analyst about Paycom's progress in converting clients to using Beti, to which defendant Richison falsely claimed that Paycom was having "**a lot of success**," even though internally, Paycom's existing clients were rejecting Beti and became angry when Paycom employed forceful sales tactics to make them convert to Beti:

**Mark Steven Marcon**
*Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst*

Congratulations on the excellent results. Wondering, can you talk a little bit about the Beti conversions that you've had so far? And what sort of revenue uplift you've seen? And then what is -- what's been the change in terms of the

level of client engagement and satisfaction and early reads in terms of retention trends among those clients?

**Chad R. Richison**
*Paycom Software, Inc. – Founder, President, CEO & Chairman of the Board of Directors*

\* \* \*

And so in answer to your question **<u>from a retention</u>**, absolutely, the more of a product business is used in our case, the more products that they use, the longer they stay and the happier that they are. So **<u>we're having a lot of success getting Beti out there</u>**.

123.    The foregoing statement was false and misleading when made because it omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the impression that existing clients largely accepted Beti and that the push for existing clients to adopt Beti was having a positive impact on retention, but omitted that more than half of Paycom's existing clients were unwilling to adopt Beti and were strongly resisting Paycom's attempts to force them to purchase and use Beti, and that Paycom's attempts to force existing clients to purchase and use Beti despite client pushback was destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

      i.    Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for existing clients that some might not want to adopt it and would be angry if forced to adopt it.

ii.      Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

iii.     CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. Upon introducing Beti in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients away from Paycom, resulting in worsening retention rates.

iv.      Evidencing existing client refusal to use Beti, Defendants reported in May 2022 that just over 25% of clients had adopted or were in the process of adopting Beti, a marginal increase from the prior quarter.

v.       During 2022, Paycom's loss of revenue from client attrition was equal to all the cross-selling revenues generated by the CRRs that year. CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically

61

to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

vi.   According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

vii.  In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rates for 2022, thus reducing the reported

retention rate for 2022 from 93% to 91% and demonstrating that
forcing the adoption of Beti drove clients away.

viii.    In June 2024, Defendant Richison finally admitted the truth about
Paycom's existing clients—that Paycom had stopped tracking
existing clients' adoption rates because "they're not all keen on
[adopting Beti]," raising an inference that some existing clients had
resisted adopting Beti from its launch in July 2021.

124.    In response to an analyst's question about whether Beti had a positive impact
on Paycom's revenues, Defendant Richison claimed that every sale of Beti to existing
clients was beneficial for the Company's revenues, but did not disclose the negative
impacts Beti was having on revenues:

> **Mark Steven Marcon**
> *Robert W. Baird & Co. Incorporated, Research Division – Senior Research
> Analyst*
>
> Chad, do you get a revenue lift on the clients that you are converting to Beti?
> And if so…
>
> **Chad R. Richison**
> *Paycom Software, Inc. – Founder, President, CEO & Chairman of the Board
> of Directors*
>
> **<u>We do. Yes. Beti -- yes. Beti provides an incremental revenue opportunity
> for us.</u>** It's a -- as I said in the past, it's a nominal fee. It's 1 of 29 modules,
> but **<u>we do get a revenue uplift each time we sell Beti to a current client</u>**.

125.    The foregoing statement was false and misleading when made because it
omitted material information, giving a reasonable investor an impression of a state of
affairs that differed in a material way from the state of affairs that actually existed.

Specifically, Defendant Richison's statement gave the impression that the revenue impact of selling Beti to existing clients was exclusively positive, but omitted that Beti usage was cannibalizing a portion of Paycom's unscheduled revenues derived from billable corrections, as evidenced by the particularized facts set forth in this complaint, including:

i.    The Beti go-to-market team identified and considered, prior to the launch of Beti, that one of the obvious risks was that Beti would have a negative financial impact on Paycom by reducing client errors that needed to be corrected with unscheduled or off-cycle payroll runs.

ii.   CW1 and CW4 corroborated that Paycom's unscheduled revenues, which included billable corrections which would be lost with Beti adoption, were a substantial amount of Paycom's revenues.

iii.  Defendant Richison admitted at the end of the Class Period, on October 31, 2023, that Beti was resulting in "lower related revenue recognized by Paycom" and Defendant Boelte admitted that same day that "increases in Beti usage" had "eliminated certain billable items, which is cannibalizing a portion of [Paycom's] unscheduled revenues."

126.    Despite that Paycom was losing clients who did not want to adopt Beti, during the 2022 Q1 Earnings Call, Defendant Richison falsely claimed that Paycom's retention number was equal to or better than the prior period: "**But with that said, this one time I will share with you that our current retention number when compared with the same period last year is either equal to or improved**."

127.    The foregoing statement was materially false and misleading when made because the facts existing at the time directly contradict Defendant Richison's statement that "our current retention number…is either equal or improved." Paycom was, in fact, suffering a great loss of existing customers who did not want to be forced to adopt Beti, as evidenced by, *inter alia*, Defendants' later restatement of its annual revenue retention rate for the year 2022 from 93% to 91%.

128.    Moreover, Defendant Richison's statement was false and misleading when made because it omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the impression that Paycom was not losing many clients and that Beti was helping keep retention high when the opposite was true. Defendants failed to disclose that, in fact, more than half of Paycom's existing clients were unwilling to adopt Beti and were strongly resisting Paycom's attempts to force them to purchase and use Beti, and that Paycom's attempts to force existing clients to purchase and use Beti were destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

i.      Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for existing clients that some might not want to adopt it and would be angry if forced to adopt it.

ii.    Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

iii.    CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. Upon introducing Beti in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients away from Paycom, resulting in worsening retention rates.

iv.    Evidencing existing client refusal to use Beti, Defendants reported in May 2022 that just over 25% of clients had adopted or were in the process of adopting Beti, a marginal increase from the prior quarter.

v.    During 2022, Paycom's loss of revenue from client attrition was equal to all the cross-selling revenues generated by the CRRs that year. CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically

to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

vi.     According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

vii.    In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rates for 2022, thus reducing the reported

retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away.

viii.    In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking existing clients' adoption rates because "they're not all keen on [adopting Beti]," raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

**C.    August 2, 2022 Q2 Earnings Call**

129.    Paycom held an earnings call with analysts and investors on August 2, 2022 to report the Company's financial and operating results for its second quarter (the "2022 Q2 Earnings Call").

130.    During the question-and-answer portion of the 2022 Q2 Earnings Call, Defendant Richison falsely told analyst Alexander Kim of Mizuho Securities ("Mizuho") that Beti was accretive to Paycom's revenue, even though Defendants had done an analysis prior to launching Beti and knew that it would cannibalize existing client revenue, stating: "as far as the opportunity, **that upselling into our client base has with Beti, it is incremental increase in revenue opportunity for us, so it's accretive to that profile**."

131.    The foregoing statement was false and misleading when made because it omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the impression that the net impact of selling Beti to existing clients was positive, but omitted that Beti usage was cannibalizing

Paycom's unscheduled revenues from billable corrections, as evidenced by the particularized facts set forth in this complaint, including:

    i.    The Beti go-to-market team identified and considered, prior to the launch of Beti, that one of the obvious risks was that Beti would have a negative financial impact on Paycom by reducing client errors that needed to be corrected with unscheduled or off-cycle payroll runs.

    ii.    CW1 and CW4 corroborated that Paycom's unscheduled revenues, which included billable corrections which would be lost with Beti adoption, were a substantial amount of Paycom's revenues.

    iii.    Defendant Richison admitted at the end of the Class Period, on October 31, 2023, that Beti was resulting in "lower related revenue recognized by Paycom" and Defendant Boelte admitted that same day that "increases in Beti usage" had "eliminated certain billable items, which is cannibalizing a portion of [Paycom's] unscheduled revenues."

**D.    November 1, 2022 Q3 Earnings Call**

132.    On November 1, 2022, Paycom held an earnings call with investors and analysts to report its financial and operating results for its third quarter ended September 30, 2022 (the "2022 Q3 Earnings Call").

133.    When asked by analyst Brad Reback of Stifel, Nicolaus & Company ("Stifel") whether he'd seen "any noticeable change in … retention at your customers," despite the increased attrition from angry clients who did not want to adopt Beti, Defendant

69

Richison flatly denied there was any change in retention stating, "**No, I can't say that we've seen any changes**."

134.   The foregoing statement was materially false and misleading when made because Paycom was, in fact, suffering a great loss of existing customers who did not want to be forced to adopt Beti, as evidenced by, *inter alia,* Defendants' later restatement of its annual revenue retention rate for the year 2022 from 93% to 91%.

135.   Moreover, Defendant Richison's statement was misleading because it omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the impression that Paycom was not losing many clients and that Beti was helping keep retention high, but omitted that more than half of Paycom's existing clients were unwilling to adopt Beti and that Paycom's attempts to force existing clients to purchase and use Beti were destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

      i.      Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for existing clients that some might not want to adopt it and would be angry if forced to adopt it.

      ii.      Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom.

Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

iii.    CW1 recalled hearing from the Turn Team that Paycom was "losing tons of clients" in late 2022 and the number was "growing every day" into 2023. However, CW1 recalled that despite the increasing rate of client attrition, the Turn Team was not timely removing the accounts of clients who had terminated their contracts with Paycom.

iv.    CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. At the time Paycom introduced Beti in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients away from Paycom, resulting in worsening retention rates.

v.    By November 2022, Paycom's loss of revenue from client attrition was equal to all the cross-selling revenues generated by the CRRs that year.

71

vi.     CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

vii.    According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

viii.    In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rate for 2022, thus reducing the reported retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away.

ix.    In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking existing clients' adoption rates because "they're not all keen on [adopting Beti]," raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

**E.    November 30, 2022 Credit Suisse Conference**

136.    Crédit Suisse AG ("Credit Suisse") welcomed Defendants Richison and Boelte to speak at its 26th Annual Technology Conference on November 30, 2022 (the "2022 Credit Suisse Conference"). When asked by host analyst Kevin Damien McVeigh whether Paycom's annual revenue retention rates were up due to Beti, Defendant Richison dodged the question as to Beti and represented that retention rates would continue to increase:

**Kevin Damien McVeigh**
*Crédit Suisse AG — Research Division*

And do you think -- because one of the things you've really seen a nice improvement is your retention rates. I think you're up around 94% now, 91%, 92% couple of years ago. Is that Beti? Is that sales because it's, again, just incredibly impressive retention rates? And does that continue to kind of march forward here?

73

**Chad R. Richison**
*Paycom Software, Inc. — Founder, President, CEO & Chairman of the Board of Directors*

Yes. I mean **you always have a certain amount that you lose from buy, sold and merged. But I definitely think you have the opportunity to continue to increase retention**. Ours is a situation with how we measure it, it wouldn't go over 100%. So I wouldn't say we would get to 100% since it can't go over 100%, but I would say that there's still room.

137.    The foregoing statement was materially false when made because Paycom was, in fact, suffering a great loss of existing customers who did not want to be forced to adopt Beti, as evidenced by, *inter alia*, Defendants' later restatement of its annual revenue retention rate for the year 2022 from 93% to 91%.

138.    Moreover, Defendant Richison's statement was false when made because it omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the impression that Paycom was only losing clients to client mergers and acquisitions and that Beti was keeping retention high, but omitted that more than half of Paycom's existing clients were unwilling to adopt Beti and Paycom's attempts to force existing clients to purchase and use Beti were destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

> i.    Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for

existing clients that some might not want to adopt it and would be angry if forced to adopt it.

ii. Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

iii. CW1 recalled hearing from the Turn Team that Paycom was "losing tons of clients" in late 2022 and the number was "growing every day" into 2023. However, CW1 recalled that despite the increasing rate of client attrition, the Turn Team was not timely removing the accounts of clients who had terminated their contracts with Paycom.

iv. CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. At the time Beti was introduced in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients away from Paycom, resulting in worsening retention rates.

v.      By November 2022, Paycom's loss of revenue from client attrition was equal to all the cross-selling revenues generated by the CRRs that year.

vi.     CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

vii.    According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic...client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants

were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

    viii.    In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rate for 2022, thus reducing the reported retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away.

    ix.    In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking existing clients' adoption rates because "they're not all keen on [adopting Beti]," raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

**F.    December 7, 2022 Barclays Conference**

139.    On December 7, 2022, Barclays hosted its Global Technology, Media and Telecommunications Conference (the "2022 Barclays Conference"), at which Defendants Richison and Boelte spoke to analysts and investors.

140.    Defendant Richison stated during the 2022 Barclays Conference that a "measurable" portion of Paycom's revenue came from CRRs' upsells, and that such cross-sales revenue had been "consistent" through the rollout of Beti:

> From a percentage of our new business revenue, the overwhelming majority has always come from new logo adds just because of the size of the revenue associated with when you first land versus what you upsell to them later. But the mix has always been -- **we've always had some upsells as well. It's been measurable as well. And so I'm just saying it's been very consistent** with

the exception of the 6 months where we had ACA where we got every right away. **Other than that, it's been very consistent,** again, overwhelming majority being new logo add.

141.    The foregoing statement was materially false and misleading when made because in truth, Paycom's CRRs were required to spend more than half of their work time helping existing clients implement and use Beti instead of cross-selling Paycom's additional, non-payroll products, which negatively impacted cross-selling revenues.

142.    Moreover, Defendant Richison's statement was false and misleading when made because it omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the impression that Paycom's cross-selling revenues were consistent and not being impacted by the push for existing clients to adopt Beti, but omitted that the Defendants' mandate from July 2021, when Paycom first introduced Beti, required CRRs to help existing clients implement Beti and to enforce client usage of Beti and was consuming half of the CRRs' work time and preventing the CRRs from cross-selling Paycom's other products, negatively impacting the Company's cross-selling revenues, as evidenced by the particularized facts set forth in this complaint, including:

> i.    Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risk that because CRRs time was completely occupied with cross-selling, assigning CRRs to assist clients with Beti implementations would reduce Paycom's cross-selling revenues.

ii.     Upon introducing Beti in July 2021, Defendants required CRRs to focus their time on selling Beti to *all* existing customers, without exception and, as described by CW2 and corroborated by CW4, made it impossible to create sales proposals that did not include Beti, thereby reducing CRRs' time and ability to cross-sell non-payroll products.

iii.    In 2022, upwards of 50% to 60% of CRRs' time that was once exclusively dedicated to cross-selling became diverted to Beti implementation, in order to meet goals for Beti-related metrics imposed on CRRs. Indeed, when Defendant Richison later admitted on August 1, 2023 that CRRs' cross-selling revenues were down because Paycom had required them to focus on "converting our client base to Beti," Richison clarified that Paycom "didn't just start doing this," adding that "[w]e really started doing this end of last year"— i.e., in the second half of 2022.

iv.     Defendant Boelte further admitted on October 31, 2023 that Paycom's decision to forgo CRR cross-selling revenues to focus more on Beti sales and implementation had been an intentional "strategic revenue decision[]" that would continue indefinitely. Considering that Defendant Richison had maintained from the outset that "everybody" would be on Beti, Defendant Boelte's October 2023 admission also

indicated that this had been Defendants' strategy since they handed down the Beti mandate in July 2021.

v.      In December 2023, Defendant Richison admitted that focusing CRRs on Beti sales and implementation resulted in CRRs "selling a lot less…than they've ever done in the past."

**G.    February 7, 2023 FY 2022 Earnings Call**

143.   Paycom held an earnings call with analysts and investors to report its financial and operational results for the fourth quarter and fiscal year ended December 31, 2022 on February 7, 2023 at 6 p.m. Eastern Time (the "FY 2022 Earnings Call").

144.   Following Defendant Richison's prepared remarks on the FY 2022 Earnings Call, Defendant Boelte reported "**Paycom's annual revenue retention rate in 2022 was 93%, which was consistent with our recent 4-year average of 93% and up more than 200 basis points from the prior 4-year period average of 91%**." Similarly, in responding to an analyst's questions about retention, Defendant Richison stated that he "would expect retention to continue to rise as a larger percent[age] of our current client base deploys Beti."

145.   The foregoing statements were materially false and misleading when made because Paycom was, in fact, suffering a great loss of existing customers who did not want to be forced to adopt Beti, as evidenced by, *inter alia*, Defendants' later restatement of its annual revenue retention rate for the year 2022 from 93% to 91%, representing tens of millions of dollars of revenue attrition.

146.   Moreover, the Defendants' statements were false and misleading when made because they omitted material information, giving a reasonable investor an impression of

a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, the Defendants' statements gave the impression that Paycom was not losing many clients and that Beti was helping keep retention high when, in fact, the opposite was true. Defendants omitted from their statements that more than half of Paycom's existing clients were unwilling to adopt Beti and that Paycom's attempts to force existing clients to purchase and use Beti were destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

i.      Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for existing clients that some might not want to adopt it and would be angry if forced to adopt it.

ii.      Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

iii.      CW1 recalled hearing from the Turn Team that Paycom was "losing tons of clients" in late 2022 and the number was "growing every day" into 2023. However, CW1 recalled that despite the increasing rate of

client attrition, the Turn Team was not timely removing the accounts of clients who had terminated their contracts with Paycom.

iv.   CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. At the time Paycom introduced Beti in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients away from Paycom, resulting in worsening retention rates.

v.   In February 2023, and during 2022, Paycom's loss of revenue from client attrition was equal to all the cross-selling revenues generated by the CRRs that year.

vi.   CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

vii.    According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

viii.   In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rate for 2022, thus reducing the reported retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away.

ix.     In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking existing clients' adoption rates because "they're not all keen on

[adopting Beti]," raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

147.    Needham & Company, LLC ("Needham") analyst Joshua Reilly asked on the FY 2022 Earnings Call about Paycom's growth with respect to new versus existing clients. Defendant Richison responded by assuring the Company had "**always had a healthy upsell to current clients**," implying that CRRs' cross-selling was going well:

**Joshua Christopher Reilly**
*Needham & Company, LLC — Research Division*

If you look at the growth expectations for 2023 here, how do you think about the mix of growth from new customers versus existing? As we know existing customers, while smaller historically in net new bookings, their growth has increased in the last couple of years. And we're seeing some different trends with different software vendors.

**Chad R. Richison**
*Paycom Software, Inc. — Founder, President, CEO & Chairman of the Board of Directors*

Yes. We're -- ours is going to primarily come from new logo ads when you just look at the size of revenue that we need to grow by in order to continue to hit our objectives. And so first prize is going to be new logo adds. We don't really have a lot to call out on pace per control growth from that perspective. But new logo ads is going to be primary for us. **We've always had a healthy upsell to current clients.** It's just been at a much smaller level than what new logo ads are. **And it's been consistent. Our upsells to current clients as a percentage has been consistent each year with the exception of the year we had ACA.**

148.    The foregoing statement was materially false and misleading when made because in truth, Paycom's CRRs had been given additional duties and were required to spend more than half of their work time helping existing clients implement and use Beti

instead of cross-selling Paycom's additional, non-payroll products, which negatively impacted cross-selling revenues.

149.    Moreover, Defendant Richison's statement was false and misleading when made because it omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the impression that Paycom's cross-selling revenues were consistent and not being impacted by the push for existing clients to adopt Beti, but omitted that the Defendants' mandate that required CRRs to help existing clients implement Beti and to enforce client usage of Beti was consuming half of the CRRs' work time and preventing the CRRs from cross-selling Paycom's other products, negatively impacting the Company's cross-selling revenues, as evidenced by the particularized facts set forth in this complaint, including:

    i.    Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risk that because CRRs time was completely occupied with cross-selling, assigning CRRs to assist clients with Beti implementations would reduce Paycom's cross-selling revenues.

    ii.    Upon introducing Beti in July 2021, Defendants required CRRs to focus their time on selling Beti to *all* existing customers, without exception and, as described by CW2 and corroborated by CW4, made it impossible to create sales proposals that did not include Beti, thereby reducing CRRs' time and ability to cross-sell non-payroll products.

iii.    In 2022, upwards of 50% to 60% of CRRs' time that was once exclusively dedicated to cross-selling became diverted to Beti implementation, in order to meet goals for Beti-related metrics imposed on CRRs. Indeed, when Defendant Richison later admitted on August 1, 2023 that CRRs' cross-selling revenues were down $20 million because Paycom had required them to focus on "converting our client base to Beti," Richison clarified that Paycom "didn't just start doing this," adding that "[w]e really started doing this end of last year"—*i.e.*, in the second half of 2022.

iv.    Defendant Boelte further admitted on October 31, 2023 that Paycom's decision to forgo CRR cross-selling revenues to focus more on Beti sales and implementation had been an intentional "strategic revenue decision[]" that would continue indefinitely. Considering that Defendant Richison had maintained from the outset that "everybody" would be on Beti, Defendant Boelte's October 2023 admission also indicated that this had been Defendants' strategy since they handed down the Beti mandate in July 2021.

150.    In response to a question from a Cowen and Company, LLC ("Cowen") analyst during the FY 2022 Earnings Call regarding a downtick in revenue retention rate versus the prior year's rate, Defendant Richison responded that the Company's 93% annual revenue retention rate was "an industry-leading number," that Paycom was "running at a

99% type retention rate" with clients that had adopted Beti, and that Beti would only improve the retention rate:

> **Bryan C. Bergin**
> *Cowen and Company, LLC, Research Division – MD & Analyst*
>
> I wanted to follow up on retention first. So I heard the comments about Beti clients being higher and the relative stability from prior years. But just as we think about the year-on-year downtick here, can you talk about -- is this larger client churn? Or is it a lot of churn among smaller clients? Just trying to understand that dynamic.
>
> **Chad R. Richison**
> *Paycom Software, Inc. – Founder, President, CEO & Chairman of the Board*
>
> * * *
>
> So you've got a couple of things at play. And then also, you've got some rounding at play, but all that's to say is **93% from what I've seen still up there, an industry-leading number.** And I do expect, again, with clients that have Beti, I mean we're running at a 99% type retention rate with them. So it's a little bit different there. **And as we continue to convert our current client base over to Beti, we expect to have some gains in that**.

151.    The foregoing statement was materially false and misleading when made because Paycom was, in fact, suffering a great loss of existing customers who did not want to be forced to adopt Beti, as evidenced by, *inter alia*, Defendants' later restatement of its annual revenue retention rate for the year 2022 from 93% to 91%, representing tens of millions of dollars in revenue attrition.

152.    Moreover, Defendant Richison's statements were false and misleading when made because they omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the impression that Paycom was not losing many clients and that Beti was helping keep retention high, but

omitted that more than half of Paycom's existing clients were unwilling to adopt Beti and that Paycom's attempts to force existing clients to purchase and use Beti were destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

i.    Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for existing clients that some might not want to adopt it and would be angry if forced to adopt it.

ii.   CW1 recalled hearing from the Turn Team that Paycom was "losing tons of clients" in late 2022 and the number was "growing every day" into 2023. However, CW1 recalled that despite the increasing rate of client attrition, the Turn Team was not timely removing the accounts of clients who had terminated their contracts with Paycom.

iii.  Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

iv.     CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. At the time Paycom introduced Beti in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients away from Paycom, resulting in worsening retention rates.

v.      In February 2023, and during 2022, Paycom's loss of revenue from client attrition was equal to all the cross-selling revenues generated by the CRRs that year.

vi.     CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

vii.    According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and

to the extent that the Company wanted them to, Paycom management was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

viii.    In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rate for 2022, thus reducing the reported retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away.

ix.    In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking existing clients' adoption rates because "they're not all keen on [adopting Beti]," raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

**H.    May 2, 2023 Q1 Earnings Call**

153.    On May 2, 2023 at 5:00 p.m. ET—after the NYSE closed for trading that day—Paycom held an earnings call (the "2023 Q1 Earnings Call") to report its financial and operating results for the first fiscal quarter of 2023, ended March 31, 2023.

154.    Analyst, Jared Marshall Levine of TD Cowen asked Defendants on the 2023 Q1 Earnings Call for commentary on the Company's revenue retention, and whether there any "notable changes" with regards to Paycom's clients. In response, Defendant Richison stated that revenue retention was to increase, especially due to Beti adoption:

> Yes. So we provide retention at the end of each year. It fluctuates quarter-to-quarter. I kind of said on the last call, we have the have and have-nots here at Paycom, and that was related to Beti. Our Beti retention rate last year was better than 99% of anybody that had Beti. So **I expect our retention to remain strong and even increases -- increase a larger percentage as more clients use the product** the right way to achieve the maximum ROI that's available to them.
>
> But yes, for retention, I've also said in the past, typically, regardless of -- I'm not comparing it from last first quarter to this first quarter, but typically, for -- especially for larger clients of any of our competitors, retentions oftentimes starts off lower the first of the year and continues to increase throughout the year because less clients usually leave in the fourth quarter, if you will. But **nothing to call out special in the first quarter. I would just say we've been very stable**, and the companies that use Beti do better.

155.    The foregoing statements were materially false and misleading when made because Paycom was, in fact, suffering a great loss of existing customers who did not want to be forced to adopt Beti and, thus, retention was not "stable" or expected to "increase," as evidenced by, *inter alia*, Defendants' later restatement of its annual revenue retention rate for the year 2022 from 93% to 91%, representing tens of millions of dollars in revenue

attrition, and later announcement that 2023's annual revenue retention rate had fallen even further compared to prior years.

156.   Moreover, Defendant Richison's statements were false and misleading when made because they omitted material information, giving a reasonable investor an impression of a state of affairs that differed in a material way from the state of affairs that actually existed. Specifically, Defendant Richison's statement gave the impression that Paycom was not losing many clients and that Beti was helping keep retention high, but omitted that more than half of Paycom's existing clients were unwilling to adopt Beti and Paycom's attempts to force existing clients to purchase and use Beti were destroying CRRs' relationships with those clients, driving clients away from Paycom, and negatively impacting the Company's retention rates, as evidenced by the particularized facts set forth in this complaint, including:

     i.     Prior to the launch of Beti in July 2021, the Beti go-to-market team identified the likely risks that Beti represented so much change for existing clients that some might not want to adopt it and would be angry if forced to adopt it

     ii.     Prior to and throughout the Class Period, Lost Clients Reports showed an increasing number of clients ending their service with Paycom. Similarly, the SaveOps Reports showed an increase in clients who were dissatisfied and at risk of ending their contract with Paycom. Both the Lost Clients Report and the SaveOps Report specified that

opposition to Beti was causing the increase in the clients who had ended or were at risk of ending their service with Paycom.

iii.    CW3 recalled that the introduction of Beti meant "another step in an already complicated process," which was not easy for clients to adopt, and CW4 recalled that at least 30% of new clients were resistant or objected to adopting Beti. At the time Paycom introduced Beti in July 2021, Paycom required CRRs to attempt to force all existing clients to purchase and use Beti by the end of 2021, which destroyed the CRRs' relationships with existing client accounts and drove many clients away from Paycom, resulting in worsening retention rates.

iv.    CW2 confirmed that, when speaking at an October 2021 national sales training which was convened by the Chief Sales Officer specifically to discuss a strategy to counteract such pushback, Richison acknowledged existing clients' strong resistance to Beti, which had begun soon after Beti debuted in 2021. CW4 similarly recalled that Paycom leadership provided materials and trainings that were designed to help Paycom employees overcome clients' objections to Beti.

v.    According to CW4, a Paycom employee from prior to the Class Period through early 2022, it was commonly known within Paycom that if a client wasn't interested in using the Company's software the way and to the extent that the Company wanted them to, Paycom management

was willing to let that client go. Indeed, on October 31, 2023, Defendant Boelte publicly admitted that Paycom was making intentional "strategic…client value decisions," later described as including forcing clients' "appropriate usage of our software [Beti]," which drove attrition of clients who were resistant to using Beti and thereby hurt Paycom's revenue growth rates then-current and future. Collectively, these facts raise a strong inference that the Defendants were willing *throughout* the Class Period to lose customers who were resistant to adopting and using Beti.

vi.   In February 2024, Defendants admitted that existing client attrition had been underreported throughout the Class Period and restated Paycom's revenue retention rate for 2022, thus reducing the reported retention rate for 2022 from 93% to 91% and demonstrating that forcing the adoption of Beti drove clients away.

vii.   In June 2024, Defendant Richison finally admitted the truth about Paycom's existing clients—that Paycom had stopped tracking existing clients' adoption rates because "they're not all keen on [adopting Beti]," raising an inference that some existing clients had resisted adopting Beti from its launch in July 2021.

## VI.  DEFENDANTS REVEAL THE TRUTH OVER MULTIPLE PARTIAL CORRECTIVE DISCLOSURES

### A.    The 2023 Q2 Earnings Call on August 1, 2023

157.    On August 1, 2023, at 5:00 p.m. Eastern after market close, Paycom held its earnings call for the second fiscal quarter ended June 30, 2023 (the "2023 Q2 Earnings Call"). As part of his prepared remarks, Defendant Boelte revealed an expected weakness in Paycom's future revenue results and attributed that weakness only to the previously-undisclosed negative impacts Beti was having on CRRs' ability to cross-sell.

158.    Specifically, although Paycom announced its 2023 Q2 revenues beat quarterly revenue guidance by $3.1 million, Paycom was only raising full year guidance by $2.0 million, indicating that Paycom's sales growth was slowing.[4]

159.    Then, during the question-and-answer portion of the 2023 Q2 Earnings Call, Barclays security analyst Raimo Lenschow asked Defendant Richison if Paycom was concerned about new sales during the second half of the year, based on the full year revenue guidance provided by Defendant Boelte that did not fully incorporate the Q2 revenue beat that had been announced. In response, Defendant Richison asserted that "demand for us is still very strong" but revealed that Paycom's CRRs had lost approximately $20 million in cross-selling opportunities as they spent their time converting existing clients to Beti:

---

[4] Paycom's revenue guidance is provided in ranges and not as a single number. The discussion here utilizes the midpoint of those ranges to describe changes in guidance.

**Raimo Lenschow**
*Barclay's Bank, PLC, Research Division*

[…] I look at this quarter, you beat by $3 million. The full year was only raised by $2 million. So do we need to read into that, that there is -- that you're kind of slightly concerned about the second half of the year? […]

**Chad R. Richison**
*Paycom Founder, President, CEO & Chairman of the Board*

[…] ***We do have a metric within our business model that sells that's down year-over-year, and that's our CRR sales. The CRR group upsells current clients. And this group has been down year-over-year. And honestly, that's because we've remained very disciplined in converting our client base to Beti.*** You had that first group that came on, and then we've been out selling the others.

***It's a lot of work for our CRR with very little revenue opportunity for them.*** So we've actually given compensation accelerators to incentivize the group to sell it, but it's still a smaller revenue product or billing item for us. ***So while self-inflicted, I mean, we are having CRR's focus on Beti. And that cost us $15 million to $20 million in bookings this year.*** But again, we're doing the accelerator commission for the CRRs to make up for the lower revenue.

We've been changing out the jet engines on our plane in mid-flight here. I mean Beti dramatically changes the way our clients do their payroll, produces a dramatic ROI. So we have to remain disciplined. We're not going to make a client go on it. We have to sell them on it. And it takes a while. ***Once you sell a deal, it takes a while. CRRs have to be out there to convert them.*** So I think we're doing something like triple. We're tripling their commissions for what they're going to be missing out.

160.    Defendant Richison, in response to an analyst question, also explained that the decline in quarterly sales growth rate—from 30% year-over-year to just 20%—was attributable to "only one metric…and that's the fact that we're having CRR spend 3 days converting" clients to Beti which reduces their ability to cross-sell.

96

**Samad Saleem Samana**
*Jefferies LLC, Research Division*

I wanted to ask one follow-up to Raimo's question on the guidance. If I think about recurring revenue and I take out the impact of higher rates and the average flow balance, ***it kind of suggests maybe like a 20% to 22% or, let's call it, low 20s like software revenue growth rate going forward. Is that the right way to think about maybe the durable subscription revenue growth rate?*** Or just maybe help us understand is that just for the back half. Or if we think about the durable number, how should we think about that?

**Chad R. Richison**
*Paycom Founder, President, CEO & Chairman of the Board*

I'll let Craig kind of comment a little bit on that. From my perspective, I mean, ***there's really only one metric that's given way for us, and that's the fact that we're having CRR spend 3 days converting a very small revenue item for a client*** that produces strong ROI. I think it's a season that we're in.

161.    Later during the call, in response to another analyst question, Defendant

Richison returned to the subject of CRRs' lost cross-selling opportunities and explained

that "instead of having a 1.5 hours or 2-hour sales call to sell a product, [the CRRs] are out

there for 3, 3.5 days […] getting the company converted over to Beti," or over one-half of

the work week:

**Chad R. Richison**
*Paycom Founder, President, CEO & Chairman of the Board*

[…] As far as -- yes, it is the exact same team that sells the global HCM product as what sells Beti. It's also that same team will sell every day is what sells Beti. And so they still have the ability to sell it. They still have the ability to go out. Nothing is precluding someone from going out and making a sell.

***The issue becomes*** -- it's not an issue. Again, it's something that have to do is regardless of what you choose to go sell on your own, you've got these clients that don't have Beti, that some of them, you already have sold Beti to and ***you're going to have to go out there and spend the time to get them converted, and it's our CRRs that do those conversions***.

*And so the difference can be instead of having a 1.5 hours or 2-hour sales call to sell a product, you're out there for 3, 3.5 days. Again, not all in the same week. It might be 3.5 days over a 4-week period of time, getting the company converted over to Beti and then you're out there when they're doing their first payroll and making sure that the ROI is being realized.* And so -- and once someone's made that conversion I believe we earn the right to even help them achieve greater return on investment by -- with these other products.

*And so I'm not saying I've told any CRRs, hey, don't go out and sell a product. What I've said is this is your priority, any clients that aren't currently on it achieving the value. I know it's a smaller revenue amount. So I'm going to pay you triple because I know it's a small revenue amount.* So any time you sell one, this will be your commission.

And we have to do that so that we can move everybody into the right value because it is the correct way to do it. It's the correct way for employees to do it themselves. And so that's what we're focused on. We're not retreating from that.

And I also believe that we do have -- we have some good things coming out here with product. We've announced some of it. We've got more coming out throughout the year, so -- but it is the first things first. *I'm not throwing my hands up on what the CRRs can do. I'm just explaining where they're at as of today.*

162.    Indeed, when Paycom began requiring CRRs to focus on forcing existing clients to implement and use Beti, the CRRs' new duties took up half of their time, leaving little time to cross-sell and making it impossible to hit quotas for such cross-selling.

163.    Barclay's securities analyst Raimo Lenschow who followed Paycom understood the revenue guidance as "inviting more questions about the 2H assumed performance." In a report published August 2, 2023, Lenschow wrote that "[w]e are not sure Q2 and guidance were strong enough to maintain the recent strong performance in shares" and noted that "[management's] decision to commit more resources to move existing customers to Beti, [] has a negative revenue impact in the short term." Lenschow

further explained the reason for Paycom's slowing sales growth: "The main factor seems to be management's decision to push for greater Beti adoption, which creates a revenue headwind."

164.    Paycom's revelation that it was dedicating CRRs to push clients to implement and use Beti—which negatively impacted cross-selling and sales growth forecasts—caused Paycom's stock price to fall from a $370.78 per share on August 1, 2023 at the close of the trading day, before the earnings call, to $299.62 per share on August 2, 2023, a decline of more than 19% on heavy trading volume.

### B.    The 2023 Q3 Earnings Call on October 31, 2023

165.    During the 2023 Q3 Earnings Call, held at 5:00 p.m. Eastern on October 31, 2023, Defendants revealed for the first time that Paycom had been making previously undisclosed "strategic performance and client value decisions" and "strategic revenue decisions" that had, and would continue to, result in a dramatic deceleration in the Company's revenue growth rates.

166.    Specifically, Paycom revealed that Paycom's use of CRRs to push Beti adoption at the expense of cross-selling revenues had caused a much more significant decline in cross-selling revenue than previously represented, and that, contrary to Defendants' prior statements that Beti adoption by existing customers was accretive to Paycom's revenue, Beti was actually causing lower sales revenues by eliminating "common after-the-fact payroll corrections that would otherwise be billable." Defendant Richison explained:

***Perfect payrolls eliminate these common after-the-fact payroll corrections that would otherwise be billable***. So the more employees do their own payroll, the greater the savings delivered to the client from Paycom future billings, ***which results in lower related revenue recognized by Paycom***.

167.   Defendant Boelte added that increased Beti usage was driving revenue growth expectations dramatically lower than any period in Paycom's recent history:

> Throughout 2023, we have been seeing ***moderating upside to our guidance model, which corresponded with increases in Beti usage*** and macro headwinds from inflation that may impact each client differently. ***Now that more clients are achieving the ROI that Beti has to offer, it has eliminated certain billable items, which is cannibalizing a portion of our services and unscheduled revenues***.
>
> ***With 10 months of data from increased Beti usage, we are incorporating the impact that our clients' ROI achievement has on our model. Based on these factors, we expect*** fourth quarter 2023 total revenues to be in the range of $420 million to $425 million, representing ***a growth rate over the comparable prior year period of approximately 14%*** at the midpoint of the range. We expect adjusted EBITDA for the fourth quarter in the range of $169 million to $174 million, representing an adjusted EBITDA margin of 41% at the midpoint of the range.
>
> ***With our Q3 results and our Q4 guidance, we now expect*** fiscal 2023 revenues to be in the range of $1.679 billion to $1.684 billion or ***approximately 22% year-over-year growth*** at the midpoint of the range. We expect adjusted EBITDA in the range of $712 million to $717 million, representing an adjusted EBITDA margin of nearly 43% at the midpoint of the range. Combining our expected revenue growth and adjusted EBITDA margin, we're still on track to reach the Rule of 65 in 2023.

168.   In addition to revealing that Beti was cannibalizing Paycom's existing revenues, Defendants also revealed that the reduction in CRR cross-selling was far greater than previously represented and would continue for at least another year and that these factors had cut the Company's expected future annual revenue growth guidance by nearly two-thirds, from 30% for FY 2022 to between 10-12% for FY 2024:

As we look out to 2024, we have a number of strategic initiatives that we believe will further strengthen the value clients receive from our offering. ***We are making strategic performance and client value decisions that we feel are best for our long-term relationship with our clients.*** Our mission is to ensure and achieve client value, and that is our focus.

***Our guidance for the next 15 months assumes the impact from the strategic revenue decisions we are and will be making***. As a result, ***we believe it is prudent for us to set expectations for 2024 year-over-year revenue growth of between 10% and 12%***. We'll have more visibility when we provide formal guidance in early February.

169.    Defendant Boelte's statement that Paycom was "making strategic… ***client value decisions,***" resulting in much lower revenue growth, was Boelte's first public admission that Defendants were willing to lose clients and revenue if the client was unwilling to adopt Beti—which was Defendants' position internally even before the launch of Beti when the risks of client attrition were raised by the Beti go-to-market team. Indeed, as Defendant Richison explained after the Class Period, Defendants' "client value decisions" meant forcing clients' "appropriate usage of our software," Beti.

170.    During the question-and-answer portion of the 2023 Q3 Earnings Call, Defendant Richison explained what was meant by "strategic ***revenue decisions***" that would result in dramatically lower revenue growth, specifying that Paycom would continue using CRRs to push Beti implementation on all existing clients, at the expense of lost cross-selling revenues:

**Mark Steven Marcon**
*Robert W. Baird & Co. Incorporated, Research Division*

Just following on, on the other questions. Is it possible to breakdown like what the impact was with regards to what you're seeing in terms of these efficiencies, how much you're seeing out of the CRR group?

And ***can you clarify what you mean by the strategic revenue decisions that you're taking for next year? Does that mean potentially paring some clients or not renewing them? Or what exactly does that mean? And how does that -- how does strong outside sales correspond to the 11% to 12% growth?***

**Chad R. Richison**
*Founder, President, CEO & Chairman of the Board*

Sure. Well, the first question is, you may have a client that was used to -- they're supposed to be running 13 payrolls in a quarter. And they were running 19, and now they're back to running 13. And so you have some of that going on with Beti as well as a lot of just the fixes. I mean it just eliminates everything. I mean perfect payroll's a thing.

New clients come on with Beti and half of their employees are doing their own payroll by the end of the first month. Our new logo sales are strong, like I said, inside sales is. ***Our cross-selling, I mean, it's been pretty weak. And that's not going to change for a little bit***.

I mean ***we're not going to keep trying to sell more products to a portion of the base not using it or receiving value. We're going to go back in and partner with the client to ensure they're achieving the full value*** available to them. And so that's a big part of our strategy here. And I will say ***our strategy is related to the base, not the go-to-market***.

171.    Thus, Defendant Richison's answers to analyst questions revealed that Paycom's Beti product was cannibalizing unscheduled revenues from billable corrections and that Paycom would continue limiting CRRs' ability to cross-sell indefinitely into the future, driving a massive, two-thirds reduction in Paycom's sales growth for the next year.

172.    While Defendant Richison identified the two factors as driving the decline in sales growth during the 2023 Q3 Earnings Call, analysts understood that Paycom's reduction in sales growth was too great to be attributed only to cannibalization of unscheduled revenues and reductions in CRR cross-selling. Defendant Richison effectively admitted that Beti adoption among existing clients had stalled when he reported "nearly 2/3 of our clients have made the shift to Beti", barely above the "about" 60% that had been

reported on the prior quarters' earnings call despite over two years since the July 2021 launch, leading analysts to understand that Paycom's revenue retention rate was declining and having a material negative impact on the Company's revenues. Indeed, multiple analysts directly asked about Paycom's retention rates during the earnings call.

173.    However, Defendants' admission that existing client adoption had stalled—despite tripling CRRs' commissions for selling Beti—effectively disclosed to the public that the remainder of Paycom's existing clients who were not using Beti were opposed to being forced to purchase and use Beti and, thus, revenue retention of these clients was worsening. Indeed, Citigroup analyst Steven Lester Enders honed in by asking "it seems like gross retention hasn't changed, but it's more of a view of the net retention dynamics... any way to[,] like[,] quantify the change in net retention that you're kind of talking about here?"

174.    On the next day following the 2023 Q3 Earnings Call, Baird Equity Research published a report in which the very first sentence criticized Paycom management for its lack of transparency: "Surprising miss and materially lowered guidance on ***an opaque call that most investors found to be confusing/suboptimal*** led to the stock declining over 30% [in after hours trading]."

175.    Analysts at D.A. Davidson also questioned whether the Defendants' stated reasons could fully explain Paycom's decline in sales growth, writing in a report published on November 1, 2023:

> Paycom reported a poor 3Q, and guided 4Q23 and 2024 well below
> expectations. The main reason given was the increasing impact of Beti
> adoption; effectively a price cut, particularly for year-end corrections (that

Paycom wouldn't have had visibility into until late in the year), management believes Beti will drive long-term value for clients, and thus for the company (higher retention rates, more new wins). ***We're a little unclear if this can explain the entire gap***; ***a 6.6% reduction to 4Q shouldn't result in a 10% reduction to the following year if the impact is mostly felt in year-end corrections***. On the other hand, management was adamant that new business continues to perform well, and stated that 'what we're talking about is more specific to Paycom and not something that [is] happening with the rest of our industry'.

176.    Deutsche Bank Securities Inc. directly questioned the Defendants' narrative on Paycom's retention of existing clients, writing in a November 1, 2023 report: "Despite positive anecdotal evidence, ***there remains limited tangible proof points on improvements to retention*** or win rates due to the availability of Beti[.]"

177.    In response to Defendants' new disclosures on October 31, 2023, Wolfe Research slashed its price target for PAYC common stock from $300 per share to a range of $120 to $180 per share. Writing in a November 1, 2023 report, Wolfe Research securities analysts put it bluntly regarding their downgrade of PAYC stock: the Company's third fiscal quarter results and guidance for fourth quarter and 2024 "fundamentally change our thesis" because "[t]he Beti product, which we once viewed as once of PAYC's differentiators, ***is now seemingly responsible for the cannibalization of a significant amount of recurring revenue***" and "***cross-sell and up-sell opportunities to existing customers have weakened significantly***."

178.    Paycom's revelation that it was making "strategic performance and client value decisions" and "strategic revenue decisions" that would result in significant declines in sales growth rates, which Paycom admitted related to Beti cannibalizing unscheduled revenues, significantly reduced CRR cross-selling revenues and worsening client attrition,

caused Paycom's stock price to fall from a $244.97 per share on October 31, 2023 at the close of the trading day before the earnings call, to $150.69 per share on November 1, 2023, a decline of more than 38%.

## VII.  POST-CLASS PERIOD EVENTS

### A.    In December 2023, Defendants Further Admit that Client Relations Representatives Were Forcing Clients to Utilize Beti, Not Cross-Selling

179.    During the December 6, 2023 Barclay's Global Technology Conference, host Raimo Lenschow of Barclays asked Defendant Richison about Paycom's future plans for its CRRs and whether they would soon return to their traditional role of cross-selling and up-selling Paycom's additional, non-payroll products. In response, Defendant Richison acknowledged that the CRRs had been "selling a lot less of [the product] than they've ever done in the past" and admitted that "at some level" the CRRs were "push[ing] [clients]" to "utilize the products that they have":

> **Raimo Lenschow**
> *Barclays Bank PLC, Research Division*
>
> And then the -- you talked earlier about one of the factors was the customer success team because you kind of -- we used it to kind of push more on Beti. If you kind of pushed slightly less going forward and give the customers more flexibility, does that mean, in theory, you can repurpose this -- or not repurpose, but I think get them back to the old kind of cross-selling [indiscernible]."
>
> **Chad R. Richison**
> *Founder, President, CEO & Chairman of the Board*
>
> Yes, I kind of said this in the past. If you kind of go back and look, I said that if you sell a client a product and you're billing them $10 and you're using $6 of it trying to go out there and sell them another product, you're creating more of a problem for a client. ***You really want the clients to achieve a value to what they've already bought. And that's what our CRRs are doing.*** It's

not that CRRs are selling the product, we do. ***It's just they're selling a lot less of it than they've ever done in the past.***

That group has typically always been up. And this year, they're going to be down $20 million in sales ***because they're out there on-site with clients, helping them utilize the products that they have.*** We are not out there pushing them [to utilize Beti]. ***I'm not going to say that we weren't [pushing them] at some level,*** but I also think that ***we've gotten better at both how Beti is utilized as well as how we work with each client and helping them achieve the full value,*** whether they're ready or not.

180.    Thus, Defendants admitted that CRRs were selling "a lot less" than they had in the past because they were "out there on-site with clients" pushing them "at some level" to utilize Beti. This trade-off—"a lot less" cross-selling by CRRs so the CRRs could be "out there on-site with clients" to push existing clients to utilize Beti—was one of the "strategic revenue decisions" and "strategic performance and client value decisions" that Defendants were making throughout the Class Period but did not disclose to investors until October 31, 2023.

**B.    In February 2024, Defendants Restate Paycom's Revenue Retention Metrics for 2022, Admitting that Paycom's Revenue Attrition Was Underreported and Revenue Retention Was Overstated Throughout the Class Period**

181.    On February 7, 2024, Paycom issued a press release reporting fourth quarter and year-end results for 2023 ("February 2024 Press Release"). In the February 2024 Press Release, Paycom explicitly admitted that its revenue attrition had been underreported throughout the Class Period by restating its revenue retention rate for 2022, explaining that Paycom was "accelerat[ing] the point at which a client is deemed 'lost' for purposes of our annual revenue retention rate calculation."

182.    Specifically, Paycom stated in the February 2024 Press Release, in relevant part:

**Annual Revenue Retention Rate Calculation**

Historically, we calculated annual revenue retention rate as total revenues minus revenue attrition, divided by total revenues. Revenue attrition is equal to the actual recurring fees paid by clients during the 12 months preceding the respective dates on which they last processed payroll with us. Throughout 2023, as we increased our engagement efforts with clients and our efforts to reduce attrition, it was important for us to identify revenue attrition more quickly. In July 2023, we implemented operational changes related to how we mobilize our services department to manage relationships with clients that have missed a payroll, as well as a contemporaneous change to our standard services agreement. ***These strategic operational and contractual changes accelerate the point at which a client is deemed "lost" for purposes of our annual revenue retention rate calculation.*** Further, we are now excluding interest earned on funds held for clients from the calculation, which has been immaterial to date. ***Based on the new methodology, the annual revenue retention rates for the years ended December 31, 2023, 2022 and 2021 were 90%, 91% and 94%, respectively***, with losses concentrated primarily among smaller clients. These changes to the annual revenue retention rate calculation had no impact on reported financial results. We believe these increased engagement efforts and operational changes contributed to an increase in the revenue retention rate in the month of January 2024 compared to the same period in the prior year.

183.    In other words, Paycom's deliberate delay in removing clients who were no longer using Paycom's payroll services from Paycom's lists of active clients—as described by CW1 in Section IV.F, *infra*—resulted in those clients being excluded from the attrition calculation as they were not yet deemed "lost," which artificially inflated Paycom's revenue retention rate that was reported during the Class Period.

184.    Notably, prior to February 7, 2024, Defendants had never before disclosed how Paycom calculated revenue retention, measured attrition, or determined when a client was deemed "lost."

185.    As noted in the February 2024 Press Release, the purported revision to the method for determining annual revenue retention rate, and the acceleration in recognizing lost clients, also meant that Paycom restated its annual revenue retention rate for its fiscal years 2021 and 2022, with the 2022 revenue retention rate being restated to lower than originally reported. *See* Figure 2.

**Figure 2**

| Fiscal Year | Ann. Rev. Retention Rate (v. prior year) *Original Reporting* | Ann. Rev. Retention Rate (v. prior year) *2024 Revised Reporting* |
|:---:|:---:|:---:|
| 2018 | 92% | - |
| 2019 | 93% | - |
| 2020 | 93% | - |
| 2021 | 94% | 94% |
| 2022 | **93%** | **91%** |
| 2023 | - | 90% |

186.    By misstating the 2022 annual revenue retention rate in the February 2023 Form 10-K, Defendants hid tens of millions of dollars in revenue attrition during 2022.

187.    Furthermore, by hiding the significant decline in ARRR from 2021 to 2022 and assuring investors that Beti was improving retention, investors were left to assume that 2023 would again have an ARRR of at least 93%, not 90%. Thus, the misstatement hid tens of millions of dollars in revenue attrition in 2023 as well.

188.    Defendants' misstated retention metrics also hid from investors that Paycom was rapidly losing clients, which resulted in a dramatically lower net increase in clients, year-over-year. Indeed, while Paycom had consistently enjoyed a net increase of nearly

3,000 clients each year prior to the class period, Paycom's net increase in clients declined in 2022 and 2023, with a net increase of only 259 net new clients in 2023. *See* Figure 3.

**Figure 3**

| Fiscal Year | No. of Customers (as of Dec. 31) | Net Change Over Prior Year | Rate of Change Over Prior Year's Net Additions |
|---|---|---|---|
| 2018 | 23,533 | - | - |
| 2019 | 26,527 | + 2,994 | - |
| 2020 | 30,994 | + 4,467 | + 49% |
| 2021 | 33,875 | + 2,881 | - 36% |
| 2022 | 36,561 | + 2,686 | - 7% |
| 2023 | 36,820 | + 259 | - 90% |

C.   **During the June 4, 2024 Baird Conference, Defendant Richison Admits Existing Clients Resist Purchasing and Using Beti**

189.   During the June 4, 2024 Baird 2024 Global Consumer, Technology & Services Conference, Richison admitted that payroll departments had been resistant to and "not all keen on" adopting Beti because it required significant changes to adopt.

**<u>Mark Steven Marcon</u>**
*Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst*

So -- and just to back up for people who aren't familiar, I mean, part of the reason for asking about Beti and focusing there is that Paycom has been historically one of the fastest-growing players within the space with the highest margins. And with this focus on Beti, we did see a bit of a slowdown. So one question -- and part of the reason why you're focused on Beti is not only does it give them a great ROI, but obviously, if you get all the employees to use the solution, that creates a barrier to exit because you've got everybody that's engaged, and so your client retention ends up being better.

**Can you talk a little bit about that client retention**, but then pivot to talking about like **I've demoed Beti, I don't understand why it's difficult to get a client to fully utilize it.**

<u>Chad R. Richison</u>
*Paycom Founder, President, CEO & Chairman of the Board*

**Yes. Well, there's some change management**. … **And so that's the process. It's a little bit different.** And you're leveraging what the employees know about their own payroll, their own expectation. I mean if you get 1,000 employees, it's difficult for me to know that, that employee worked 42.7 hours regular time and x amount of overtime. And so you do need a process. The employee does know though. And the employees catch a lot of things in the system that we would be fixing after the fact. **But there is some change management for people.**

You know businesses, they want to keep their electricity going. They want to sell their product. There's a lot of things that they want to do. And so we're one aspect of that coming in and working with them. And to some extent, they had a good process already. I mean, with -- if you're in -- if you're utilizing Paycom already because we have this single database, things are working for them, and then we go out and we say, hey, we can make this even more automated for you.

**And the first time you hear that we expect employees to do their own payroll, people when you first tell them that, they're not all keen on that** until they understand the advantages and how they can't get hurt through that process.

190.    When an analyst asked whether the resistance in adopting Beti was coming from existing clients' employees or payroll departments, Richison admitted it was existing clients' payroll departments that were resisting Beti and stated that the Company was no longer forcing existing clients to adopt Beti:

<u>Mark Steven Marcon</u>
*Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst*

And so **is the change management the barrier coming from the payroll department?** Or is it coming from the employees or both?

110

**Chad R. Richison**
*Paycom Founder, President, CEO & Chairman of the Board*

**I would say it's more payroll department driven** than employees. …

And **we're not making any one go on Beti**, that's not it. **We're not forcing it on someone**, client will make that decision. But I do believe that as you look into the future, full automation of these products because it can be done.

191.    Moreover, when an analyst asked what percentage of existing clients had adopted Beti, Richison admitted Paycom had stopped tracking that, signaling that Paycom truly was no longer attempting to force existing clients to adopt Beti:

**Mark Steven Marcon**
*Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst*

And what percentage of the installed base now has Beti?

**Chad R. Richison**
*Paycom Founder, President, CEO & Chairman of the Board*

We haven't updated it. We call it one installed base total. We have not updated it since we last gave the number of 2/3. We do say, though, we -- all new clients continue to come on Beti, and we do continue to have success with current clients uptaking it.

## VIII. SCIENTER

192.    The facts alleged herein create a strong inference that Defendants acted with scienter when issuing the misrepresentations alleged in this complaint.

193.    Defendants knew or recklessly disregarded that forcing Beti on unwilling existing customers was driving customer attrition to the detriment of Paycom's retention rates, that Beti was cannibalizing unscheduled revenues from billable corrections, and that CRRs, in pushing Beti, were generating fewer cross-sales, as evidenced by the following:

(a) Defendants were informed of these risks prior to Paycom launching Beti in July 2021;

(b) Defendants were given extensive negative customer feedback from the Client Relations teams, yet continued to mandate that Beti be pushed on all existing clients; (c) Defendant Richison was admittedly, and confirmed by CWs to be, deeply involved in the details of Beti including the decision to push Beti on unwilling customers; (d) Defendants admittedly tracked and discussed customer retention, lost clients and other reports on a weekly basis; (e) Defendants admittedly monitored KPIs and "months of data" regarding Beti; (f) Defendants commented extensively regarding Beti, thus demonstrating an intimate knowledge of the product and its issues; (g) Beti was essential and core to the Company's operations; (h) Defendant Richison instructed Paycom's Turn Team to delay removing lost clients, and in 2024, Paycom admitted needing to accelerate recognition of lost clients; and (i) Defendants were motivated by equity-based rewards to inflate the price of Paycom's common stock and maintain the appearance of a high revenue retention rate.

**A.    Defendants Were Warned Prior to Beti's Launch that Beti Would Cannibalize Paycom's Unscheduled Revenues, Negatively Impact Paycom Employees' Ability to Cross-sell Additional, Non-Payroll Products, and Increase Client Attrition**

194.    In April 2021, prior to the launch of Beti in July 2021, Paycom's leadership established the Beti go-to-market team to ensure the go-to-market launch of Beti was successful and optimized. The go-to-market team reported to Shelly Ballew, the Beti Program Manager, who Richison assigned to take on Beti.

195.    Prior to the Beti launch and prior to the Class Period, the Beti go-to-market team identified the following likely risks from Beti that would negatively impact Paycom's

revenue and financial results: (1) Paycom's revenues would decline by reducing client errors that needed to be corrected with unscheduled or off-cycle payroll runs, as corroborated by CW4; (2) it would be difficult for the CRR and PSD groups to find time to sell Beti and/or do implementations for the product once it did launch and if they were made to focus on selling Beti, they would not have enough time for cross-selling; and (3) existing customers may resist adopting Beti because it would require them to completely change their payroll processes.

196.    Beti's risks were communicated to Shelly Ballew, head of the Beti team, so that she and Dickens Aubourg, Director of Product Management, could discuss them with Paycom's leadership including Defendant Richison during meetings. Thus, the financial risks Beti represented to off-cycle payrolls and to CRRs' cross-selling capacity were predicted (and expected) prior to Beti's launch in July 2021,

197.    Defendant Richison would have been aware of the foregoing risks from his regular meetings with Ballew. Moreover, given that Beti was Defendant Richison's idea, and considering how routinely Defendant Richison would discuss Beti, it is likely that Defendant Richison would have been keenly aware of the risks Beti posed.

198.    Thus, Defendants' creation of a go-to-market team to consider the risks relating to the launch of Beti, and Defendants were apprised of and considered them prior to the product's launch raises a strong inference that the Defendants' Class Period misstatements were made with scienter.

B.    **Defendants Received Enormous Backlash from CRRs and Managers Who Complained that the Mandate for All Clients to Adopt Beti Was Destroying Relationships with Client Accounts and Preventing CRRs from Cross-Selling**

199.    In June 2021, Defendant Richison imposed an end-of-year deadline at which time all clients would be required to have purchased Beti. It was well known within Paycom that the mandate to sign everyone up for Beti came directly from Defendant Richison. Defendant Richison himself communicated internally as early as April 2021 that "everybody is going to be on Beti," without publicly giving deadlines.

200.    But, by September 2021, CRRs were voicing concerns and complaints from existing clients about the push for all clients to adopt Beti when the clients did not want Beti. This was conveyed up the sales reporting chain and conveyed to Defendants Richison and Boelte, included that forcing clients to adopt Beti was destroying relationships with the client accounts and was preventing CRRs from selling Paycom's additional, non-payroll products because CRRs were forced to spend much of their time helping clients implement Beti.

201.    In response to the CRRs feedback, Defendants held a national sales training meeting in October 2021 that was convened to train Paycom's sales and CRR teams how to lower clients' resistance to Beti. Despite Defendants' acknowledgment during that training of clients' strong resistance to Beti and that forcing Beti upon clients had the effect of pushing clients away, Paycom management's message to CRRs in the ensuing months was to just "sell more, sell more."

202.    By mid-2022, there was a significant shift in Defendants' response to the negative feedback about Beti, and Faurot responded to the CRRs feedback with an ultimatum that if a CRR did not sell a certain amount of Beti, the CRR would be put on a performance improvement plan, even if the CRR had achieved 100% of their other goals for the period. After Faurot's threats, the CRRs were required to provide daily reports regarding their efforts to meet with clients about purchasing and using Beti.

203.    Thus, the enormous backlash from CRRs that was communicated to the Defendants regarding the mandate that all clients purchase and use Beti, and the Defendants response to this backlash, raises a strong inference that the Defendants' Class Period misstatements were made with scienter.

**C.    Defendant Richison Admits, and Confidential Witnesses Confirm, that Defendant Richison Was Deeply Involved in the Details of Beti and the Decisions to Push Beti on All Clients**

204.    Defendant Richison admitted throughout the Class Period that he was aware of and involved with Paycom's strategy with respect to Beti and clients' usage of Beti. For example, during the 2023 Q1 Earnings Call on May 2, 2023, Defendant Richison boasted that "[Paycom's] product and go-to-market strategy are working. I just returned from our annual President's Club meeting with our top salespeople, and I couldn't be more excited about the tone of the conversations and enthusiasm for our product, especially around employee usage in Beti."

205.    Defendant Richison also admitted at the end of the Class Period, during the August 1, 2023 Q2 Earnings Call, that Defendant Richison himself had been directing the

CRRs to focus their efforts away from cross-selling additional products and instead focus on getting existing clients to use Beti, even specifying that he had tripled CRR commissions relating to Beti to make up for the commissions CRRs would have received if they had been cross-selling additional products rather than helping clients implement and use Beti. Defendant Richison explained:

> And so I'm not saying I've told any CRRs, hey, don't go out and sell a product. What ***I've said*** is this is your priority, any clients that aren't currently on it achieving the value. I know [Beti is] a smaller revenue amount. So I'm going to pay you triple because I know it's a small revenue amount. So any time you sell one, this will be your commission.

206.    Beti was Defendant Richison's vision for years prior to its launch. Notably, Defendant Richison did not credit anyone else when he routinely discussed Beti. Moreover, the mandate that all existing clients adopt Beti came directly from Defendant Richison.

207.    Additionally, CW2 recalled that Defendant Richison was involved in sales trainings on how to overcome known client resistance to Beti. CW2 stated that Defendant Richison spoke at national sales training meeting in Aspen, Colorado in October 2021, which was convened by the Chief Sales Officer specifically for the purpose of training employees on how to counteract customers' resistance to Beti. During the training, Defendant Richison spoke and acknowledged that existing client's pushback to Beti since its rollout was high.

D.    **Defendants Admit Reviewing Weekly "Retention Reports" and Other Reports throughout the Class Period that Showed Client Resistance and Revenue Attrition from the Many Clients Who Opposed Being Forced to Adopt Beti**

208.    Defendants admit receiving and reviewing reports throughout the Class Period which detailed information that contradicted their false and misleading statements alleged herein, raising a strong inference that Defendants made the false and misleading statements with scienter. These reports the Defendants admit to reviewing included Usage Reports, Retention Reports, Lost Clients Reports, and Save Opportunity Reports.

209.    For example, during a May 4, 2021 earnings call, Defendant Richison admitted receiving and reviewing Retention Reports and Usage Reports and knowing the trends in those reports:

> In fact, someone gave me a retention report the other day, and I thought it was a usage report because the trends are almost the exact same. You watch usage go up, you watch retention go up. And so that's really what we've been seeing as a reflection of strong retention, it's about usage.

210.    Later, during a June 1, 2021 conference held by securities research firm Cowen and Company, Defendant Richison admitted that Paycom had been tracking retention "the same way since 2007," and expressed his understanding of the how retention was calculated.

211.    Moreover, despite Paycom's policy of reporting retention metrics to the public just once per year in February, Defendant Richison kept himself apprised of retention performance all year long and regularly demonstrated his knowledge of Paycom's then-current retention metrics, often commenting on Paycom's retention metrics during

earnings calls and other conference calls. *E.g.*, February 8, 2022 ("Paycom's annual revenue retention rate increased once again to 94% this year"); May 3, 2022 ("our current retention number when compared with the same period last year is either equal to or improved"); August 2, 2022 ("usage has been impacting retention"); May 2, 2023 ("I would just say we've been very stable [in terms of revenue retention]"); August 1, 2023 ("[revenue retention] does fluctuate throughout the year" and "I don't see people leaving that have Beti"); October 31, 2023 ("neither [] our surprise in the third quarter nor our larger-than-normal adjustment for fourth quarter guide are related to any change in our expectation for retention achievements").

212.    CWs also confirmed that the Defendants received and discussed weekly Retention Reports, Lost Clients Reports, and SaveOps Reports throughout the Class Period that kept the Defendants apprised of Paycom's retention metrics and revenue attrition. The SaveOps and Lost Client reports detailed the clients that left Paycom or were in danger of leaving the Company and the reasons why the client was leaving, among other information. These reports would have shown, throughout the Class Period, increasing client attrition due to being forced to adopt Beti.

213.    CW2, a Sales Manager employed at Paycom prior to and during the Class Period, recalled that Defendant Richison reviewed the Lost Clients and SaveOps Reports regularly. CW4 likewise recalled that the Lost Clients and SaveOps reports were circulated at least monthly, that such information was also readily-available in Paycom's internal systems to which CW4 had access, and that when new clients were added as SaveOps, emails would be sent noting the additions, with Paycom management copied on the emails

depending on the size of the client. Furthermore, CW4 knew that Defendant Richison reviewed the Lost Clients Report because CW4 specifically recalled Richison making reference to one of CW4's clients who had appeared on the Report in 2021.

**E.      Defendants Admit Tracking KPIs and Reviewing "Months of Data" of Beti Usage During the Class Period that Showed Beti Cannibalizing Paycom's Revenues**

214.    After the Class Period, during the 2023 Q3 Earnings Call held on October 31, 2023, Defendant Boelte admitted that the Defendants analyzed "months of data" of Beti usage to understand Beti's impact:

> Now that more clients are achieving the ROI that Beti has to offer, it has eliminated certain billable items, which is cannibalizing a portion of our services and unscheduled revenues. With 10 months of data from increased Beti usage, we are incorporating the impact that our clients' ROI achievement has on our model.

215.    Importantly, Beti was launched in July 2021 and thus, Defendants would have had approximately 8 months of data from Beti usage prior to the commencement of the Class Period before Defendants began making materially false and misleading statements. Thus, Defendants' admission that they analyzed months of data of Beti usage data during the Class Period, and that the data showed Beti was cannibalizing Paycom's unscheduled revenues from billable corrections, creates a strong inference that Defendants knew throughout the Class Period that increased Beti usage was resulting in a substantial cannibalization of Paycom's revenues.

216.    That the risks of revenue cannibalization and encumbered cross-selling were anticipated before the launch of Beti by the Beti go-to-market team and communicated to Defendants, Defendants' admission that they analyzed months of data of Beti usage, that

the data showed Beti causing revenue cannibalization, and that Defendants had at least 8 months of Beti usage data prior to the commencement of the Class Period creates a strong inference that Defendants' materially false and misleading statements were made with scienter.

217.    Defendants also admitted at the end of the Class Period on October 31, 2023 that their decisions to push Beti upon clients, despite the known impacts, were intentional, purported "strategic revenue decisions" and "strategic performance and client value decisions" that focused on what Defendants "feel [is] best for our long-term relationship with our clients" at the expense of revenue growth.

218.    Defendant Richison also repeatedly professed throughout the Class Period that the Individual Defendants had excellent visibility into Paycom's revenue, including in guiding for future revenues. For example, Defendant Richison stated *twice* during the 2022 Q1 Earnings Call that "we've always had great visibility" into revenue guidance. Then on the 2022 Q2 Earnings Call, Richison again stated "we have great visibility … guiding quarter-to-quarter." On the 2022 Q3 Earnings Call, Defendant Richison provided that "we do have pretty good visibility as we go quarter-to-quarter." Then, finally, on the FY 2022 Earnings Call, Defendant Richison remarked that "we have quite a bit of visibility as we go quarter-to-quarter." That Defendant Richison repeatedly admitted that "we" (he and fellow Paycom management, like Defendant Boelte) had insight into Paycom's future revenues demonstrates that the Individual Defendants intimately tracked the Company's revenue, and thus that the false and misleading Class Period statements were made with scienter as to factors that were affecting such revenue.

219.    The Individual Defendants' frequent public statements about both Beti adoption and usage rates and Paycom's recurring revenue also strongly suggest that they closely tracked these two crucial metrics.

220.    Throughout and after the Class Period, Defendant Richison repeatedly discussed the portions and quantities of Paycom's clients and clients' employees that had purchased and/or implemented Beti:

    i.    In the May 3, 2022 Q1 Earnings Call, Defendant Richison reported that "over 1/4 of our clients have implemented and/or are in the process of implementing Beti," which represented "over 10,000 of our clients."

    ii.    In the August 2, 2022 Q2 Earnings Call, Defendant Richison reported that "Beti is the future of payroll and already over 13,000 clients or nearly 40% of our client base have embraced Beti."

    iii.    In a September 7, 2022 conference hosted by Citigroup, Defendant Richison reported that "[w]e started converting" existing customers "in September. Today, as companies come on already, half of their employees are doing their own payroll within their first payroll." Defendant Richison also reported that "[w]e've got 40% of our client base on it."

    iv.    In the November 1, 2022 Q3 Earnings Call, which reported figures as of the end of the third quarter ended September 30, 2022, Defendant Richison reported that "about 50% of all current clients are on Beti."

v.      In the February 7, 2023 FY 2022 Earnings Call, Defendant Richison reported that "[w]e're around 50%. It's about where we were when we reported in November."

vi.      In a June 6, 2023 conference hosted by Baird, Defendant Richison reported that "[w]ith Beti, we're over 50% now of the employees do their own payroll."

vii.      In the August 1, 2023 Q2 Earnings Call, Defendant Richison reported that "we've still got about 40% of our client base not on Beti."

viii.      In the October 31, 2023 Q3 Earnings Call, which reported figures as of the end of the third quarter ended September 30, 2023, Defendant Richison reported that "nearly 2/3 of our clients have made the shift to Beti."

ix.      After the Class Period, during the June 4, 2024 Baird Conference, Defendant Richison reported in response to an analyst question about Beti adoption that "[w]e have not updated it since we last gave the number of 2/3"—*i.e.,* since the October 31, 2023 Q3 Earnings Call, which reported figures current as of the end of the third quarter ended September 30, 2023.

221.    That Defendant Richison frequently apprised investors as to the adoption and usage rates for Paycom's new flagship product, Beti, over the course of more than a year strongly supports an inference that the Defendants closely tracked and monitored the Beti

rollout, and thus that they had knowledge of the issues with the Beti rollout whilst making false and misleading statements to investors. Moreover, given that Beti adoption stalled out multiple times—first at approximately 50% of customers for the over eight months from September 30, 2022 through June 6, 2023, and then at approximately 66% ("2/3") for the over eight months from September 30, 2023 through June 4, 2024—Defendant Richison knew or should have known that many existing clients were resistant to adopting Beti, especially given this was predicted by the Beti go-to-market team prior to the product's launch, and given this was observed by CRRs.

F.    **Defendant Richison Instructed Paycom's Turn Team to Delay Removing Lost Clients from Reported Revenue Retention and Customer Counts, Resulting in a Restatement of Revenue Retention in 2024**

222.    Paycom's changing treatment of which client accounts were considered "active" for purposes of client retention contributes to a strong inference that the Class Period misstatements were made with scienter.

223.    CW1 provided that Paycom's Turn Team, part of the PSD group, was responsible for going into the Company's Admin B2 System and terminating the accounts of clients who had cancelled their contracts with Paycom, so that they would not be counted as active clients. CW1 recalled hearing from members of the Turn Team that Paycom was "losing tons of clients" by late 2022 and that this number grew "every day" into 2023, yet also that the Turn Team had been directed to proceed slowly in removing such clients from Paycom's systems, a fact which CW1 personally observed through access to the Admin B2 System, in order to prevent a sudden hit to the Company's client count. CW1 believed that

Defendant Richison had directed the Turn Team to remove clients dilatorily because "most ideas" such as this, in CW1's experience, came from Defendant Richison.

224.    Well after the Class Period, Paycom issued the February 2024 Press Release, admitting that Paycom was restating its revenue retention for 2022 and "accelerat[ing] the point at which a client is deemed 'lost' for purposes of [Paycom's] annual revenue retention rate calculation," the algorithm for which was also modified compared to prior years. As a result, Paycom's annual revenue retention rate for 2022 was revised down from the 93% previously reported to 91%, representing tens of millions of dollars in revenue attrition.

225.    That Paycom during the Class Period had deliberately delayed removing client accounts, which was likely at the direction of Defendant Richison, only to later admit a need to hasten removal of such accounts which bore on the Company's crucial retention metric, supports an inference that Defendants' false and misleading statements during the Class Period were made with knowledge as to the true rate at which clients were leaving Paycom.

**G.    Defendants Were Motivated by Equity-Based Awards to Inflate Paycom's Stock Price and Maintain the Appearance of a High Revenue Retention Rate**

226.    The Individual Defendants were entitled under a Long-Term Incentive Plan to receive equity-based awards that would be determined based on the achievement of pre-established performance goals. Among the performance goals that impacted the Individual Defendants' equity-based awards were "the daily volume weighted average price of the Company's common stock and annual retention rate[.]"

227.    Thus, the Individual Defendants were motivated to inflate the price of Paycom stock throughout the Class Period and to maintain the appearance the Company's revenue retention rate remained high, raising a strong inference that the Defendants' Class Period misstatements were made with scienter.

## IX.   LOSS CAUSATION AND ECONOMIC LOSS

228.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Paycom securities and operated as a fraud or deceit on Class Period purchasers of Paycom securities by failing to disclose, and misrepresenting, the adverse facts detailed herein. Defendants' false and misleading statements had the intended effect and caused Paycom common stock to trade at artificially inflated prices throughout the Class Period, trading as high as $370.78 per share on August 1, 2023, peaking immediately before the truth was revealed to the market.

229.    Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market and the price of Paycom securities declined significantly as the prior artificial inflation came out of the securities' prices. As a result of their purchases of Paycom securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Plaintiff's and the other Class members' damages were a direct result of Defendants' fraudulent scheme to artificially inflate the price of Paycom securities and the subsequent declines in Paycom share price when the Defendants' prior misrepresentations and other fraudulent conduct were revealed.

230.    Moreover, when Defendants directed Paycom's CRRs to attempt to force all existing clients to purchase and use Beti, they created substantial and material risks that CRRs would have fewer cross-selling opportunities, that increased Beti adoption and usage would cannibalize a portion of Paycom's unscheduled revenues from billable corrections, and that increased client attrition would negatively impact annual revenue retention rates. Defendants concealed those risks from investors throughout the Class Period. When those risks materialized, Defendants missed revenue guidance and/or were forced to lower revenue guidance in a series of corrective disclosures, causing Paycom's stock price to plummet and damaging Plaintiff and other Class members.

### A.    August 1, 2023 Disclosure

231.    Specifically, during the 2023 Q2 Earnings Call on August 1, 2023, while discussing Paycom's financial results for Q2 2023, the Defendants partially revealed the truth that, as the Company pushed for existing clients to adopt Beti, the Client Relations Representatives had significantly less time to cross-sell, resulting in revenue headwinds of at least $20 million in 2023, which was having a negative impact on the Company's revenue growth rate. Thus, despite Q2 revenue beating expectations by $3.1 million, Paycom only raised its full-year guidance by $2.0 million, acknowledging a deceleration in the Company's revenue growth rate.

232.    When asked what was causing the deceleration in revenue growth rate, Defendant Richison specified that "there's really only one metric that's given way for us" that was causing the revenue growth slowdown, "and that's the fact that we're having CRR[s] spend 3 days converting [existing clients to Beti]." Thus, a risk that had been

concealed from investors throughout the Class Period—the risk that using CRRs to push Beti implementation would hurt cross-selling—had materialized, resulting in lower cross selling revenues and lower revenue growth expectations. Moreover, the fact that CRRs had been spending half their work time helping clients implement and use Beti had also been concealed from and unknown to investors and market analysts.

233.    Media and market analysts understood Defendants' August 1, 2023 disclosure to be correcting prior misrepresentations. For example, Jefferies Research Services, LLC reported on August 1, 2023 that "Mgmt noted the push to convert customers to BETI will result in a $15-$20M bookings headwind in 2023, likely explaining the 2Q softness and guidance for a further slowdown in 2H23." Jefferies further explained: "The push by the CRR team to drive BETI conversion has led to lower sales of other, higher ARPU add-ons, which we believe contributed to the light 2Q results." On the hope and expectation that the CRR teams were only temporarily diverted and would return to their normal focus, Jefferies maintained its price target ("PT") for Paycom stock: "Despite the near-term hiccup, we are willing to exercise patience and see if growth re-accelerates once the BETI push ends and the CRR team returns to its normal focus on upsell/cross-sell of PAYC's other, higher ARPU products."

234.    Baird Equity Research reported on August 1, 2023 that although outside sales continue to be strong, "revenue growth decelerated against tough comps as CRR group focused on Beti conversions." Baird Equity Research further explained that "CRR has been tasked with Beti conversions," "revenue is decelerating as CRR bookings have been weaker," and "greater emphasis on Beti vs. other areas cost them ~$15-$20mn in annual

bookings this year." Accordingly, Baird Equity Research lowered its PT for Paycom stock from $443 per share prior to the disclosure to $427 per share after the disclosure.

235.    J.P. Morgan's equity analysts reported on August 1, 2023 that Paycom suffered from "some transitory growth impacts as Paycom focuses on selling and migrating existing clients to Beti" and noted that "[t]he $2M raise to the full-year revenue outlook falls below the Q2 beat and is materially below the historical cadence of raises to this metric[.]" J.P. Morgan further explained that "[Paycom's] CRR group, focused on upselling Beti to its current clients, is down y/y" and "Paycom believes that the CRR team's focus on BETI vs. selling new products is likely costing the business $15-20M in bookings this year, though characterizes this as a 'season', in other words suggesting the season will eventually change." Thus, on the expectation that Paycom's revenue growth deceleration was a temporary "season," J.P. Morgan maintained its PT for Paycom's stock.

236.    Securities analysts at Piper Sandler also reported on August 1, 2023 that strong demand for Paycom's services among new clients was "offset by weakness with up-selling to current clients." Piper Sandler further explained: "CRR (upselling of current clients) is down y/y due to focus on converting to Beti."

237.    On August 2, 2023, Barclay's published an equity research report that noted Paycom's deceleration in sales growth and stated: "The main factor seems to be management's decision to push for greater BETI adoption, which creates a revenue headwind." Barclays further explained that full-year guidance was raised less than the Q2 beat and that management believed the slowdown was caused by "its decision to commit more resources to move existing customers to BETI, which has a negative revenue impact

in the short-term." Barclays also noted the supposed magnitude of this negative impact, writing: "Management discussed a $15-20mn bookings headwind from committing more Client Relations Reps (CRRs) to converting existing clients to BETI versus selling higher revenue modules[.]"

238.    Citi Research reported on August 2, 2023 that Paycom's outside sales remained strong "yet PAYC faced difficulties with expansion bookings as [CRRs] work to convert the 40% non-Beti cohort, impacting bookings ($15-20M impact)."

239.    Needham & Company reported on August 2, 2023 that "CRR reps up-selling customers BETI is creating a headwind to bookings. Management outlined the impact of client representative reps up-selling customers BETI is creating a headwind to bookings for the year of $15-$20mm." Needham explained that Paycom's deceleration in revenue growth rate was "impacted somewhat as inside sales reps continue to sell a lower ARPU solution in BETI to achieve 100% adoption."

240.    Deutsche Bank Securities reported on August 2, 2023 that Paycom's "disappointing guide" was "partially led by 'Self-Inflicted' BETI focus." Deutsche Bank explained: "CRR (retention and upsell group) saw a y/y decline in revenue growth from a focus on driving BETI adoption. Commentary indicated that management has upped incentive compensation around BETI to drive sales, even if a lower revenue product as compared to other modules with a $15-20mn impact to bookings in FY23."

241.    Wolfe Research reported on August 2, 2023 that Paycom management insisted that "broad demand remains strong, though they did call out that the CRR group, which upsells current clients, has been down Y/Y. The main reason is that PAYC is focusing

the CRR group's efforts on converting the client base to Beti (40% left to convert), which has resulted in a 'self-inflicted' $15-20M headwind to bookings this year, a headwind management called out on our callback as transitory." Accordingly, Wolfe Research lowered its PT for Paycom stock from $420 to $375.

242.    The revelation during the 2023 Q2 Earnings Call that Paycom was using its CRRs to push existing clients to adopt Beti, resulting in lower cross-selling revenues and decelerating the Company's revenue growth rate, caused Paycom's stock price to fall from a $370.78 per share on August 1, 2023 at the close of the trading day, before the earnings call, to $299.62 per share on August 2, 2023 at the close of the first trading day after the earnings call, a decline of more than 19% on heavy trading volume.

**B.    October 31, 2023 Disclosure**

243.    Then, during the 2023 Q3 Earnings Call on October 31, 2023 discussing the Company's disappointing financial results for Q3 2023, Paycom finally revealed the truth that its decision to focus CRRs on Beti adoption was not a "transitory" revenue headwind, but was part of Paycom's longer-term, previously undisclosed "strategic performance and client value decisions" and "strategic revenue decisions" that had, and would, impact the Company for at least the "next 15 months." Defendants further revealed that, as more of its clients adopted Beti, it could no longer charge those clients the unscheduled revenues for correcting payroll errors it had customarily relied on for its past, outsized revenue growth, as Beti was specifically designed to eliminate the inefficiencies that led to those errors.

244.    As a result, Paycom reported 3Q23 revenues of $406 million, down from the $410 million to $412 million range it had projected on August 1, 2023. Paycom also reduced its annual FY23 financial guidance. Defendants now expected revenue guidance in the range of $1.679 billion to $1.684 billion, down from the $1.715 billion to $1.717 billion range projected on August 1, 2023, and rather than adjusted EBITDA in the $722 million to $724 million range, the Company only expected $712 million to $717 million. Additionally, Defendants warned that Paycom's 4Q23 revenue growth rates were slowing, announcing that revenues would increase less than 15%, and would only increase 10–20% in FY24, approximately one-third of the growth experienced in the past.

245.    Paycom's dramatic decline in revenue growth rates was also a materialization of the risks that had been concealed from investors. Specifically, Defendants had falsely represented that Beti would be accretive to existing customer revenues and concealed that Beti would cannibalize Paycom's unscheduled revenues from billable corrections. Defendants also concealed that pushing Beti would reduce CRRs cross-selling revenues, existing clients' resistance to adopting Beti, and the risk that higher client attrition would result from Paycom's insistence that all existing clients adopt Beti. Thus, the dramatic decline in Paycom's revenue growth rates that was announced on October 31, 2023 was a materialization of these risks that had been concealed by Defendants throughout the Class Period.

246.    Upon the news that Paycom's previously undisclosed strategic performance and client value decisions and strategic revenue decisions were severely decelerating Paycom's revenue growth, Paycom's share price fell $94.28 per share, or 38.5%, from its

close of $244.97 per share on October 31, 2023 to close at $150.69 per share on November 1, 2023, thereby damaging investors.

247.    Media and market analysts understood Defendants' October 31, 2023 disclosure to be correcting prior misrepresentations.  For example, on November 1, 2023, Deutsche Bank published a report titled "Not Betting on Beti for Now; Downgrade to Hold," in which it explained that it was downgrading Paycom because "the company signaled adoption of its Beti solution is driving greater efficiencies for customers and saving them money on services and unscheduled payroll runs, negatively impacting monetization opportunities for Paycom."

248.    Similarly, Citigroup downgraded Paycom to neutral in a November 1, 2023 report, attributing its decision to "further concerns on the Beti growth outlook due to cannibalization of the [revenue] base."

249.    A November 1, 2023 report from Oppenheimer titled "Downgrade Paycom to Perform Rated as the Growth Trajectory Becomes Impaired" further demonstrated the market's understanding that the main cause of Paycom's slowing growth was that "[t]he implementation of BETI has led to a decrease in the need for fixing issues and errors, which were previously a significant source of revenue. This has led to a reduction in the amount existing clients that are billed for these services."

250.    Writing in an October 31, 2023 report, Baird Equity Research analysts found Paycom's third quarter 2023 results and guidance "[e]xtremely disappointing," noting that "weaker CRR bookings due to focus on Beti conversions vs. other areas reduced annual bookings ~$15-$20mn for '23" and that "[m]anagement cited for the first time a headwind

from the reduction in certain billable items such as unscheduled payroll runs and corrections as Beti is resulting in less payroll errors."

251.    Accordingly, the decline in Paycom's share price that occurred immediately after the Defendants' corrective disclosures brought the reality of Beti's impact on the Company's revenue to light and was a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in Paycom securities negates any inference that Plaintiff's and the other Class members' losses were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

252.    As Defendants' misrepresentations were revealed to the market, Paycom's stock fell from $370.78 before the first partially corrective disclosure on August 1, 2023 to just $150.69 after the October 31, 2023 disclosure, a decline of nearly 60%. *See* Figure 4, *infra*.

**Figure 4**



## X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

253.    At all relevant times, Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine. At all relevant times, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities.  At all relevant times:

    i.    Paycom's common stock was actively traded on the New York Stock Exchange, with an average weekly trading volume of 2.4 million shares during the Class Period;

    ii.    The market price for Paycom's common stock reacted promptly to the dissemination of public information regarding the Company;

    iii.    Paycom's common stock was followed by multiple financial analysts from different institutions, including those cited in this Complaint, who participated in Paycom's quarterly earnings calls;

    iv.    As a regulated issuer, Paycom filed periodic public reports with the SEC during the Class Period;

    v.    Paycom regularly communicated with public investors through established market communication mechanisms; and

    vi.    During the Class Period, Paycom's market capitalization was as high as $23.1 billion on August 15, 2022, and as of February 8, 2022, the Company had 60.2 million shares outstanding.

254.    Throughout the Class Period, the Company was followed consistently by the market, including by numerous media sources and securities analysts.  The market relies upon the Company's financial results and management to accurately present the Company's financial results and business operations.  During this period, Defendants continued to disseminate materially false and misleading information into the marketplace regarding the adoption of Beti and its impact on Paycom's revenue growth and client retention.  This information was promptly reviewed and evaluated by analysts and institutional investors and assimilated into the price of the Company's securities.

255.    As a result of the misconduct alleged herein, the market price for Paycom securities was artificially inflated.  Under such circumstances, the presumption of reliance available under the fraud-on-the-market theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are each responsible.

256.    Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Paycom securities at artificially inflated prices and the subsequent decline in the price of those securities once the truth was revealed.

257.    Plaintiff and other Class Members are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because claims asserted in this complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

258.   Had Plaintiff and other Class Members known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, they would not have purchased Paycom securities at artificially-inflated prices.

## XI.   NO SAFE HARBOR

259.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

260.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause results to differ materially from those in the purportedly forward-looking statements.

261.   In fact, Defendants did not warn at any time during its earnings calls that any of the statements made were "forward-looking statements," and did not provide any meaningful cautionary statements identifying important factors that could cause actual results to differ materially.

262.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker had actual knowledge that the forward-looking statement was materially false

or misleading, and/or the forward-looking-statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## XII. CLASS ACTION ALLEGATIONS

263.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Paycom securities between February 8, 2022 and October 31, 2023, inclusive, seeking to pursue remedies under the Exchange Act (the "Class").

264.    Excluded from the Class are (a) Defendants; (b) members of Defendants' immediate families; (c) Defendants' subsidiaries and affiliates; (d) any person who is an officer, director or controlling person of Paycom; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors or assigns of any such excluded party.

265.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Indeed, throughout the Class Period, Paycom had approximately 58 million shares outstanding.

266.    Members of the Class may be identified from records maintained by Paycom or its transfer agent and may be notified of the pendency of this action by mail through a form of notice customarily used in securities class actions.

267.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

      i.      Whether Defendants violated the federal securities laws;

      ii.      Whether the statements made were materially false and misleading;

      iii.      Whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

      iv.      Whether the price of Paycom common stock was artificially inflated during the Class Period as a result of Defendants' conduct complained of herein; and

      v.      Whether the Class Members have sustained damages, and, if so, the proper measure of those damages.

268.    Plaintiff's claims are typical of the claims of other members of the Class and the other members of the Class sustained damages arising out of Defendant's wrongful conduct in violation of federal law as alleged in this Complaint.

269.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained competent counsel experienced in class actions and in securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

270.    Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine.  All purchasers of Paycom securities during the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially-inflated prices.  A presumption of reliance therefore applies.

## XIII.  COUNTS

### <u>Count I</u>

For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against All Defendants

271.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

272.    This claim is brought under § 10(b) of the Exchange Act, 15 U.S.C. § 78k(b) and Rule 10b-5 promulgated thereunder by the SEC.

273.    The Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

274.    Defendants individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

275.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the

issuance or dissemination of such statements or documents as primary violations of the securities laws.  These Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

## Count II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

276.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

277.    This claim is brought under § 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

278.    The Individual Defendants, by reason of their status as senior executive officers and/or directors of Paycom, directly or indirectly controlled the conduct of the Company's business and its representations to Plaintiff and to the Class, within the meaning of §20(a) of the Exchange Act.

279.    The Individual Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff's and the Class's investments in Paycom securities within the meaning of § 20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

280.   The Individual Defendants knew or recklessly disregarded the fact that Paycom's representations were materially false and misleading and/or omitted material facts when made.  In so doing, the Individual Defendants did not act in good faith.

281.   By virtue of their high-level positions and their participation in, and awareness of, Paycom's operations and public statements, the Individual Defendants were able to, and did, influence and control Paycom's decision-making, including controlling the content and dissemination of the documents and statements that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

282.   The Individual Defendants had the power to control or influence the statements made, giving rise to the securities violations alleged herein, as set forth more fully above.

283.   As set forth herein, the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Paycom securities.

## XIV.  PRAYER FOR RELIEF

284.    WHEREFORE, Plaintiff prays for judgment as follows:

285.    Declaring that this action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23, and certifying Plaintiff as a Class Representative and Lead Counsel as Class Counsel;

286.    Awarding Plaintiff and each Class Member compensatory damages;

287.    Awarding Plaintiff and each Class Member pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

288.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

289.    Awarding such other and further relief as this Court may deem just and proper.

## XV.  JURY DEMAND

290.    Plaintiff hereby demands a trial by jury.

DATED:        July 8, 2024            Respectfully submitted,

  /s/ *Shannon L. Hopkins*
Shannon L. Hopkins (admitted *pro hac vice*)
**LEVI & KORSINSKY, LLP**
Gregory M. Potrepka (admitted *pro hac vice*)
David C. Jaynes*
P. Cole von Richthofen*
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: 203-992-4523
shopkins@zlk.com
gpotrepka@zlk.com

djaynes@zlk.com
cvrichthofen@zlk.com

*Lead Counsel for Plaintiff*
*Dr. Calvin Mein*

**FEDERMAN & SHERWOOD**
William B. Federman, OBA #2853
10205 N. Pennsylvania Avenue
Oklahoma Cit, OK 73120
Tel: (405) 235-1560
Fax: (405) 239-2112
wbf@federmanlaw.com

*Liaison Counsel for Plaintiff*
*Dr. Calvin Mein*

\* *Pro hac vice* application forthcoming