**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In re PAYCOM SOFTWARE, INC. SECURITIES LITIGATION<br><br><br>This Document Relates to: All Actions | Master Case No. 5:23-cv-01019-F<br><br>CLASS ACTION |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ........................................................................................1

II.  STATEMENT OF FACTS............................................................................................3

III. ARGUMENT.................................................................................................................6

   A.   Legal Standards..................................................................................................6

   B.   Defendants Made Materially False and Misleading Statements ...............................7

      1.   Defendants Misrepresented Existing Client Demand for, and Adoption and Usage of, Beti........................................................................................................... 7

         a.   Defendants' Statements are Not Immaterial Puffery ................................... 11

         b.   Defendants' Statements are Not Inactionable Opinions Nor Protected by the PSLRA Safe Harbor................................................................................. 13

      2.   Defendants Misrepresented Customer and Revenue Retention .......................... 15

      3.   Defendants' Misrepresented Beti's Net Revenue Impact and Effect on Paycom's Cross-Sales of Other Modules ....................................................................... 18

   C.   The Complaint Adequately Alleges Scienter .........................................................21

      1.   Defendants' Own Admissions Support Scienter ...............................................21

      2.   Defendants Were Warned That Beti Would Cannibalize Unscheduled Revenues and Hurt Cross-Selling and Retention.............................................................22

      3.   Defendants' Review of Internal Company Reports and Data Support Scienter...25

      4.   Defendants' Intentional Delayed Removal of Lost Clients from Reported Revenue Retention Totals, Supports Scienter ...................................................................27

      5.   Richison's Extensive Personal Involvement With Beti Supports Scienter ..........27

      6.   Holistic Review Provides a Strong Inference of Scienter...................................29

   D.   The Complaint Adequately Alleges a Claim under Section 20(a)............................30

IV.  CONCLUSION.............................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003)................................................................7, 23, 24, 28

*Alich v. Opendoor Techs. Inc.*,
2024 WL 839146 (D. Ariz. Feb. 28, 2024).................................................................. 16

*Anderson v. Spirit AeroSystems Hldgs., Inc.*,
827 F.3d 1229 (10th Cir. 2016)..............................................................................23, 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ 7

*Better v. YRC Worldwide Inc.*,
2012 WL 4433500 (D. Kan. Sept. 25, 2012)............................................................... 11

*Bristol Cnty. Ret. Sys. v. Adient PLC*,
2022 WL 2824260 (2d Cir.  July 20, 2022)................................................................. 11

*Christine Asia Co., Ltd. v. Ma*,
718 Fed. App'x 20 (2d Cir. 2017)................................................................................ 23

*Edge v. Tupperware Brands Corp.*,
2023 WL 6310236 (M.D. Fla. Sept. 28, 2023)............................................................ 27

*El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*,
709 F. Supp. 3d 1296 (D. Colo. 2023) ........................................................................ 12

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
2022 WL 716653 (D. Utah Mar. 9, 2022) .................................................................. 23

*Genesee Cnty. Empls' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*,
825 F. Supp. 2d 1082 (D.N.M. 2011)........................................................................... 14

*Grossman v. Novell*,
120 F.3d 1112 (10th Cir. 1997) ................................................................................... 12

*IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*,
706 F. Supp. 3d 1225 (D. Kan. 2023) ................................................................... 14, 18

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ............................................................... 11

*In re CarLotz, Inc. Sec. Litig.*,
2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024)............................................................. 26

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2020 WL 3026564 (D.N.J. June 5, 2020) ................................................................... 23

*In re Facebook Inc. Sec. Litig.,*
  87 F.4th 934 (9th Cir. 2023) ........................................................................... 14

*In re Gold Res. Corp. Sec. Litig.,*
  957 F. Supp. 2d 1284 (D. Colo. 2013), *aff'd,* 776 F.3d 1103 (10th Cir. 2015) ..................... 14

*In re IAC/InterActiveCorp Sec. Litig.,*
  695 F. Supp. 2d 109 (S.D.N.Y. 2010) ................................................................ 10

*In re Imergent Sec. Litig.,*
  2009 WL 3731965 (D. Utah Nov. 2, 2009)............................................................ 29

*In re Level 3 Commun's, Inc. Sec. Litig.,*
  667 F.3d 1331 (10th Cir. 2012)............................................................... 13, 23, 25

*In re Okta, Inc. Sec. Litig.,*
  2023 WL 2749193 (N.D. Cal. Mar. 31, 2023)........................................................ 11

*In re Plains All Am. Pipeline, L.P. Sec. Litig.,*
  307 F. Supp. 3d 583 (S.D. Tex. 2018).............................................................. 13

*In re Quality Sys., Inc. Sec. Litig.,*
  865 F.3d 1130 (9th Cir. 2017)...................................................................... 26

*In re Scholastic Corp. Sec. Litig.,*
  252 F.3d 63 (2d Cir. 2001) .................................................................... 24, 26

*In re Sprint Corp. Sec. Litig.,*
  232 F. Supp. 2d 1193 (D. Kan. 2002) .............................................................. 11

*In re Williams Sec. Litig.,*
  339 F. Supp.2d 1242 (N.D. Okla. 2003) .......................................................... 7, 27

*In re Williams Sec. Litig.,*
  496 F. Supp. 2d 1195 (N.D. Okla. 2007).......................................................... 18

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.,*
  45 F.4th 1236 (10th Cir. 2022)............................................................... passim

*Inst. Invs. Grp. v. Avaya, Inc.,*
  564 F.3d 242 (3d Cir. 2009) ...................................................................... 24

*Kapur v. USANA Health Scis., Inc.,*
  2008 WL 2901705 (D. Utah July 23, 2008)......................................................... 13

*Khoja v. Orexigen Therapeutics, Inc.,*
  899 F.3d 988 (9th Cir. 2018)........................................................................ 3

*LifeVoxel Va. SPV, LLC v. LifeVoxel.AI, Inc.,*
  622 F. Supp. 3d 935 (S.D. Cal. 2022) ............................................................. 13

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
  513 F.3d 702 (7th Cir. 2008) ...................................................................... 9

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)......................................................................................7

*Medina v. Clovis Oncology, Inc.*,
   215 F. Supp. 3d 1094 (D. Colo. 2017) ....................................................27

*Meitav Dash Provid. Funds & Pension Ltd. v. Spirit AeroSystems Hldgs. Inc.*,
   79 F.4th 1209 (10th Cir. 2023).........................................................23, 25

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit Aerosystems Hldgs., Inc.*,
   2022 WL 377415 (N.D. Okla. Jan. 7, 2022)...........................................10

*MHC Mut. Conv. Fund, L.P. v. Sandler O'Neill & Ptnrs, L.P.*,
   761 F.3d 1109 (10th Cir. 2014)................................................................23

*Mobley v. McCormick*,
   40 F.3d 337 (10th Cir. 1994).....................................................................6

*Nakkhumpun v. Taylor*,
   782 F.3d 1142 (10th Cir. 2015).........................................13, 17, 21, 29

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp.3d 472 (S.D.N.Y. 2018) ......................................................29

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226, 1228 (9th Cir. 2004) .........................................................9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) .................................................................................13

*Oregon Laborers Emps. Pension Tr. Fund v. Maxar Techs. Inc.*,
   2020 WL 5500458 (D. Colo. Sept. 11, 2020)..........................................27

*Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*,
   372 F. Supp. 3d 1139 (D. Colo. 2019) ..............................................28, 30

*Pirraglia v. Novell, Inc.*,
   339 F.3d 1182 (10th Cir. 2003)..................................................................7

*Pub. Empls' Ret. Sys. of Miss. v. Treehouse Foods*,
   2018 WL 844420 (N.D. Ill. Feb. 12, 2018) .............................................12

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ...........................................9

*SEC v. Kokorich*,
   663 F. Supp. 3d 63 (D.D.C. 2023) .............................................................9

*Shafer v. Lightning Emotors, Inc.*,
   2024 WL 691458 (D. Colo. Feb. 20, 2024), *recommendation adopted*, 2024 WL 1509166
   (D. Colo. Mar. 26, 2024)..........................................................................30

*Smallen v. The W. Union Co.*,
   950 F.3d 1297 (10th Cir. 2020)..........................................................23, 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 324 (2007)...............................................................................21, 29
*TSC Indus. v. Northway*,
    426 U.S. 438 (1976) .................................................................................... 11, 16
*Weiner v. Tivity Health, Inc.*,
    528 F. Supp. 3d 795 (M.D. Tenn. 2021)........................................................... 16
*Weston v. Docusign, Inc.*,
    669 F. Supp.3d 849 (N.D. Cal. 2023).............................................................9, 26
*Wolfe v. AspenBio Pharma, Inc.*,
    587 Fed. Appx. 493 (10th Cir. 2014) .........................................................25, 28
*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
    426 F. Supp.3d 864 (D. Kan. 2019) ...........................................................22, 29

## I.    PRELIMINARY STATEMENT

Paycom offers software for human capital management ("HCM"), consisting of 29 software modules, with its payroll module serving as the foundation for any Paycom software product. In July 2021, the Company launched "Beti" (Better Employee Transaction Interface), a purported enhanced payroll module that allows clients' employees to review their own, upcoming paychecks to catch and prevent errors before issuance.

Prior to its launch, Defendant Richison established a go-to-market team tasked with identifying risks posed to Paycom from launching Beti. The team reported back to Richison that launching Beti would bring three main risks: (i) Beti would *cannibalize* Paycom's "unscheduled revenues" gained from off-cycle payrolls; (ii) Client Relations Representatives ("CRRs") tasked with "cross-selling" *non*-payroll modules would not have time to up-sell any of Paycom's other modules if forced to focus on Beti, resulting in lower cross-sales; and (iii) existing customers were resistant to adopting Beti for its complexities. Despite these risks, Richison took a hard line in pursuit of his vision, telling staff that "we know what's best" for customers and that he was unequivocally willing to lose clients that did not want to adopt Beti.

In June 2021, before launching Beti in July, Richison and Chief Sales Officer ("CSO") Holly Faurot mandated that CRRs persuade 100% of existing clients to adopt Beti by the end of 2021. By September 2021, however, CRRs began reporting back a barrage of complaints from at least 50% of existing clients who did not want to adopt Beti because of its higher costs, complexity, ceding of control to employees, and/or requiring unwanted changes to payroll processes. Due to clients' resistance, Paycom fell well short of its 100% goal for year-end 2021, barely squeezing out 25% Beti adoption for *all clients* (new and existing) by May 2022. Richison concealed client resistance from investors during the Class Period, assuring them that Paycom was "having a lot of success with the installed base using Beti" and seeing "strong adoption" from existing clients resulting in increased client retention.

1

In the face of widespread client resistance, confidential witnesses ("CWs"), who are former Paycom employees, confirm that Defendants ramped up measures for CRRs to push Beti adoption on existing customers, which took away 50-60% of CRRs' time generating cross-sales from other modules. Yet, Defendants concealed declining cross-sale revenues and told investors that Paycom's cross-sales revenue remained "very consistent."

The CWs reported that existing clients, frustrated that Paycom was forcing Beti on them, began leaving Paycom in droves, which was communicated to Defendants at internal meetings and via the Lost Clients, SaveOps, Retention and Usage reports. CW1 reported that Richison instructed the Company's Turn Team to delay removing lost clients from Paycom's systems to avoid a large hit to Paycom's publicly reported client counts and closely-watched annual revenue retention rate. Contrary to these facts, Richison told the market "we're not having a lot of losses on customers," that retention was "equal to or improved" over prior years, and that Paycom's retention rate for fiscal year 2022 was an "industry-leading" 93%.

Defendants admitted the truth in two partially corrective disclosures, revealing: (i) client attrition throughout the Class Period had been increasing as angry existing clients who did not want Beti left Paycom; (ii) making CRRs push Beti rather than cross-sell had caused Paycom to lose tens of millions of dollars in revenue; and (iii) Beti was further hurting revenues by cannibalizing "unscheduled revenues." Defendants admitted the foregoing was the result of "strategic" decisions to intentionally forego cross-sales revenues to push Beti, and willingly lose clients that did not want Beti. As a result, Paycom's stock fell nearly 60%.

Defendants' Motion seeks to create an alternative factual narrative and often challenges piecemeal statements Plaintiff does not even allege are false, while ignoring their misleading portions and Plaintiff's well-pled scienter allegations. Considering in totality and accepting Plaintiff's allegations as true, Defendants' Motion should be denied.

## II.    STATEMENT OF FACTS[1]

Paycom offers software for HCM. ¶¶28-29.[2] The payroll module serves as the foundation for any Paycom system. ¶30. From there, CRRs were tasked with "cross-selling" clients on additional, *non*-payroll modules. ¶32. According to CW2, Paycom generated 20% to 25% of its weekly revenue from cross-selling, which Richison confirmed was a "measurable" portion of Paycom's revenue. ¶¶32, 36, 140. In addition, CW1 reported that Paycom generated a "fairly big" portion of its revenues from payroll error corrections ("unscheduled revenues"). ¶¶33-35.

In July 2021, Paycom launched "Beti", an "enhancement" to the payroll module allowing clients' employees to "self-service" their own payroll, purportedly to increase efficiency and reduce payroll errors. ¶¶4, 62, 166. Prior to launch, in April 2021 Defendant Richison established a Beti go-to-market ("BGTM") team, overseen by Program Manager Shelly Ballew, which was tasked with identifying Beti-related risks. ¶¶53, 58, 194. Prior to Paycom launching Beti, the BGTM team identified and reported to Ballew the following Beti risks: (i) Beti would *eliminate* the need for error corrections and, thereby, reduce Paycom's unscheduled revenues; (ii) existing clients would not want to adopt Beti, given how much it affected clients' employees and payroll processes; and (iii) CRRs would not have time to both cross-sell, and sell and implement Beti.

---

[1] Defendants request that the Court take judicial notice of self-serving, cherry-picked excerpts from nine exhibits. DB4 n.1. Eight of Defendants' exhibits are conference call transcripts cited in the Complaint that are *in dispute*. The Court should not take judicial notice of Defendants' exhibits because they take out of context excerpts that wholly omit the relevant page(s) containing the facts alleged in the Complaint. If the Court is inclined to take judicial notice of Defendants' exhibits, it cannot do so for their truth as the exhibits are in dispute. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018) (judicial notice improper of documents, including conference call transcripts, that are "subject to varying interpretations" and "dispute as to what [they] establish[]."); *see also Meitav Dash Provident Funds & Pension Ltd. v. Spirit Aerosystems Hldgs., Inc.*, 2022 WL 377415, at *6 (N.D. Okla. Jan. 7, 2022) (declining judicial notice of call transcripts proffered to show statements were not misleading).

[2] Citations to "¶_" refer to the First Am. Compl. for Violations of the Fed. Sec. Laws ("Complaint"), filed July 8, 2024 (ECF No. 77), and "DB_" refers to pages of Defendants' Brief. Capitalized terms have the same meanings as ascribed in the Complaint.

3

¶¶54-58. Ballew discussed these risks with Richison, who nevertheless pushed forward with launching Beti. ¶58.

Unbeknownst to investors, beginning in June 2021, Richison and CSO Holly Faurot, mandated to the Company's CRRs that they focus cross-selling efforts on getting *every* existing client on Beti by the end of 2021. ¶¶5, 60, 66.[3] Getting 100% of existing clients to adopt Beti was paramount to Richison, as Beti was his idea for the "future of payroll" and "how payroll should be done." ¶¶51, 60, 120. Beti launched in July 2021. ¶62.

The risks the BGTM team had identified quickly materialized, and by September 2021, about half of Paycom's existing clients were opposed to adopting Beti, with many of them leaving Paycom altogether at an increasing rate starting by April 2022 and continuing into 2023. ¶¶69, 71, 92, 94. CW1, in the billing department, stated that throughout the Class Period, many of Paycom's existing clients did not want to use Beti and complained about being charged for Beti. ¶75. CW2 corroborated CW1's account, reporting frequent discussions with Joshua Antonius, CRR lead in CW2's region, that CRRs were being forced to sell Beti to clients who did not want it. ¶77.

Existing clients did not like having Beti forced upon them and, as a result, began leaving Paycom in droves. ¶¶91-96, 101. CRRs reported to managers and VP of Client Relations Kyle Supak that Paycom's directive to force all existing clients to adopt Beti was destroying client relationships, increasing client attrition and consuming all the CRRs' time so they could not cross-sell anything but Beti. ¶¶71, 76. CW2 reported attending an October 2021 national sales force training meeting, convened to discuss with Richison and Faurot how to deal with the high existing client pushback to Beti. ¶93. Despite Richison's admitted awareness that existing clients

---

[3] Sales Manager CW2 stated that upon Beti's launch, CRRs were required to include Beti with all cross-sales proposals, which was corroborated by CW4, a Transition Support Specialist ("TSR") who worked on Beti implementations. ¶68.

did not want Beti, he told Paycom's sales force that "if a customer doesn't want to automate their payroll by adopting Beti then we don't want them—we know what's best for them." ¶56. In other words, Richison was willing to lose existing clients who refused to adopt Beti. By November 2022, about 18 months after launch, only 50% of existing clients adopted Beti and that stayed the same until August 2023 when adoption peaked at about 60%. ¶97. Defendants, however, did not disclose that the remaining existing clients had refused to use Beti and/or left Paycom altogether. ¶98.

CW3 prepared for the Individual Defendants and CSO Faurot weekly Lost Client Reports, showing the number of clients lost that week and reasons therefor, and Save Opportunities ("SaveOps") Reports, reporting clients at risk of leaving Paycom, reasons therefor, and last scheduled payroll run dates. ¶¶42-43, 45, 94. CW2 corroborated Richison reviewed these reports and CW3 and CW4 confirmed they were circulated to executives every Thursday given the importance of retaining clients and Paycom's annual revenue retention rate ("ARRR"), upon which analysts measured Paycom against its competitors. ¶¶39-45.

As corroborated by CWs 1, 2, 3 and 4, the Lost Client, Save Ops, Retention and Usage Reports all showed that before and during the Class Period, at least half of Paycom's existing clients opposed adopting Beti, and were increasingly leaving Paycom because of Beti, a trend that CW1 said worsened during 2022. ¶¶42-46, 69, 92, 94, 116.ii., 212-14.  In response, throughout 2022, Defendants ramped up measures to try and increase Beti adoption by focusing CRRs on Beti instead of cross-selling. CW2 and CW4 stated Paycom's sales tool was altered to disallow proposals without Beti. ¶77. In July 2022, Defendants expanded CRRs' roles to require that they provide Beti trainings, implementations, and reporting, with Faurot threatening to fire CRRs if they did not meet goals. ¶¶79-82. Unbeknownst to investors, the CRRs' new focus on Beti took 50-60% of their time, preventing them from hitting quotas for cross-selling other

modules and causing cross-sale revenues to materially decline. ¶¶83, 87. By late 2022, CW1 learned from Paycom's Turn Team[4] and Admin B2 System that Paycom was "losing tons of clients," and that number was growing daily into 2023. ¶101. Yet, CW1 learned from the Turn Team that Richison instructed them to defer client terminations to avoid a drop in reported client retention, a practice that continued into 2023. ¶¶100-03.

Despite knowledge of the foregoing issues, Defendants told investors throughout the Class Period, *inter alia*, that Beti was net "accretive" to Paycom's revenues, that Paycom's cross-selling revenue was "very consistent," and that there was "a lot of success deploying Beti" thanks to "strong adoption" from existing clients leading to "strong" or "improved" client retention. ¶¶107, 117, 126, 130, 140, 154.

Defendants belatedly revealed the adverse impacts of their push for Beti over two partially corrective disclosures on August 1, 2023 and October 31, 2023, causing Paycom's stock price to drop $220.09 per share, or nearly 60%, and thereby investor losses. ¶¶12, 157-78.

## III.    ARGUMENT

### A.    Legal Standards

On a motion to dismiss, plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "'accept the well-pleaded [factual] allegations of the complaint [as true] and construe them in the light most favorable to the plaintiff.'" *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1247 (10th Cir. 2022). The relevant inquiry is not whether Plaintiff will ultimately prevail, but whether Plaintiff is entitled to offer evidence to

---

[4] Whether this was called the Turn Team, or Term Team (DB 27 n.6), is insignificant as the Complaint adequately pleads how the retention rate was overstated and CW1's basis for knowledge. ¶¶ 24, 48, 100-03. In any event, courts must take the Complaint's allegations as true. *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).

support its claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007); *In re Williams Sec. Litig.*, 339 F. Supp.2d 1242, 1252 (N.D. Okla. 2003).

To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, a complaint must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pluralsight*, 45 F.4th at 1247 (citation omitted).

Defendants only challenge the first two elements, *i.e.*, material misrepresentation and scienter. Thus, Plaintiff only addresses those elements of his claim herein.

**B.      Defendants Made Materially False and Misleading Statements[5]**

Section 10(b) claims must specify the "allegedly misleading statements and the reasons why those statements are misleading." *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1188 (10th Cir. 2003). The Court evaluates whether the allegations, "taken as a whole," support a "reasonable belief" that the "statements identified by the plaintiff were false or misleading." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099 (10th Cir. 2003). Disclosure of omitted facts is required "when necessary to make … statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (cleaned up).

**1.   Defendants Misrepresented Existing Client Demand for, and Adoption and Usage of, Beti**

Defendants falsely represented during the Class Period that Beti demand, adoption, and usage among Paycom's *existing* clients was strong and a resounding success. S1, ¶107 (2/8/22,

---

[5] For the Court's convenience, Plaintiff has included an Appendix A, listing each alleged false statement in the order in which it appears in the Complaint, and inserted columns containing the reasons why the alleged statements are alleged to be false and made with scienter. Each statement is referred to as "S" followed by the corresponding number, *e.g.*, S1.

claiming "strong demand" and "very strong adoption and record employee usage" of Beti); S3, ¶112 (2/8/22, "we're having a lot of success with the installed base using Beti" and "continue to have success selling Beti ... into our current installed base"); S7, ¶122 (5/3/22, "from a retention" perspective, "we're having a lot of success getting Beti out there"); S16, ¶150 (2/7/23, "we continue to convert our current client base over to Beti"). These, and similar misstatements (*e.g.*, S5-6, ¶¶117, 120), were false when made because throughout the Class Period, at least one half of Paycom's installed base (*i.e.*, existing clients) refused to use Beti and a significant number were leaving Paycom. Thus, Paycom did not have "strong adoption" or "success" converting existing clients over to Beti.

Indeed, by September 2021 and continuing throughout the Class Period, existing clients were informing CRRs that they did not need or want to pay the extra fees for Beti, in part because, as CW3 and CW4 stated, Beti required complex changes to clients' established payroll processes, or otherwise did not "fit" their needs. ¶¶66, 71-73. CWs 1, 2 and 4 confirmed it was commonly known at Paycom that the Company was losing existing clients at an increasing rate throughout the Class Period, and 50% of existing clients had refused to use Beti. ¶¶45, 56, 69, 92-94, 98, 113. CW2 attended the special sales training meeting in October 2021 where CW2 and other sales personnel discussed with Richison and CSO Faurot that there was a high level of pushback from existing clients towards adopting Beti. ¶93. Further, CWs 1, 2, 3 and 4 corroborate that the weekly SaveOps and Lost Clients Reports (which listed, *weekly*, clients at risk and/or who left Paycom and their reasons for leaving) reflected that an increasing number of existing clients were leaving Paycom by March or April 2022 and continuing throughout 2022 and into 2023 because they were angry that the Company was forcing Beti on them and billing them for Beti when they did not want or need it. ¶¶42-46, 71, 75-76, 92, 94, 101, 200-01, 212.

Defendants confirmed the CWs' accounts when they reported in February 2023 that Paycom had only converted "around 50%" of existing clients to Beti and by June 2023, purportedly just over that—a far cry from Richison's prior mandate that "*all*" existing clients be on Beti by the end of 2021. ¶¶66, 97. By the June 4, 2024 Baird conference, Richison stated that Paycom was no longer "forcing" Beti on customers. ¶190.

Courts have held similar misstatements regarding product demand or success actionable. *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 706-07 (7th Cir. 2008) (statements of "strong [product] demand" that "customers are embracing" with "strong acceptance" misleading where company pushed product on customers "that [they] had not requested"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1228, 1234 (9th Cir. 2004) (statements of "sustained" and "robust demand" misleading where defendants admitted tracking metrics indicating sales slowdown, corroborated by CWs); *Weston v. Docusign, Inc.*, 669 F. Supp.3d 849, 880-81 (N.D. Cal. 2023) (demand statements misleading where CWs and executives' tracking of usage and retention metrics indicated waning demand); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *3-4, 6, 9-10 (N.D. Cal. Apr. 28, 2020) (statements of "strong demand" and adoption of key product misleading where reports, meetings, and company database reflected clients did not want to pay for or implement product, and "reputation[]" with clients was "damage[d]"); *see also SEC v. Kokorich*, 663 F. Supp. 3d 63, 71 (D.D.C. 2023) (claim of "success" in key technology misleading where it "did not meet internal criterion for success.").

Defendants' arguments are meritless. First, Defendants' contention that Paycom purportedly "disclosed the percentage of clients that had not adopted Beti" (DB12) is false. Defendants only disclosed the *net* percentage of clients that *had* purportedly adopted Beti and did not distinguish between new and existing client adoption. *See, e.g.*, ¶97.i. ("over 1/4 of our clients have implemented and/or are in the process of implementing Beti"). Because Paycom

did not differentiate between new and existing clients using Beti, it misleadingly masked the fact that the majority of *existing* clients rejected Beti.[6]

Second, the Complaint alleges more than an "occasional disgruntled customer" as in *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 120 (S.D.N.Y. 2010) (DB 12). *Three* CWs corroborate that numerous (at least one-half) Paycom existing customers refused to adopt Beti, as later confirmed by Defendants' own public admissions. *E.g.*, ¶¶7, 69, 71-72, 75, 77, 189-90 (CW2 discussed with regional CRR lead "all the time" that clients did not want Beti; CW1 stated customers were unhappy being billed for Beti; CWs described "enormous backlash" and that the mandate was destroying existing customer relationships; CW 4 stated about 30% of new clients resisted adopting Beti, while about half of existing customers were opposed).

Third, Defendants' CW criticisms (DB12, 27-28) are unfounded. The Complaint provides each CWs "job title, time spent in that position, the supervisors, and the specific duties" of each CW, "demonstrat[ing] that [each CW] was positioned to have known the information alleged." *Meitav Dash*, 2022 WL 377415, at *8. For example:

- CW1 was Team Lead of Billing and Revenue Accounting from 2020 to 2024, responsible for account billing and auditing, and thus was in a position to know the status of customer accounts through CW1's access to the Admin B2 system, and interaction with the Turn Team.
- CW2 was a Sales Manager reporting to CSO Faurot from before the Class Period through mid-2023 responsible for selling Beti to clients nationwide.
- CW3 was a Client Support Specialist from March 2020 through March 2022 responsible for assisting clients with software implementation and a Sales Operations Strategist from March to September 2022 responsible for preparing sales and client retention reporting packages, among others, for discussion at Defendants' weekly Thursday meetings.
- CW4 worked as a CRR and TSR from before the Class Period to early 2022 responsible for implementing software products for new clients. ¶¶24-27.

---

[6] Beti adoption by *existing* clients was particularly critical and focused on by analysts because the majority of Paycom's client base was comprised of existing clients, ¶188 (reporting 30,994 customers for 2020 and 33,875 customers for 2021, post-Beti launch).

Thus, these CWs were positioned to know the information they provided, unlike *In re Okta, Inc. Sec. Litig.*, 2023 WL 2749193 (N.D. Cal. Mar. 31, 2023) (DB12) ("unclear [CWs] would have been positioned to know" adverse information where two left before false statement; third (salesperson) did not observe losing a single sale due to data breach).[7]

### a.    Defendants' Statements are Not Immaterial Puffery

Defendants cherry pick words from the alleged misstatements to argue they are entirely immaterial puffery because they do not contain objectively verifiable facts and/or are not something upon which investors would rely. DB9-10. But statements must be "viewed in their entirety and in context" to determine whether they are puffery, *Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *6 (D. Kan. Sept. 25, 2012), and are actionable if "grounded in … objectively verifiable data[.]" *Pluralsight*, 45 F.4th at 1249. The key inquiry is whether a reasonable investor would rely on and consider such information important. *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1217 (D. Kan. 2002), *citing TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976).

Here, Defendants' statements as to Paycom's existing customer adoption of Beti, which Defendants touted as the "future of payroll" and central to Paycom's strategy, taken in context, are actionable as they are based on verifiable facts and were of utmost importance to the market as analysts repeatedly asked about it every quarter. ¶¶97, 120. *See* S1, ¶107 (claiming Paycom was "seeing very strong adoption [of Beti] and record employee usage as measured by the DDX"

---

[7] Unlike here, in *Bristol Cnty. Ret. Sys. v. Adient PLC*, 2022 WL 2824260, at *1-2 (2d Cir. July 20, 2022) (DB12), there was "no allegation … that the projected [metric] was not achievable," or that the overall business was not on an upward trajectory. *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *13 (S.D.N.Y. Apr. 2, 2020). Here, Plaintiff alleges that net customer growth and client retention were decreasing throughout the Class Period and, thus, misstatements that, *e.g.*, "all" clients were adopting Beti, and Paycom was having "success deploying Beti" to existing clients (¶117) were directly contradicted by the facts as at least half of existing customers refused Beti.  ¶¶66, 97.

and had "[s]trong demand" for Beti resulting in increased sales—verifiable against DDX, sales figures and Richison's goal of having 100% of existing clients on Beti by end of 2021); S3, ¶112 (**responding to analyst** question about "getting the installed base to using Beti," Richison stated "we're having a lot of success with the installed base using Beti" and "continue to have success selling Beti both into our current installed base"—verifiable facts where either existing customers are adopting Beti and in line with Richison's stated end-of-2021 100% adoption goal, or they are not); S7, ¶122 (**responding to analyst**, stating "from a retention [standpoint] … we're having a lot of success getting Beti out there"—verifiable from existing client retention).[8]

Further, reasonable investors would interpret the statement "we continue to have a lot of success deploying Beti, and I still expect that all of our clients will be using Beti" (S5, ¶117) to mean that *all* existing clients had and/or would be converting to Beti—facts verifiable against actual adoption rates. Courts have found similar misstatements, actionable. *See, e.g., Pub. Empls' Ret. Sys. of Miss. v. Treehouse Foods*, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018) (statements claiming "successful track record" and prior "success", "taken in context" of important initiative, not puffery).[9]

---

[8] Similarly, Defendants' claims of high customer "satisfaction" and "not having a lot of losses on customers" (S2, ¶110, S4, ¶114) were representations of present status of an issue of great importance to Paycom, analysts and investors, capable of verification through numbers of complaints and losses, including Lost Clients and SaveOps Reports. *See also* S12, ¶136 ("opportunity to continue to increase retention" indicates retention then increasing – alleged to be false, important, and verifiable from Retention Reports); S6, ¶120 (touting "embrac[ing] of Beti). *See Tellabs*, 513 F.3d at 706 ("customers are embracing" product actionable).

[9] Defendants' "puffery" cases are inapposite. DB10. *Grossman v. Novell*, 120 F.3d 1112, 1121 (10th Cir. 1997) ("substantial success" in integrating the sales forces of two companies "incapable of objective verification."); *El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*, 709 F. Supp. 3d 1296, 1331-33 (D. Colo. 2023) (company's ability to "successfully manag[e]" risk and "scale successfully" unverifiable). Here, Defendants' statements "cross the line … to objectively verifiable matters of fact" because Paycom could measure the portion of existing clients that had converted to Beti and compare it against internal benchmarks. *In re Level 3 Commun's, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir.

          *b.*        *Defendants' Statements are Not Inactionable Opinions Nor Protected by the PSLRA Safe Harbor*

Defendants claim three of the alleged misstatements, S5 (¶117), S12 (¶136) and S17 (¶154), are inactionable opinions. DB15-17. Opinion statements are "considered false if the speaker does not actually *or reasonably hold that opinion.*" *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1159 (10th Cir. 2015) (emphasis added), or if the opinion does not "fairly align[] with the information in [defendants'] possession at the time." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). Here, S5 is not a pure opinion. The first part, that "we *continue* to have a lot of success deploying Beti," is a historical fact that was false for the aforementioned reasons. *See also* S12 ("continue to increase retention" is historical fact). Even if the remaining portion of S5 ("I still expect that all of our clients will be using Beti at some point") and S17 ("I expect our retention to remain strong and even increase[]") are opinions, they are actionable because "the real facts [were] otherwise, but not provided": about half of existing clients refused to adopt Beti, as reported by CRRs in September 2021, discussed with Richison at the October 2021 sales meeting, and reported to Defendants in weekly Lost Clients and SaveOps reports throughout the Class Period. *Id.,* 575 U.S. at 188; ¶¶55-56, 69-72, 168-69.[10]

---

2012); ¶172. Moreover, Defendants' and analysts' focus on Beti adoption show Defendants' statements were important to investors.

[10] Defendants' mostly out-of-circuit cases (DB16-17) are inapposite because each refers to threadbare assumptions, rather than particularized falsity allegations. *See In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 642 (S.D. Tex. 2018) (plaintiffs relied purely on "*assumption[s]* that the defendants received '[contrary] material information' based on their … positions" and because they provided Sarbanes-Oxley certifications on SEC filings) (emphasis added); *LifeVoxel Va. SPV, LLC v. LifeVoxel.AI, Inc.*, 622 F. Supp. 3d 935, 945 (S.D. Cal. 2022) (plaintiffs "simply state[d]" an investor presentation "must have been fabricated" without the "'who, what, when, where, and how' of the alleged fraud."); *Kapur v. USANA Health Scis., Inc.*, 2008 WL 2901705, at *15 (D. Utah July 23, 2008) (plaintiff "d[id] not disclose its source[s]," nor provide facts to support anything "more than a conclusory allegation.").

Defendants' next argument, that the PSLRA safe harbor protects Richison's statements (DB17), fails for at least three reasons. First, S5 (¶117) and S17 (¶154) are "'mixed' statements of both present and future events[,]" where the first half of S5 referring to then-*current* Beti adoption, and the portion of S17 referring to the then-current retention rate "to *remain* strong," are present facts and not protected. *In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1295 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015) (mixed statements claiming "continued success" actionable).

Second, these statements are not "'accompanied by meaningful cautionary [language] identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Gold,* 957 F. Supp.2d. at 1294. The only purported warnings Defendants point to in Paycom's earnings calls "about the uncertainty inherent in" Paycom's "future plans, objectives, and expected performance" (DB17), were too general and vague, as neither these warnings, nor the (unspecified) risk factors in the February 18, 2021 Form 10-K referenced therein, warned that Defendants had been losing existing clients unwilling to adopt Beti, had determined to let clients go if they were not willing to adopt Beti, or that total Beti adoption was only possible by consciously losing Beti-resistant clients. ¶¶56, 94-96, 169. *See IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*, 706 F. Supp. 3d 1225, 1262 (D. Kan. 2023) (generic warnings provide no protection); *Genesee Cnty. Empls' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1184 (D.N.M. 2011) ("language did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss.") (citations omitted). Third, even if Defendants' purported warnings were sufficiently specific, Defendants' statements are still not protected because the risk to Beti's performance and adoption rate—that many existing clients did not want Beti—had already transpired. *In re Facebook Inc. Sec. Litig.,* 87 F.4th 934, 949 (9th Cir. 2023) ("hypothetical" warnings misleading where risks "transpired").

14

## 2.  Defendants Misrepresented Customer and Revenue Retention

Throughout the Class Period, Defendants falsely reported inflated customer retention rates, a key metric, as greater than or equal to prior periods, to portray Paycom's Beti product as a success. *See* S9, ¶126 (5/3/22 Earnings Call: Richison stating "our current retention number when compared with the same period last year is either equal to or improved."); S14, ¶144 (2/7/23 Earnings Call: Boelte stating "Paycom's annual revenue retention rate in 2022 was 93%, which was consistent with our recent 4-year average of 93%"); S16, ¶150 (2/7/23 Call: Richison stating that while 93% was "an industry-leading number[,]" "as we continue to convert our current client base over to Beti, we expect to have some gains in that.").

These statements were materially false and misleading when made because, according to CW1, Defendants intentionally delayed recognizing a client as "lost" for purposes of calculating Paycom's annual revenue retention rate, thereby understating the retention rate reported in its public filings. ¶50. CW1 reported that Paycom was "losing tons of clients" by March through late 2022 and that the number was "growing every day." ¶¶92, 101. CW1 understood that Defendant Richison directed the Turn Team to keep treating such clients as "active" to avoid a big hit to Paycom's reported client count and retention rates and portray Beti as a success. ¶¶50, 102. According to CW1, Paycom's Admin B2 System dashboard (accessible by Defendants), showed that by December 2022, a large number of clients had cancelled their contracts but were still counted as "active"—a problem CW1 immediately reported up the chain to Defendant Boelte. ¶102. As a result of Paycom's improper inclusion of lost clients in its retention calculation, the Company had to restate its FY2022 retention rate from 93% down to 91%. ¶¶102, 185.

Defendants contend that the restatement of Paycom's annual retention rate for FY 2022 was "immaterial" because it was a 2% decline and suggest Paycom's stock price did not decline on the 2024 restatement announcement. DB20-21. While, contrary to Defendants'

15

representation, Paycom's stock price did decline on February 8, 2024 upon the news of a restatement,[11] the market first became aware of Paycom's declining customer retention rate on October 31, 2023, when Defendants revealed, *inter alia*, that Paycom was cutting annual revenue growth guidance by nearly two-thirds because Beti adoption had stalled at around 60%, leading analysts to conclude that Paycom's revenue retention rate was lower than previously reported. ¶¶168, 172-73. For example, during the Q3 2023 Earnings Call, analysts asked if there was "any way to … quantify the change in net retention that you're talking about here?" and concluded there was "limited tangible proof" Beti drove any "improvements to retention." ¶176. "'[T]he perceptions of analysts are an acceptable measure of what reasonable investors would have understood[.]'" *Alich v. Opendoor Techs. Inc.*, 2024 WL 839146, at *7 (D. Ariz. Feb. 28, 2024) (citation omitted).

Moreover, materiality is not determined solely by numbers. *Weiner v. Tivity Health, Inc.*, 528 F. Supp.3d 795, 808 (M.D. Tenn. 2021) ("'error to rely exclusively on…numerical or percentage benchmark[s]'", as "'[m]ateriality has both a quantitative and a qualitative component[.]'") (citation omitted). Rather, other factors present here, including lost investor and analyst confidence, and the reduction in Paycom's forecast due to decreased retention, demonstrate Paycom's revenue retention rate was highly material, as it was one of Paycom's self-proclaimed "key metric[s]" that was asked about extensively by analysts every quarter. *See, e.g.*, ¶¶99, 110, 112, 114, 122, 136, 144, 150. Regardless, materiality is an issue for the trier of fact. *TSC*, 426 U.S. at 440.[12]

---

[11] https://finance.yahoo.com/quote/PAYC/history/.

[12] Defendants mischaracterize Richison's statements in ¶¶110, 114 as concerning 2021 historical rates (DB18), but there, he claimed that currently "we're not having a lot of losses on customers," and noted Paycom "being able to *raise [the retention rate] again*," and "as we just talked about *our retention rate going up*." As discussed, because Paycom was losing customers prodigiously, Richison had no basis for such misleading statements.   Defendants'

Defendants further misrepresented that Paycom was not losing any clients due to Beti, and that customer satisfaction was high such that Defendants expected retention to increase.[13] *See* S2, ¶110 (2/8/22 Earnings Call: "[w]e're seeing a lot of satisfaction across the client base. So … I wouldn't necessarily say we're done with our retention aspirations, but we feel really good by being able to raise it again."); S4, ¶114 (2/8/22 Call: "we're not having a lot of losses on customers, as we just talked about our revenue retention rate going up."); S7, ¶122 (5/3/22 Call: "from a retention [standpoint]", "the more of a product [Beti] they use, the longer they stay"); S11, ¶133 (11/1/22 Call: "No, I can't say that we've seen any changes" in retention); S17, ¶154 (5/2/23 Call: "I expect our retention to remain strong and even … increase a larger percentage as more clients use the product[,]"); S12, ¶136 (11/30/22, claiming any lost clients were due to normal course of business (not Beti) and stating "I definitely think you have the opportunity to continue to increase retention.").

The foregoing statements were false and misleading when made because at that time, Defendants were aware that about half of Paycom's existing clients did not want Beti, and a large number were angry at Paycom's CRRs forcing Beti on them, driving clients to leave Paycom and hurting Paycom's annual revenue retention rate. CWs stated that by September 2021, CRRs were receiving complaints from clients who were angry Paycom was trying to push Beti on them. ¶6. CW1 likewise reported Paycom was "losing tons of clients" by March to late 2022 and the number was "growing every day." ¶¶92, 101. According to CW1, Paycom's Admin B2 System dashboard showed that by December 2022, a large number of client accounts had

---

claim (DB20) that the FY *2022* retention rate restatement was due only to a methodology change ignores that the Turn Team was asked to delay deleting accounts from the "active" list to boost retention numbers, which practice the new methodology reversed.

[13] Defendants' challenges to falsity also "focus[] on allegations that [plaintiff] didn't make[,]" and should thus be disregarded. *Nakkhumpun*, 782 F.3d at 1149. *See* DB14 (*e.g.*, quoting parts of ¶¶140 and 147 about growth from "new logo adds" and "mix of growth" that are not bolded as allegedly actionable, or not even said by Defendants).

cancelled their contracts. ¶102. *See also* §III.C. *infra*. Thus, Defendants' assurances that Paycom was not losing many customers, and any lost clients were part of routine business and not Beti, were false and Defendants had no reasonable basis to claim Paycom's retention rate would increase. *IBT*, 706 F. Supp. 3d at 1251-52; *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1279 (N.D. Okla. 2007).

Further, Defendants' claim that what the above statements actually mean is "Paycom believed that once clients *had* adopted Beti, *then* retention would increase" (DB17) is not what the statements say, and on a motion to dismiss, the Court must accept Plaintiff's well-pled allegations as true and may not adopt Defendants' competing interpretations.

3. **Defendants' Misrepresented Beti's Net Revenue Impact and Effect on Paycom's Cross-Sales of Other Modules**

Throughout the Class Period, Defendant Richison falsely stated that "Beti provides an incremental revenue opportunity for us[]" as "we do get a revenue uplift each time we sell Beti to a current client," (S8, ¶124) and that "upselling into our client base [] with Beti [is an] incremental increase in revenue opportunity for us" and "accretive" to revenues. S10, ¶130. These statements were false and misleading when made because, unbeknownst to investors, the revenue generated from the Beti module itself was minimal, while Beti significantly cannibalized unscheduled revenues that Paycom would otherwise collect. ¶¶124, 130, 167-68. Thus, Beti did not give Paycom an "incremental" revenue opportunity, but had a net negative revenue impact, which Defendants admitted on October 31, 2023 when they revealed Beti "has eliminated certain billable items, which is cannibalizing a portion of our services and unscheduled revenues[]" and "results in lower related revenue" to Paycom (*i.e.*, any additional fees from Beti were overrun by loss of unscheduled revenues), thereby causing a major revenue growth deceleration. ¶¶166-67.

18

Defendants argue they fully disclosed Beti would reduce revenues from unscheduled payrolls. DB5, 13. But the statements they cite say no such thing. In fact, none of Defendants' examples (DB5, n.2) even mention the words "revenue" or "sales. Nor do they disclose that the net revenue impact from Beti after offsetting the loss of sales from unscheduled payroll runs would be negative. *E.g., id.*, Def. Ex. 4 ("[C]lients that use Beti have less papercuts…."). Not until the end of the Class Period did Defendants finally disclose that Beti had a material, negative revenue impact in cannibalizing Paycom's revenues. Moreover, Defendants' "adequate disclosure" contention is belied by analysts' surprise at Beti's cannibalization impact on Paycom's revenue. *E.g.*, ¶250 ("[m]anagement cited ***for the first time*** a … reduction in … unscheduled payroll runs … as Beti is resulting in less payroll errors[]") (emphasis added); ¶248 (rating downgrade based on "concerns on the Beti growth outlook due to cannibalization of the [revenue] base[]"); ¶249 (similar) (emphases added).

Defendants also falsely represented that Paycom's revenue from cross-selling additional modules had not declined and was consistent. S13, ¶140 ("upsells" to current clients have "been measurable" and "very consistent" throughout Beti rollout); S15, ¶147 ("Our upsells to current clients as a percentage has been consistent each year[]"). These statements were false when made because, as a result of Defendants' admitted "strategic revenue decisions" to focus on pushing Beti adoption from the outset, Paycom's CRRs' were unable to focus on revenue-generating cross-sales, resulting in a substantial loss of cross-selling sales, as evidenced by: (i) CWs 2 and 4 corroborated that starting in June 2021, up to, and during the Class Period, Defendants mandated that all current clients had to be sold Beti by the end of 2021 and required CRRs to prioritize Beti over other cross-sales (¶¶66-69, 71); (ii) CWs 1, 2 and 4 corroborated that throughout the Class Period, the forced imposition of Beti on clients destroyed CRRs' relationships with their clients, causing cross-sales to significantly decline (¶¶71, 72, 75, 77, 93,

101-02); (iii) according to CW2 and CW4, Defendants eliminated CRRs' ability to create cross-sales proposals for other products if they did not include Beti, exacerbating clients' discontent (¶77); (iv) Defendants changed CRRs' responsibilities in July 2022 to include being responsible for implementing and training on Beti (and reporting Beti metrics), eliminating 50% to 60% of CRRs' time otherwise spent on revenue-generating cross-sales (¶¶79-83, 87); and (v) Defendants revealed on August 1, 2023 that requiring CRRs to spend so much time selling/implementing Beti had cost Paycom at least $20 million of revenue in the first half of 2023. The cost of this tradeoff was forecasted to increase significantly as Defendants lowered annual revenue growth forecasts for 2024 by nearly two thirds, and Richison admitted "that's not going to change for a little bit." ¶¶90, 159, 170-71.

Defendants downplay $20 million in lost cross-sales as a purported small part "of *annual* revenues[]." DB6. But Richison disclosed losing $20 million in Paycom's *first half* of fiscal year 2023, not the full year. ¶159. Moreover, Richison indicated the lost cross-sales were material: responding to an analyst about the downward trend in growth, he claimed the decline in Paycom's quarterly sales growth rate—from 30% year-over-year to just 20%—was attributable to "only" the fact that Defendants were having CRRs focus on Beti. ¶160. Analysts understood that "[management's] decision to commit more resources to move existing customers to Beti[] has a negative revenue impact in the short term." ¶163.[14]

---

[14] While Defendants downplay the import of cross-selling revenues (DB14), in 2022, such revenue equaled the amount lost to client attrition—indicating cross-sales were a necessary stopgap to prevent an even larger hit to revenues—and CW2 stated Companywide sales calls indicated cross-sales generated 20-25% of revenues. ¶¶36, 98. Defendants contend that Richison's statement at S13, ¶140 demonstrates cross-selling sales were insignificant, but Richison there spoke solely to growth from "*new* business revenue." (DB14-15). Defendants' claim that unscheduled revenues were not material (DB13) is also belied by CW1's statement that they were a "fairly big" portion of revenues, and Boelte stating they represented 5% of annual revenues in 2024. ¶¶35, 179-80.

### C.    The Complaint Adequately Alleges Scienter

To plead scienter, Plaintiff must allege Defendants knew or recklessly disregarded the risk that their statements would mislead. *Nakkhumpun*, 782 F.3d at 1147-50 (plaintiffs need not allege "primary purpose" of defendants' actions was "misleading shareholders"). Recklessness is "'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Pluralsight*, 45 F.4th at 1259. The inference of scienter "need not be irrefutable ... or even the 'most plausible'", but "as compelling as any opposing inference'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Scienter allegations are to be evaluated "collectively" and "holistically," not "scrutinized in isolation[.]" *Id.* at 322-23, 326; *Pluralsight*, 45 F.4th at 1259-60. A showing that defendants had motive to commit fraud is not required, but may support scienter. *Tellabs*, 551 U.S. at 325.

#### 1.    Defendants' Own Admissions Support Scienter

Defendant Richison admitted on October 31, 2023, at the end of the Class Period, that, contrary to his prior statements that Beti was "accretive" to revenue, in fact, Beti resulted in "lower related revenue recognized by Paycom" because, as Defendant Boelte conceded, Beti had been "cannibalizing a portion of our services and unscheduled revenues." ¶¶166-68. Defendants further admitted in connection with Paycom's lowered guidance, that they made: (i) "strategic revenue decisions" at the time of Beti's launch in July 2021 to focus CRRs on Beti sales and training, which had diminished cross-selling revenue indefinitely ("cross-selling [has] been pretty-weak [a]nd that's not going to change," ¶170); and (ii) "strategic … client value decisions," meaning forcing clients' "appropriate usage of" Beti. ¶¶168-70. Thus, Defendants admitted they had made "strategic" "decision[s]" (by July 2021, ¶¶51-56) to mandate Beti for existing customers, despite knowing it "cannibalize[d]" "unscheduled revenues," rendered

21

cross-selling "pretty weak," and "result[ed] in lower related revenue."[15] Defendants' admissions show these were *known, deliberate choices* regarding Beti. *See Pluralsight*, 45 F.4th at 1262 (later statement supported inference of prior knowledge); *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp.3d 864, 874 (D. Kan. 2019) (same).

Moreover, Defendants admitted analyzing "months of data" of Beti usage for its impact on Paycom, which is significant because they had eight months' data between Beti's July 2021 launch to the beginning of the Class Period, ample time to confirm Beti's adverse effect on "unscheduled" and cross-selling revenues. ¶¶214-16. *See also* ¶218 (Richison emphasizing "great visibility" into revenue guidance); *Pluralsight*, 45 F.4th at 1262-64.

### 2. Defendants Were Warned That Beti Would Cannibalize Unscheduled Revenues and Hurt Cross-Selling and Retention

In April 2021, Paycom established the BGTM team reporting to Shelly Ballew, assigned by Richison to lead the project. The BGTM team, tasked with identifying risks before Beti's launch, identified the following risks from Beti: (i) elimination of revenues from unscheduled payroll errors; (ii) opposition from existing clients; and (iii) that CRRs would be unable to sell and implement Beti while also cross-selling. ¶¶53-55, 57-58. The BGTM team briefed Ballew about the risks, who then met with Richison to discuss them. ¶¶58, 195-97. These warnings quickly came to fruition. By September 2021, two months after Beti's launch, CRRs were voicing complaints from current clients about forced adoption of Beti, including that it was

---

[15] *See also* ¶¶159-61 (8/1/23 admissions cross-selling "has been down year-over-year" and "cost us 15 to \$20 million in bookings [through Q2]" which was "***self-inflicted***" "because we've remained very disciplined" in focusing CRRs on "converting our client base to Beti[]"; ¶179 (12/6/23 admission CRRs had cross-sold "a lot less [at least \$20 million] than they've ever done … because they're out there on-site with clients, helping them utilize [Beti] … I'm not going to say that we weren't [pushing them]" to do so); ¶¶181-88 (2/7/24 release admitted retention rate was overstated during Class Period due to *Defendants'* changes to when clients are deemed "lost," and restated 2022 rate from 93% to 91%); ¶¶189-90 (6/4/24 admission that existing clients were "not all keen on [adopting Beti]").

destroying client relationships and hindering CRRs' cross-selling, which were conveyed to the Individual Defendants. ¶¶71, 200. That Defendants were forewarned of adverse consequences of mandating Beti for existing customers supports scienter. *See Adams*, 340 F.3d at 1105 (that defendant was forewarned of acquisition's unprofitability supported scienter); *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2022 WL 716653, at *8 (D. Utah Mar. 9, 2022) (scienter where defendants "knew about [undisclosed] serious critiques" of product).

Defendants dismiss the BGTM team's warnings as insufficiently "particularized" to plead they ever reached Richison. DB22-24. But Plaintiff alleges Ballew discussed such risks directly with Richison before Beti's launch. ¶¶58, 69, 194, 196. It strains credulity that Ballew would *not* discharge her duty and report to Richison the identified risks. *See Christine Asia Co., Ltd. v. Ma*, 718 Fed. App'x 20, 23 (2d Cir. 2017) ("virtually inconceivable [important] threat was not communicated to … management"); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *30 (D.N.J. June 5, 2020) (CW's reporting of issues to supervising officer "support[ed] inference that other high-level executives [] became aware of [them]"). [16] Defendants' fallback argument—that it was within Richison's purview to ignore known risks (DB24)—misses the point. Senior executives who make misleading statements by

---

[16] Defendants' cases (DB23-24) are inapposite. *Anderson v. Spirit AeroSystems Hldgs., Inc.*, 827 F.3d 1229, 1246 (10th Cir. 2016) (conclusory allegations of defendants' titles, meeting attendance, and receipt of cost data did not support inference they knew project would not eventually breakeven); *Level 3*, 667 F.3d at 1344-45 (finding no scienter where even if defendants reviewed the internal reports, plaintiff failed to allege they contained facts contradicting public statements); *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1307 (10th Cir. 2020) (failure to allege meetings involved anything beyond routine compliance matters); *Meitav Dash Provid. Funds & Pension Ltd. v. Spirit AeroSystems Hldgs. Inc.*, 79 F.4th 1209, 1224 (10th Cir. 2023) (no allegation any relevant information conveyed to CEO in meetings); *MHC Mut. Conv. Fund, L.P. v. Sandler O'Neill & Ptnrs, L.P.*, 761 F.3d 1109, 1122 (10th Cir. 2014) (bare allegation of routine meeting attendance). Unlike these cases, here, Ballew communicated both data and *actual* Beti-related *risks* to Richison, and Richison admittedly reviewed detailed reports that, according to CWs, showed increasing client attrition due to Beti. *See* §III.C.3, 5, *infra*.

mischaracterizing or failing to disclose known, substantial risks act with scienter. ¶¶89, 192-225, 280. *Adams*, 340 F.3d at 1105.

Defendants further argue that allegations regarding the CRRs' complaints about existing client dissatisfaction and departures because of being forced to use Beti, and inability to cross-sell, and Paycom's October 2021 national sales meeting, are too "vague and conclusory." DB24-25. But the Complaint alleges the requisite "who" (CRRs), "what" (at least 50% of existing customers refused to adopt Beti, many of which were canceling their contracts, and Paycom's Beti focus was adversely impacting cross-sales), "when" (by September 2021 and continuing throughout the Class Period) and "why" (forced Beti adoption). Notably, Defendants do not deny this deluge of complaints occurred (or when, why, and by whom), nor that they were so serious that Paycom called a national sales meeting in October 2021 in response (¶¶93, 201) (for which Plaintiffs allege the location, time, attendees, and substance of what was said), nor what Defendants including Richison communicated thereat, and thereafter.[17]

Lastly, Defendants claim Richison "addressed [clients'] concerns" at the October 2021 training (conceding his knowledge) and suggest it was possible they were fixed by the Class Period. DB25. But knowledge of adverse facts pre-Class Period is classic indicia of scienter. *See Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 259 n.13 (3d Cir. 2009) ("'[B]oth post-class-period data and pre-class data'" relevant "to 'confirm what a defendant should have known'"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (same). Further, the Complaint refutes Defendants' argument as it alleges customer dissatisfaction and complaints *continued*, and even worsened, throughout the Class Period (*e.g.*, CW1 corroborated many more clients were leaving Paycom by April 2022, with "tons" leaving towards the end of 2022 and into 2023) because

---

[17] Defendants argue Plaintiff does not state a claim because Richison did not promise Beti was issue-free (DB24), but ignore Defendants were touting Beti adoption and resulting increased retention by existing clients at the same time they knew existing clients were leaving because they did not want to be forced on Beti. *See Adams*, 340 F.3d at 1105.

Richison *did not* address client concerns and, instead, increased pressure to adopt Beti. ¶¶76-90, 92, 94, 96, 99-101, 202, 211-14, 221 (allegations, including CW accounts and Lost Clients and SaveOps reports, of continued problems during Class Period); § III.C.1., *supra*.[18]

### 3.   Defendants' Review of Internal Company Reports and Data Support Scienter

Defendants knew mandating Beti adversely affected results because they received and reviewed Retention, Usage, SaveOps, and Lost Clients Reports showing client attrition throughout the Class Period from trying to force Beti on customers. ¶¶41-46, 94, 96, 99, 208-13. Richison admittedly personally reviewed Retention and Usage Reports, and Defendants knew how Paycom tracked retention. ¶41; ¶¶211, 214-15 (Richison's statements displaying consistent familiarity with retention; Boelte's statement on regular analysis of usage data). Defendants do not dispute they received Retention and Usage Reports or that these reports showed data on client retention trends and usage of Beti. ¶¶208-16.[19]

Additionally, CW3 stated Richison requested the *weekly* Lost Client Report, showing the number of clients lost that week and reasons why, and the SaveOps Report, showing clients at risk of being lost. ¶¶42-44. CW3 created and delivered both reports, based on CRR-supplied data, to Richison for weekly Thursday meetings. *Id.* CW2 confirmed Richison regularly

---

[18] In *Wolfe v. AspenBio Pharma, Inc.*, 587 Fed. Appx. 493 (10th Cir. 2014) (DB25), unlike here, defendant cryptically said product "wasn't working" 1.5 years *pre*-Class Period, and there were no allegations it continued not to work.

[19] Defendants argue still more detail must be pled, but here they **have *admitted receiving and reviewing*** the reports and do not dispute their existence or contents. Thus, this is not a case that rests on conclusory allegations of mere "access" to unspecified reports, as in Defendants' cases (DB25-26). *See Meitav Dash*, 79 F.4th at 1216-17 (noting *in dicta* that "access" to information "alone" was not enough; no allegations defendants received report); *Anderson*, 827 F.3d at 1239-43 (no allegation defendants received cost reports or what final reports said); *Level 3*, 667 F.3d at 1345 (isolated "puzzle pieces" from "low [company] expenditure levels" not inconsistent with defendants' high-level "progress estimates", and "critical terms … [were] open to multiple interpretations.").

reviewed these Reports in meetings, and CW4 stated they were circulated Company-wide at least monthly, Richison referenced content on the Report, and Paycom executives were notified when significant clients appeared on the SaveOps Report. ¶¶45-46. CW1, CW2 and CW4 corroborated that the Lost Clients and SaveOps Reports showed that prior to and during Class Period, Paycom's existing clients were leaving Paycom because they did not want or need Beti, and Paycom's internal metrics showed a revenue retention rate decline from 94% to 90% from 2021 to 2023, as Paycom ultimately disclosed. ¶¶45-46, 94, 96, 101-02 ("tons of clients" lost in 2022 to 2023, as seen in Admin B2 System accessible by Defendants).[20]

These allegations are also supported by Richison's repeated claims on earnings calls that "we" (*i.e.*, including Boelte) have "great visibility" into revenue, and their frequent statements confirming Defendants monitored and closely tracked retention, Beti adoption and usage rates. ¶¶218-21.[21] Thus, Defendants' false assurances were made with scienter. *See Pluralsight*, 45 F.4th at 1263 ("careful[] monitor[ing]" of data supports scienter); *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *17 (S.D.N.Y. Mar. 29, 2024) (defendant's claims of good "visibility"

---

[20] *See also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (CW statements that sales were declining, sales reports "automatically delivered to the management team," and executives had "habit of 'continually monitor[ing] the Company's revenue and earnings[,]'" supported scienter); *Weston*, 669 F. Supp.3d at 884 (CWs statements that defendants "tracked metrics including product usage and retention" which "plausibly show[ed] that the individual defendants had access to and monitored data indicating [the] decline in customer demand sufficient). Defendants argue for more detail as to these Reports (DB27), but do not contest they received or reviewed such reports, nor what they showed. Plaintiffs allege the reports' titles; how they were created and sent, and by whom; frequency of receipt (weekly); that they showed lost clients, and clients at risk of being lost, and the reasons therefor (being forced on Beti); and CW corroborations that the reports showed throughout the Class Period that existing clients were leaving Paycom because they did not want Beti. *See Scholastic*, 252 F.3d at 73 (similar allegations sufficient).

[21] Richison also admitted reviewing metrics showing CRRs spent at least 3 days per week implementing Beti, hurting cross-selling (¶¶159-61; *see also* ¶¶80-90 (CRR daily reports to CSO Faurot about Beti client meetings and management reactions thereto)), and Boelte admitted Usage reports indicated cannibalization of unscheduled revenues. ¶¶167, 214-15.

supported scienter); *Or. Laborers Emps. Pension Tr. Fund v. Maxar Techs. Inc.*, 2020 WL 5500458, at *14 (D. Colo. Sept. 11, 2020) (close monitoring); *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1125 (D. Colo. 2017) ("access to" and "continuous[] review[] and analy[sis]" of data supported scienter); *Williams*, 496 F. Supp.2d at 1282 (scienter where defendants "knew facts or had access to non-public information contradicting" statements).

### 4. Defendants' Intentional Delayed Removal of Lost Clients from Reported Revenue Retention Totals, Supports Scienter

CW1 stated that Paycom's Turn Team, responsible for terminating accounts of lost clients, told CW1 that Paycom was "losing tons of clients" in late 2022 and 2023, yet Richison instructed the Turn Team to delay removing such clients from the "active" client list to prevent a large hit to Paycom's publicly reported client count and retention rate. ¶¶99-104. CW1 personally observed this through the Admin B2 System. *Id.*[22] After the Class Period, Defendants confirmed CW1's account when Paycom restated its retention rate for 2022 and (as of July 2023) had "accelerat[ed] the point at which a client is deemed 'lost' for purposes of [Paycom's] annual revenue retention rate calculation[,]" resulting in a downward revision of its annual revenue retention rate, representing tens of millions of dollars in revenue attrition. ¶¶104, 181-88, 224. "[I]ncongruity between word" (Defendants representing lost clients as active) "and deed" (concealing such clients had terminated their contracts), supports scienter. *Edge v. Tupperware Brands Corp.*, 2023 WL 6310236, at *6 (M.D. Fla. Sept. 28, 2023).

### 5. Richison's Extensive Personal Involvement With Beti Supports Scienter

As the Complaint alleges, Richison admitted, and CWs confirmed, "Beti was Richison's baby," vision, and idea, with which he was so enamored that he insisted Paycom's entire client

---

[22] That Richison's compensation was based on Paycom's retention rate further supports that he was motivated to stay close to, and manipulated, inputs thereto. ¶¶226-27.

base had to adopt it, and he was willing to lose customers and revenues to make that happen. *See* ¶¶51-52, 56, 95, 197, 206 (*e.g.*, Richison emphasizing "*everything is about Beti*," and that "***I*** tell our salespeople **all the time** … **I don't have anything else** for you to sell.[']" other than Beti, "… a strategy that we've been continuing to drive."); *see also* ¶¶194, 199, 204-07. Richison also admitted he had changed CRRs' responsibilities, directed them to refocus efforts from cross-selling to selling and implementing Beti, and ordered the tripling of CRRs' commissions for selling Beti, indicating his awareness that customers were resisting Beti adoption requiring such drastic measures to prop up his crusade. ¶¶159-61, 205 (*e.g.,* "**I've said** … this is your priority").

Not only did Richison personally issue the mandate forcing Beti on existing customers (¶¶5, 66, 199, 206), he tracked Beti adoption and usage like a hawk, reporting on adoption and usage rates each quarter, and thus was well aware of existing clients' resistance to adoption and reasons therefor. ¶¶97-98, 219-21. Richison's personal direction of Beti and obsessive focus on its adoption rates indicate his false assurances were made with scienter. *See Peace Officers' Annuity & Ben. Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1154 (D. Colo. 2019) (scienter where executives personally involved in monitoring key metrics). [23] Lastly, the Individual Defendants' scienter is imputable to Paycom. *Adams*, 340 F.3d at 1106.[24]

---

[23] Defendants' cases (DB25) are inapposite. In *Smallen*, 950 F.3d at 1308, while the court noted the CEO's status was "relevant," there was no indication he was familiar with any of the facts at issue); *Wolfe*, 587 F.App'x at 497-98 (similar; *supra*).

[24] Defendants argue no scienter facts connect to Boelte's false statement about revenue retention rates (¶144). DB29-30. But they ignore that, *e.g.*: Boelte admitted Paycom had made intentional "strategic… client value decisions" mandating Beti usage, despite knowing it caused lost clients (¶¶168-69); received Retention and Usage reports reflecting many clients refused to use Beti and were leaving (¶¶10, 212); was made aware by CRRs and CW1, through the reporting chain, of complaints that mandating Beti was destroying CRR relationships with existing customers (¶¶71, 200), and the delay in removing terminated clients (¶102); and Richison, on calls with Boelte, claimed "*we*" have "great visibility" into revenues and guidance. ¶218.

28

### 6.    Holistic Review Provides a Strong Inference of Scienter

A holistic review of the allegations gives rise to an unavoidable inference of scienter at least as compelling as any opposing, non-fraudulent inference. Defendants single-mindedly insisted on mandating Beti for existing clients, and falsely and misleadingly described customer satisfaction with it, client retention, and cross-selling revenues, ***despite knowing*** before and during the Class Period from Company meetings and detailed reports, among other sources, that: (i) existing clients objected to the Beti mandate, driving attrition and decreasing retention rates; (ii) Beti cannibalized revenues from billable corrections; and (iii) Richison's order that CRRs focus on Beti implementation significantly reduced cross-selling revenues. Defendants later admitted they knew of the adverse consequences of forced Beti adoption, but had made a "strategic" decision to continue mandating it, on Richison's internal mantra that "if a customer doesn't want [] Beti then we don't want them." Moreover, while motive is not necessary to plead scienter (*Nakkhumpun*, 782 F.3d at 1152), the Individual Defendants had financial motive to inflate Paycom's stock price and retention rate as their compensation was based on "the daily volume weighted average price of [Paycom's] common stock *and annual retention rate*[.]" ¶226. *Nguyen v. New Link Genetics Corp.*, 297 F. Supp.3d 472, 498 (S.D.N.Y. 2018) (incentive plan supported scienter because bonuses "were tied to a specific goal" relevant to claim). Defendants' lone case is inapposite. DB28-29. *See In re Imergent Sec. Litig.*, 2009 WL 3731965, at *11 (D. Utah Nov. 2, 2009) ("appeas[ing] the client" insufficient motive for auditor-defendant).

Considered holistically, these allegations more than suffice to raise a strong inference of scienter at least as compelling as Defendants' opposing inference—that they adequately disclosed Beti's risks, adoption and retention rates, and were merely "optimistic." *Tellabs*, 551 U.S. at 325-26; *Yellowdog*, 426 F. Supp.3d at 876.

29

**D.     The Complaint Adequately Alleges a Claim under Section 20(a)**

Because Plaintiffs have adequately pled primary violations of §10(b), they have also stated claims for control person liability under §20(a). *DaVita*, 372 F. Supp. 3d at 1156.

**IV.     CONCLUSION**

For the foregoing reasons, the Motion should be denied in full. If the Court dismisses any part of the Complaint, Plaintiffs request leave to amend. *Shafer v. Lightning Emotors, Inc.*, 2024 WL 691458, at *18 n.9 (D. Colo. Feb. 20, 2024) ("[l]eave to amend is to be granted with extreme liberality in securities fraud cases[]") (citations omitted), *recommendation adopted*, 2024 WL 1509166, at *3 (D. Colo. Mar. 26, 2024).

DATED:        November 5, 2024              Respectfully submitted,

/s/ *Shannon L. Hopkins*

Shannon L. Hopkins (admitted *pro hac vice*)
**LEVI & KORSINSKY, LLP**
Gregory M. Potrepka (admitted *pro hac vice*)
Andrew E. Lencyk*
David C. Jaynes*
P. Cole von Richthofen*
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: 203-992-4523
shopkins@zlk.com
gpotrepka@zlk.com
alencyk@zlk.com
djaynes@zlk.com
cvrichthofen@zlk.com

*Lead Counsel for Plaintiff*
*Dr. Calvin Mein*

**FEDERMAN & SHERWOOD**
William B. Federman, OBA #2853
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Tel: (405) 235-1560
Fax: (405) 239-2112

30

wbf@federmanlaw.com

*Liaison Counsel for Plaintiff*
*Dr. Calvin Mein*

\* *Pro hac vice* application forthcoming

31